IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

FRABIAN ELI CARRION,
an individual

       Plaintiff,

v.

EMMANUEL GAZMEY SANTIAGO,
an individual and REAL HASTA LA
MUERTE, LLC., a Florida limited
liability company,

       Defendants.
_____/

EMMANUEL GAZMEY SANTIAGO,
an individual and REAL HASTA LA
MUERTE, LLC., a Florida limited
liability company,

       Counter-Plaintiffs,

v.

FRABIAN ELI CARRION,
an individual

       Counter-Defendant.
_____/

Case No: 22-016738-CA-01 (CA06)

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AND DEFENDANTS' COUNTERCLAIM

Defendants EMMANUEL GAZMEY SANTIAGO ("Artist") and REAL HASTA LA MUERTE, LLC ("Company") (collectively, "Defendants"), by and through undersigned counsel, hereby files their Answer and Affirmative Defenses to Plaintiff FRABIAN ELI CARRION's ("Carrion" or "Plaintiff") Complaint, and hereby files their Counterclaim, alleging as follows:

## JURISDICTION[1]

1.    Admitted for jurisdictional purposes only, and denied as to liability.

## PARTIES

2.    Defendants are without knowledge and therefore denied.

3.    Admitted.

4.    Admitted.

## VENUE

5.    This paragraph contains a legal conclusion and therefore no response is required.

## CONDITIONS PRECEDENT & ATTORNEY'S FEES

6.    Denied.

7.    Denied.

## GENERAL ALLEGATIONS

8.    Denied.

9.    Admitted.

10.   Denied as stated.

11.   Denied.

12.   Admitted in that Artist recorded and released music while incarcerated, and otherwise denied.

13.   Admitted in that Artist released his debut album on or about July 17, 2018 following his release from prison, and otherwise denied.

14.   Admitted.

15.   Denied as stated.

---

[1] Defendants adopt the headings provided by Plaintiff in his Complaint for convenience and reference purposes only.

16.   Admitted.

17.   Admitted that Plaintiff was a member of Company and its Chief Executive Officer, and otherwise denied.

18.   Admitted that Artist has had success in the music industry, engaged in strategic business partnerships and purchased a professional basketball team in Puerto Rico, and otherwise denied.

19.   Admitted that Artist terminated the Management Agreement (attached as Exhibit A to Plaintiff's Complaint), and otherwise denied.

20.   Admitted that Plaintiff was removed as member of Company on or about August 22, 2022, and otherwise denied.

21.   Admitted that Plaintiff was also removed from Company's bank account, and otherwise denied.

22.   Denied.

## COUNT I – BREACH OF MANAGEMENT AGREEMENT
### (Against the Artist)

23.   Defendants reaffirm their responses to paragraph 1-22 above and further responds:

24.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

25.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

26.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

27.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

## COUNT II – UNJUST ENRICHMENT
### (Against the Artist and the Company- In the Alternative)

28.   Defendants reaffirm their responses to paragraph 1-22 above and further responds:

29.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

30.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

31.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

## COUNT III – CONSTRUCTIVE TRUST
### (Against the Artist)

32.   Defendants reaffirm their responses to paragraph 1-22 above and further responds:

33.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

34.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

35.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

36.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

37.   This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

<u>**COUNT IV – ACCOUNTING**</u>
<u>**(Against the Artist and the Company)**</u>

38.    Defendants reaffirm their responses to paragraph 1-22 above and further responds:

39.    This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

40.    This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

41.    This paragraph contains a legal conclusion and therefore no response is required. To the extent a response is required, such allegations are denied.

<u>**AFFIRMATIVE DEFENSES**</u>

<u>**First Affirmative Defense**</u>

Plaintiff's claims are barred, in whole or in part, by estoppel and/or waiver to the extent Plaintiff failed to comply with its contractual and/or professional obligations to Defendants. Specifically, Plaintiff breached the Management Agreement at issue by, among other things, executing documents in Defendants' name without Artist's knowledge, written consent or ratification, as required by the Management Agreement, as well as transferring and converting significant funds from the Company's accounts without authorization, which Plaintiff used to fund his own extravagant lifestyle; to satisfy his and his family's personal and professional obligations unrelated to the Defendants; and otherwise to benefit himself to the detriment of the Defendants.

<u>**Second Affirmative Defense**</u>

The injuries and damages sustained by Plaintiff, if any, as a result of the purported occurrences set forth in Plaintiff's Complaint were caused, in whole or in part, by Plaintiff's own fraudulent acts and omissions, and/or other illegal acts and omissions of Plaintiff, including but not limited to, Plaintiff breaching the Management Agreement at issue by, among other things,

executing documents in Defendants' name without Artist's knowledge, written consent or ratification, as required by the Management Agreement, as well as transferring and conversion significant funds from the Company's accounts without authorization, which Plaintiff used to fund his own extravagant lifestyle; to satisfy his and his family's personal and professional obligations unrelated to the Defendants; and otherwise to benefit himself to the detriment of the Defendants.

### Third Affirmative Defense

The injuries and damages sustained by Plaintiff, if any, as a result of the purported occurrences set forth in Plaintiff's Complaint were caused, in whole or in part, by Plaintiff's breach of contract, fault, and failure to act. Examples of such include but are not limited to, Plaintiff breaching the Management Agreement at issue by, among other things, executing documents in Defendants' name without Artist's knowledge, written consent or ratification, as required by the Management Agreement, as well as transferring and converting significant funds from the Company's accounts without authorization, which Plaintiff used to fund his own extravagant lifestyle; to satisfy his and his family's personal and professional obligations unrelated to the Defendants; and otherwise to benefit himself to the detriment of the Defendants.

### Fourth Affirmative Defense

Depending on Plaintiff's claims at trial, and to the extent Plaintiff alleges oral discussions and/or modifications, Plaintiff's claims are barred, in whole or in part, by the parol evidence rule and/or the statute of frauds to the extent the alleged oral discussions and/or modifications were not reduced to writing. In fact, the Management Agreement explicitly states that "no modification, amendment, waiver, or change shall be valid except in a writing signed by both parties hereto." *See* Exhibit A to Plaintiff's Complaint.

**Fifth Affirmative Defense**

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands. Examples of such include but are not limited to, Plaintiff breaching the Management Agreement at issue by, among other things, executing documents in Defendants' name without Artist's knowledge, written consent or ratification, as required by the Management Agreement, as well as transferring and converting significant funds from the Company's accounts without authorization, which Plaintiff used to fund his own extravagant lifestyle; to satisfy his and his family's personal and professional obligations unrelated to the Defendants; and otherwise to benefit himself to the detriment of the Defendants.

**Sixth Affirmative Defense**

Plaintiff has failed to state a cause of action upon which relief can be granted. Plaintiff's claim for breach of contract against Defendants fails to state a cause of action against Defendants as Plaintiff committed blatant fraud and unequivocally materially breached the Management Agreement, prior to Artist's termination thereof, such that immediate termination, notwithstanding the notice provision of the Management Agreement was sufficient and equitable. Notwithstanding, there is no provision in the Management Agreement regarding Defendants being obligated not to remove Plaintiff as a manager of the Company or not to remove Plaintiff from the Company bank account. As it relates to Plaintiff's claim for damages from Artist's alleged breach of the Management Agreement and from unjust enrichment, it is axiomatic that Plaintiff cannot, either legally or equitably, be permitted to make such assertions considering Plaintiff is currently in possession of, and has already used and converted, millions of dollars belonging to the Defendants for his own personal and professional benefit to Defendants' detriment. As a result of Plaintiff's

acts, as outlined above, Plaintiff cannot be entitled to a constructive trust and/or an accounting from Defendants.

### Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because of lack of consideration. Plaintiff conveyed no consideration, or insufficient consideration, to Defendants to support its present contract-based claims or equitable claims. Plaintiff so blatantly failed to perform his contractual obligations to Artist under the Management Agreement, and his fiduciary duties to Defendants as Artist's manager and the CEO of the Company, that Defendants have lost millions of dollars already, and may be required to spend significant sums of money to rectify issues created by Plaintiff. Considering the Management Agreement, obligated Plaintiff "to do all things necessary and desirable to promote Artist's career and maximize earnings therefrom," Plaintiff provided no consideration, or at minimum insufficient consideration, to supports his current claims.

### Eighth Affirmative Defense

To the extent that Plaintiff alleges any recoverable damages in this action, such damages are subject to set-off. Plaintiff breached the Management Agreement at issue by, among other things, executing documents in Defendants' name without Artist's knowledge, written consent or ratification, as required by the Management Agreement, as well as transferring and converting significant funds from the Company's accounts without authorization, which Plaintiff used to fund his own extravagant lifestyle; to satisfy his and his family's personal and professional obligations unrelated to the Defendants; and otherwise to benefit himself to the detriment of the Defendants. In doing so, Plaintiff has caused Defendants to lose millions of dollars for which Defendants are rightfully entitled, and thus, even if Plaintiff is entitled to damages in connection with his claims, such damages will be far less than the damage Plaintiff's acts have caused to Defendants.

## RESERVATION OF RIGHTS TO AMEND AFFIRMATIVE DEFENSES

Defendants reserve the right to allege additional affirmative defenses as they may present themselves in the future or otherwise may be learned through discovery.

## JURY DEMAND

Defendants demand a jury trial on all issues so triable.

## DEFENDANTS'/COUNTER-PLAINTIFFS' COUNTERCLAIM AGAINST CARRION

Defendants/Counter-Plaintiffs' EMMANUEL GAZMEY SANTIAGO ("Artist") and REAL HASTA LA MUERTE, LLC ("Company") (collectively, "Counter-Plaintiffs"), by and through undersigned counsel, and pursuant to Rule 1.170 of the Florida Rules of Civil Procedure, hereby file their Counterclaim against Plaintiff/Counter-Defendant FRABIAN ELI CARRION ("Carrion"), alleging as follows:

## NATURE OF THE CASE

1.      This is an action for, among other things, fraud, breach of contract, breach of fiduciary duty, and conversion stemming from the unequivocal failures of Carrion to perform his contractual obligations to, and act in the best interest of, the Counter-Plaintiffs. The contract at the forefront of this action—*i.e.*, the contract which expressly set forth Carrion's obligations to, and authority to act on behalf of, the Counter-Plaintiffs, and through which Carrion carried out his fraudulent scheme to exploit the Counter-Plaintiffs by, among numerous other acts and omissions, grossly exceeding his authority—is the Management Agreement between Artist and Carrion dated March 8, 2019 (the "Management Agreement"). *See* Plaintiff's Complaint, at Exhibit A.

2.      In fact, in complete and utter contravention of his contractual and fiduciary duties; all reasonable sense of morality; and his years long friendship with Artist, which led Artist to place

his full trust in Carrion, Carrion (i) entered into contracts, and executed binding documents in connection therewith, on behalf of the Counter-Plaintiffs without Artist's knowledge, and Artist's written consent or ratification, as required by the Management Agreement and otherwise; (ii) conspired with third parties to hike prices on, among other things, real estate, private jets and automobiles in return for "kickbacks"; and (iii) ultimately, bilked Counter-Plaintiffs out of millions of dollars for which they are rightfully entitled.

3.      Carrion thereafter used the stolen monies to fund his own extravagant lifestyle; to satisfy his and his family's personal and professional obligations unrelated to the Counter-Plaintiffs; and otherwise to benefit himself to the detriment of the Counter-Plaintiffs.

## PARTIES, JURISDICTION, and VENUE

4.      Artist, known professionally as Anuel AA, is an individual resident of the State of Florida, and a widely acclaimed recording artist in the Latin trap music genre. Artist is otherwise *sui juris*.

5.      Company is a Florida limited liability company organized pursuant to the laws of the State of Florida, with its principal place of business located in Miami, Florida.

6.      Carrion is an individual resident of the State of Florida, and is otherwise *sui juris*.

7.      This Court has jurisdiction over this Counterclaim because it arises out of the same transaction or occurrence that is the subject matter of the Plaintiff's Complaint, and because the Counter-Plaintiffs seek recovery in excess of the jurisdictional threshold, exclusive of attorneys' fees and costs.

8.      Venue is appropriate in Miami-Dade County, Florida pursuant to the express terms of the Management Agreement, and because a significant amount of the events and transactions underling this Counterclaim, as well as the damages suffered as a result of Carrion's acts and omissions, as outlined herein, occurred in this judicial district.

9.      All conditions precedent to maintaining this action have occurred, been performed or waived, or are otherwise futile.

## GENERAL ALLEGATIONS

10.     Artist began his rise to superstardom in approximately 2010. He released his first album, entitled "Real Hasta la Muerte," in July of 2017.[2] In fact, Artist was "one of the Boricua," *i.e.*, native Puerto Rican, rappers, "who spearheaded the Latin trap movement." *Id,*

11.     The album was wildly successful, leading to Artist being named the Artist of the Year, Favorite Male Artist and Favorite Urban Artist, and the album being named the Album of the Year and Favorite Urban Album, at the 2019 Latin American Music Awards.[3]

12.     Artist was also named the New Artist of the Year at the 2019 Billboard Latin Music Awards, as well as being nominated as the Top Latin Artist at the 2019 Billboard Music Awards, with the album also being nominated for Top Latin Album of the Year by both publications.[4]

13.     Artist has continued to have significant financial success, both in the music industry, and through alternative business endeavors, and has been nominated for a number of other awards over the last few years.

14.     Artist and Carrion had been friends for some time, yet despite their friendship, and despite Carrion having earned significant sums of money over the years acting as Artist's representative

---

[2] *See* Paul Simpson, *Anuel AA – Artist Biography*, https://www.allmusic.com/artist/anuel-aa-mn0003551236/biography (last visited November 10, 2022).

[3] *See* Jessica Rolz, *Latin American Music Awards 2019: See the Complete List of Nominees*, Billboard (September 4, 2019), https://www.billboard.com/music/latin/latin-amas-2019-nominations-list-8528783/.

[4] *See* Jennifer Drysdale, *Billboard Latin Music Awsrds 2019: All of the Best Performances, Biggest Winners and Most Memorable Moments,* ET Online (April 7, 2019), https://www.etonline.com/billboard-latin-music-awards-live-updates-today-2019-04-25; *see also* Joe Lynch, *2019 Billboard Music Award Winners: The Complete List, Billboard* (May 1, 2019), https://www.billboard.com/music/awards/billboard-music-awards-2019-winners-list-8509655/.

in the entertainment industry, and as a direct result of Artist's personal successes, Carrion maliciously exploited that friendship, breached his obligations and fiduciary duties to the Counter-Plaintiffs, and conspired with third parties to defraud the Counter-Plaintiffs out of millions of dollars between 2018 and 2022, as further outlined herein.

## I.    The 2018 Letter of Intent

15.    On or about June 20, 2018, Artist and Carrion first entered into a contractual agreement in connection with Carrion's representation of Artist. The letter of intent, attached as Exhibit A hereto, entitled Carrion to act as Artist's exclusive manager in the entertainment industry–defined as "all recording business, publishing, artistic presentations, tours, sponsorships, merchandise, and acting." *See* Exhibit A.

16.    In consideration for Carrion's services thereunder, Artist agreed to pay Carrion ten percent (10%) of gross income earned from Artist's endeavors in the entertainment industry. Notably, from the outset of the relationship, it was understood and agreed that Carrion was to "seek the consent or ratification of [Artist] for each business before approving it." *Id.*

## II.    The Creation of the Company and the SST Agreement

17.    The Company, named after Artist's first album, was created on or about July 30, 2018 for the purposes of performing certain functions, including acting as a loan-out entity, in connection with Artist's music and business endeavors. As indicated by the Company's Articles of Organization, Artist was the Company's initial registered agent, sole authorized representative, and sole member/manager. *See* Exhibit B, Initial Articles of Organization for the Company.

18.    On or about August 30, 2018, and based upon the advice of, and representations made by, Carrion, Counter-Plaintiffs entered into an Attorney-Client Contingency Agreement with the law firm Singh, Singh & Trauben ("SST"), and firm partner, Simran Singh ("Singh"), pursuant to

which Artist and Company agreed to pay SST seven percent (7%) of all Compensation (as defined therein) "earned or accrued by Client or Client's affiliated companies, arising out of or in connection with any agreement for which Attorney [SST] has rendered any services" during the term of the agreement. *See* Exhibit C, SST Agreement.

19.    At Carrion's urging, and based on Simran's representations, Artist eventually acquiesced in entering into the SST Agreement, which was drafted by Singh and/or one of Singh's associates at SST. *See Id.*

### III.    Counter-Plaintiffs Enter Into The Kobalt Agreement

20.    On or about October 25, 2018, the Counter-Plaintiffs entered into an Administration Agreement with Kobalt Music Services America, Inc. ("Kobalt"), through which Kobalt was granted specified rights, including the right to administer and exploit certain musical compositions written and/or produced by Artist. *See* Exhibit D, Kobalt Agreement.

21.    The Kobalt Agreement required all payments made to Kobalt, and/or otherwise owed to Artist thereunder, to be made directly to the Company, with Carrion being named an authorized representative of the Company *solely as it related to granting or withholding approval for Kobalt's uses of Artist's musical compositions contemplated therein. Id.* (emphasis added).

22.    Counter-Plaintiffs received an advance deposit from Kobalt in connection with the Kobalt Agreement on or about November 14, 2018, and approximately one-week later, ten percent (10%) of the advance deposit was paid by the Company to Carrion, as agreed pursuant to the Letter of Intent*, see* Exhibit A. In actuality, Carrion was overpaid in that he received ten percent (10%) of Artist's earnings prior to deductions for production costs, and other necessary expenses.

**IV.**    **Artist and Carrion Expand Their Professional Relationship**

23.    On or about March 8, 2019, Artist and Carrion entered into a long form Management Agreement to govern the parties' relationship. *See* Plaintiff's Complaint, at Exhibit A.

24.    Significantly, the impetus to approach Artist regarding entering into the long form Management Agreement came from Singh, who subsequently induced Artist into entering into the agreement by representing to Artist that he would personally review, and advise and act as Artist's fiduciary with regard to, the Management Agreement,

25.    The Management Agreement provided, in pertinent part, as follows:

> (a) Artist hereby engages Manager [Carrion] to serve as Artists' exclusive manager in the Entertainment Business[5] … commencing on the Effective Date hereof and continuing for a period of seven (7) years (the "Term");[6]

> (b) Manager agrees **to use best efforts to devote himself to Artist's career in the entertainment business** and to do all things necessary and desirable to promote Artist's career and maximize earnings therefrom; and

> (c) Artist hereby authorizes and empowers Manager, and Manager agrees subject to the limitations set forth herein this Agreement: to [among other things] (a) to represent, advise and assist Artist in fixing the terms governing all manner of disposition, use, employment or exploitation of Artist's talent and the products thereof … (c) to supervise Artist's professional employment in the Entertainment Business on Artist's behalf and consult with employers and prospective employers so as to assure the proper use and continued demand for Artist's services … (i) **to generally promote the best interest, professional and artistic value,**

---

[5] The "Entertainment Business" is defined in the Management Agreement as "music, live performance, personal engagements, amusement, motion picture, television, endorsements and branding, theatrical and advertising fields and all similar areas throughout the music industry in which Artist's artistic talents are developed and exploited. *Id.*

[6] Crucially, as it relates to this action, Carrion's services under the Management Agreement were not exclusive to Artist, however, the Management Agreed specifically stated that Carrion's representation of other artists and performers could "not adversely affect ... Artist's career and/or earnings," or otherwise create a "conflict of interest." *Id.* The Management Agreement further specified that in the event of such Artist had the "right and power to terminate th[e] Agreement effective immediately." *Id.*

> ***profit, benefit and advantage of Artist***, and to advise and consult with
> regards to general practices in the Entertainment Business and with
> respect to such matters of which Manager may have knowledge
> concerning compensation and privileges for similar artistic value

*Id.* (emphasis added).

26.     While Artist permitted Manager to publicly hold himself out to be Artist's exclusive

manager in the Entertainment Business, the only express agency powers granted to Manager by

way of the Management Agreement were as follows:

> (a) sign agreements on Artist's … behalf ***provided that Artist has
> approved the terms of such agreements in writing***;
>
> (b) approve and permit the use of Artist's name (actual and
> professional), approved likeness, approved photographs and
> approved biographical material in marketing and promotion of
> Artist's career (***subject to prior approval of Artist***);
>
> (c) collect and receive all Gross Earnings payable to Artist; deposit
> or cash any and all checks or other instruments payable to Artist;
> and retain all sums owing to Manager; ***it being understood and
> agreed however that such rights and power shall not be
> extended beyond Gross Earnings earned by Artist as a result
> of Artist's activities in and throughout the Entertainment
> Business and shall not relate to any personal property owned
> by Artist***; and
>
> (d) audit and examine and records of parties with whom Artist has
> contractual or other rights to audit and examine books and
> records

*Id.* (emphasis added).

27.     As it related to Carrion's compensation in consideration for sufficient performance of his

contractual obligations, the Management Agreement stated:

> (a) As compensation for Manager's services rendered hereunder,
> and except as otherwise provided expressed herein, Artist
> hereby agrees to pay Manager a sum equal to ten percent (10%)
> of Artist's "Gross Earnings" … that are earned and received
> during the Term (the "Commission");

(b) The term "Gross Earnings," as used herein refers to the total of all monetary earnings, whether in the form of salaries, earnings, fees, bonuses, royalties, advances against royalties, sponsorship fees, endorsement fees, residuals, deferred compensation, shares of profits, or any other kind or type of income which is directly related to Artist's career in the Entertainment Business.

(c) Notwithstanding anything to the contrary herein, Gross Earnings shall specifically **_exclude_**: (i) bona fide recording costs paid by Artist, including any monies paid from part of an "advance" or recording fund received by Artist, or paid to third parties on behalf of Artist … (iii) any income derived from any business investments and entrepreneurial activities unrelated to Artist's career in the Entertainment Business … (x) any monies or other consideration paid or credited to Artist (or on Artist's behalf) and required to be paid and actually used by Artist to pay unaffiliated third-party co-publishers, co-writers, and songwriters or their designees … and (xvii) any sums paid to Artist's so-called "loan-out" companies as specific reimbursement for payroll taxes, guild or union pension and welfare payments;

(d) Artist shall reimburse Manager for reasonable, out-of-pocket, verifiable expenses incurred by Manager during the Term that are necessary for the performance of Manager's duties hereunder, **_but in no event shall Artist be responsible for any expenses related directly to Manager's general overhead expenses, operating expenses or any other costs or expenses incurred by Manager except as expressly provided for herein_**; and

(e) Notwithstanding the foregoing, Artist shall not be responsible for paying or reimbursing Manager for any expenses, cost or charge incurred by Manager whatsoever in excess of five hundred dollars ($500) (either single or expense or in the aggregate during any calendar month)("Manager Expense(s)"), **_unless such Manager Expense(s) are approved in writing by Artist prior to such Manager Expense(s) being incurred and unless Manager provides all receipts, vouchers, and/or other documentation as may be requested [by] Artist in its sole discretion, evidencing the expense, cost or charge_**

*Id.* (emphasis added).

28.   The Management Agreement further explained:

In the event that any party actually pays any Gross Earnings to Manager instead of Artist, Manager agrees to immediately pay Artist (or Artist's designee [e.g., Artist's legal counsel]) the entire amount of those Gross Earnings so that Artist's designee can carry out the terms of this Agreement with respect to the Commission, **unless Artist gives written approval for Manager to retain his Commission … and pay the balance to Artist accompanied with a copy of any statements received by Manager in connection therewith**

*Id.* (emphasis added).

29.     Shortly after entering into the Management Agreement, and based on the express and implied representations made by Carrion therein, as well as in reliance on their years long friendship, Artist showed his trust in Carrion by adding him as a manager of the Company (*see* Exhibit E, Company's 2019 Annual Report); naming him the Chief Executive Officer of the Company; and making him an authorized individual with respect to the Company's bank account at Chase Bank (the "Company Account").

30.     Carrion was never an equity owner in the Company, despite being added as a manager, and significantly, never contributed any financial capital whatsoever toward the Company.

## V.     Carrion Uses Stolen Company Funds and Receives Kickbacks In Furtherance of His Fraudulent Scheme

### (a) *Real Estate Purchases*

31.     In April of 2019, Artist purchased a condo in Sunny Isles, Florida, and in September of 2019, Artist purchased a home for his parents in Miami, Florida.

32.     Upon information and belief, Carrion agreed, and conspired, with real estate agent, Rafael Zuzolo ("Zuzolo") of Realty ONE Group Evolution, such that Carrion would assist Zuzolo in

getting Counter-Plaintiffs to pay a higher than necessary price for the real estate, and in return, Zuzolo would pay Carrion a percentage of the purchase price, or a flat fee, as a "kickback."[7]

33.   In November of 2020, Carrion purchased a home in Doral, Florida for a purchase price of approximately $3.17 million. Upon information and belief, between November of 2020 and present day no less than $1 million from the Company Account was used by Carrion, or at Carrion's direction, in connection with the purchase and remodeling of his home. *See* Exhibit F, Warranty Deed for Carrion's Home; *see also* Exhibit G, Company Account Statement for October 31, 2020 to November 30, 2020 (showing payment of $613,528.51 from the Company Account to the law firm Weisburg, Eisen & Possenti, P.A; the firm that prepared the warranty deed); *see also* Exhibit H, Checks from the Company to the Grand Floridian. Indeed, the payments were made without Artist's knowledge, and without written consent or ratification.

   (b) *Automobile Purchases*

34.   In January of 2019, Carrion purchased a 2018 Range Rover from Irenko Auto Sales, Inc. ("Irenko"), paying the entirety of the $21,000 down payment from the Company Account without Artist's knowledge, consent or ratification. *See* Exhibit I, Company Account Statement for January of 2019. Upon information and belief, a number of other payments towards Carrion's Range Rover have been made from the Company Account and/or from other accounts belong to the Counter-Plaintiffs.

35.   And, on or about August 21, 2020, Carrion—naming the Company as the buyer and himself as the co-buyer—purchased a 2012 Lamborghini Aventador from Irenko for a total purchase price of $354,536.20 without Artist's knowledge, consent or ratification. *See* Exhibit J, Retail

---

[7] Notably, without Artist knowledge, consent or ratification, on or about February 24, 2022, Carrion unilaterally added Zuzolo as a Registered Agent for the Company. *See* Exhibit F, Company's 2022 Annual Report.

Installment Contract. Between September of 2020 and August of 2022, at least $191,814.48 was paid from the Company to Irenko and a related finance company named RBI Alliance, LLC towards the purchase price for the Lamborghini, which upon information and belief, Carrion gifted to one of his other clients, artist Kendo Kaponi ("Kaponi"), who is affiliated with Carion's solely owned company Eli Entertainment, LLC, and not affiliated in anyway with the Company.

   (c) *Jewelry Loans and Private Jet Rentals*

36.    Further, Carrion took out a loan of more than $1 million from a jewelry company named One of One Timepieces, Inc. ("One of One"). And, despite the loan being provided to Carrion, and not the Company, the entirety of the $1 million loan was repaid by the Company without Artist's knowledge, consent or ratification.

37.    Upon information and belief, Carrion frequently engaged in similar fraudulent acts, including using Company funds without Artist's knowledge, consent or ratification, in connection with private jet rentals for himself, his family, and other clients of his who were not associated with the Company. Upon information and belief, Carrion used a number of different companies to do so, including Global Jet.

**VI.    Carrion Defrauds the Company Out of Excess Monies Paid to Him in Connection With the Orchard Agreements**

38.    On or about November 7, 2019, the Counter-Plaintiffs entered into a global distribution agreement with Orchard Enterprises NY, Inc. ("Orchard"), pursuant to which Orchard and Sony Music Entertainment US Latin LLC became the exclusive distributors of certain music recorded by Artist, and were granted specified rights, including exclusive rights to sell, copy, distribute, perform, sublicense, monetize and otherwise exploit Artist's recordings (the "First Orchard Agreement").

39.    In connection with the First Orchard Agreement, Orchard paid Artist a delivery advance, and in accordance with the terms of the Management Agreement, Carrion was paid ten percent (10%) of the advance by the Company, with Carrion, once again, being overpaid in that necessary deductions were not made to Artist's earnings prior to Carrion receiving his ten percent (10%) fee.

40.    Despite Carrion being paid all monies owed to him in connection with the First Orchard Agreement, and in fact being overpaid, directly from Orchard, Carrion was paid an additional $775,656.40 from the Company in 2020 in connection with the First Orchard Agreement. Carrion never disclosed, or accounted for, the excess payments to the Counter-Plaintiffs, as such payments were a part of Carrion's scheme to defraud Counter-Plaintiffs out of monies for which they are rightfully entitled.

41.    On or about January 26, 2021, Counter-Plaintiffs entered into a second global distribution agreement with Orchard pertaining to the distribution, exploitation, and administration of certain Artist recordings. *See* Exhibit K, Second Orchard Agreement.[8]

42.    And, despite Orchard (and Broadcast Music, Inc.)[9] paying all monies owed to Carrion in connection with the Second Orchard Agreement directly to Carrion, and in fact overpaying Carrion as explained above, Carrion was paid an additional $745, 550 in 2020, and an additional 1.145 million in 2021, in connection with the Second Orchard Agreement. Carrion never disclosed, or accounted for, the excess payments to the Counter-Plaintiffs, as such payments were

---

[8] The First and Second Orchard Agreements are collectively referred to herein as the "Orchard Agreements."

[9] Broadcast Music, Inc., or BMI as it is generally referred to, is a performance rights organization that collects license fees on behalf of Artist's and their affiliated entities, retaining a small fee for the services before transferring the remainder to an artist and/or an artist's designee.

a part of Carrion's scheme to defraud Counter-Plaintiffs out of monies for which they are rightfully entitled.

**VII.** **Carrion Defrauds the Company Out of Excess Monies Paid to Him in Connection With the Kobalt Agreement and Amendment**

43.    On or about July 27, 2022, Carrion electronically executed an amendment to the Kobalt Agreement without Artist's knowledge, consent or ratification, as required by the Management Agreement (the "Kobalt Amendment"). *See* Exhibit L, Kobalt Amendment. Further, pursuant to a letter of direction attached to the Kobalt Amendment, which was also electronically executed by Carrion without Artist's knowledge, consent or ratification, ten percent (10%) of all monies earned in connection therewith was to be paid by Kobalt directly to Carrion's solely owned entity Eli Entertainment. *Id.*

44.    Upon information and belief, in contravention of its internal policies and/or the duties it undoubtedly owes to Counter-Plaintiffs due to the parties' business and contractual relationship, Kobalt failed to take any steps whatsoever to verify the validity of Carrion's fraudulent electronic signature.

45.    In connection with the Kobalt Agreement and Amendment, Counter-Plaintiffs earned multi-million dollars in 2022, all of which was paid directly to Eli Entertainment and SST, and all, or at least a significant amount, of which was never transferred by Carrion and/or Singh to the Company.

46.    Upon information and belief, Carrion and Singh had agreed, and conspired, to withhold and retain those monies for their own personal and professional use and benefit.

47.    In addition to wrongfully withholding and retaining the monies referenced above, which were paid to Carrion and Singh directly from Kobalt and intended for Counter-Plaintiffs, Carrion was paid an additional $505,000 from the Company in connection with the Kobalt Agreement

and Amendment during 2022. In furtherance of his fraudulent scheme, Carrion never disclosed, or accounted for, the excess payments to the Counter-Plaintiffs.

## VIII.   Carrion Steals and Retains Monies Set-Aside at Artist's Direction for the Payment of Taxes, Leaving Counter-Plaintiffs With Significant Tax Liability

48.   From 2018 to 2022, Artist entrusted Carrion—as his manager and the CEO of the Company—with deciding on when and how to structure Counter-Plaintiffs' tax payments so as to maximize Counter-Plaintiffs' annual earnings, but Carrion was specifically told to set aside millions of dollars each year for satisfaction of Counter-Plaintiffs' tax liabilities.

49.   Disregarding explicit instructions, as well as the best interests of the Counter-Plaintiffs, Carrion instead decided against setting aside funds for payment of Counter-Plaintiffs' taxes, and instead, purportedly allocated a majority of the set aside funds towards other investments and business opportunities, leaving Counter-Plaintiffs with significant tax liabilities for those years.

50.   Carrion did so without Artist's knowledge, consent or ratification, and upon information and belief, Carrion (and likely, Singh and/or SST) remain in actual or constructive possession of millions of dollars which were set aside specifically to be used towards Counter-Plaintiffs' tax payments, and/or has otherwise used the monies to fund his continued extravagance, to pay personal and professional expenses unrelated to Counter-Plaintiffs, and otherwise to benefit himself to the detriment of the Counter-Plaintiffs.

## IX.   Carrion, On Behalf of the Counter-Plaintiffs, Purchases a Professional Basketball Team in Puerto Rico

51.   On or about June 8, 2021, based on the advice of, and representations made by, Carrion, Artist acquiesced in purchasing a Puerto Rican professional basketball team named Capitanes de Arecibo. Despite approaching Artist and making numerous representations to him regarding the viability of the investment, at no time prior or subsequent to the purchase did Carrion ever notify Artist of the terms of the purchase, or advise him as to the significant additional expenses the

Counter-Plaintiffs would, and in fact did, incur in connection with funding and operating a professional basketball team.

52.     Shortly following Carrion's agreement, on behalf of the Counter-Plaintiffs, to purchase the team, the Company paid the former owner, Luis R. Monrouzeau ("Monrouzeau"), at least $786,000, and paid an additional approximately $834,343.35 towards team payroll, taxes, and other team expenses.

53.     Upon information and belief, Carrion had a secret agreement with Monrouzeau whereby Counter-Plaintiffs would overpay to purchase the team, and in return, Carrion would receive a "kickback" based on the percentage of the purchase price, or a flat fee. Upon information and belief, and without Artist's knowledge, consent or ratification, Carrion used Company and team funds to purchase gifts, property, and other assets for himself and others.

**X.     Carrion Enters into Fraudulent Agreements with CMN and Zuffa, and Receives "Kickbacks" In Connection Therewith**

54.     On or about January 11, 2022, without Artist's knowledge, consent or ratification, Carrion executed a term sheet with Cardenas Marketing Network ("CMN") on behalf of Counter-Plaintiffs, pursuant to which CMN was to act as Counter-Plaintiffs' exclusive promoter for a specified number of concert tours during the term (the "CMN Term Sheet"). *See* Exhibit M, CMN Term Sheet.

55.     And, on or about April 27, 2022, Carrion, on behalf of Counter-Plaintiffs, entered into an unauthorized verbal handshake agreement with Jose Max Torres Perez ("Perez") and his company Buena Vibra Group ("BVP"), whereby Perez and BVP would execute a sponsorship deal with Zuffa LLC d/b/a Ultimate Fighting Championship (the "Zuffa Agreement") that required Artist to perform certain obligations on behalf of Zuffa, *see* Exhibit N, Zuffa Agreement.

56.    At no time did Carrion inform, or seek the consent of, Artist as to his agreement with Perez

or the Zuffa Agreement, and further, shortly after the Zuffa Agreement was finalized, either

Carrion himself, or someone else at Carrion's direction, transferred $950,000 to Zuffa from the

Company, and another $254,565.89 to Jose Max Torres Perez ("Perez") from the Company

shortly after the Zuffa Agreement was finalized. Upon information and belief, this was another

"kickback" scheme orchestrated by Carrion to Counter-Plaintiffs' detriment.

57.    Upon information and belief, the payment to Perez was in consideration of a secret

agreement between Carrion and Perez, pursuant to which each would receive a cut of monies in

connection with the Zuffa Agreement. Upon information and belief, Carrion entered into a similar

agreement with CMN and/or an agent or representative of CMN, which precipitated him

fraudulent entering into the CMN Term Sheet on behalf of the Counter-Plaintiffs.[10]

## XI.    Other Miscellaneous Fraudulent Acts By Carrion

58.    Between September 23, 2020 and June 21, 2020, approximately $234,350 was transferred

from the Company Account directly to Carrion and/or Eli Entertainment, either by Carrion or at

his direction, and without Artist's knowledge, consent or ratification. Upon information and

belief, the monies were used to pay certain personal and professional obligations of Carrion and/or

Eli Entertainment, including numerous payments to Kaponi and Carrion's personal

assistant/Company security guard, Alexis Parra ("Parra"), who was aware of, and conspired with

Carrion in furtherance of, the fraudulent scheme outlined herein.

59.    Upon information and belief, and without Artist's knowledge, consent or ratification,

Carrion also provided Kaponi and Parra with Company credit cards, which he told them could be

---

[10] Upon information and belief, Carrion engaged in another similar "kickback" scheme with someone at Wolfe Law Miami, and either by Carrion himself, or at Carrion's direction, the Company paid $250,000 to Wolfe Law Miami on or about December 23, 2020.

used without limitation, and that all payments would be made by the Company. This is in addition to the Company credit card Carrion maintained possession of, and used at will and to excess, for a number of years.

60.   In addition to those acts outlined above, between 2019 and present day, Carrion used significant Company funds to, among other things, fund his own extravagant lifestyle and professional endeavors not associated with the Counter-Plaintiffs; purchase gifts and necessities for, and pay other personal obligations of, his family and other artists which he manages; and to otherwise benefit himself to the detriment of Artist.

61.   Upon information and belief, and without Artist's knowledge, consent or ratification, Carrion stole and utilized Company funds, as follows:

> (a) Payment of approximately $40,483.11 for goods and merchandise at, among other places, Dolce & Gabanna, Hugo Boss, Luis Vuitton, Best Buy, and Apple;
>
> (b) Payment of approximately $133,516.10 towards his wife, Priscilla Carrasco's ("Priscilla")[11] expenses, such as her phone, internet, utilities, and credit card bills;
>
> (c) Payment of more than $20,000 towards Carrion's personal expenses and expenses of Eli Entertainment, including for phone Internet, utilities, car insurance, and essentially daily Ubers and food deliveries through Uber Eats;
>
> (d) Withdrawing at least $238,000 in cash;[12]
>
> (e) Payment of approximately $87,500 to Cervera Real Estate Inc. for the deposit on a Penthouse Beach Club;

---

[11] For a few years prior to Parra being hired as Carrion's assistant, Priscilla worked as a secretary for the Company and acted as Carrion's assistant, being paid, upon information and belief, an exorbitant amount (*i.e.*, approximately $12,000 per month) in salary throughout that time

[12] *See*, *e.g.*, Exhibit O, Withdrawal Receipts from September 24, 2019, and December 6, 2019. Upon information and belief, Carrion, without authorization, withdrew significantly more money from the Company Account between approximately 2018 and present day to be used for his personal and professional benefit.

(f) Payment of approximately $29,700 to Quetglas Law Firm in Guaynabo, Puerto Rico for an unknown purpose;

(g) Payment of approximately $15,000 to Dorado Owners LLC for Carrion's personal villa;

(h) Payment of approximately $40,000 to MAS Capital Investments as a consulting fee; and

(i) Payment of approximately $61,971 to Build Up Construction & Management in San Juan, Puerto Rico for an unknown purpose.[13]

62.     Upon information and belief, Carrion also used Company funds to repay $222,101.52 in outstanding credit card debt in connection with a credit card issued by Banco Popular Dominicano, S.A. in Santo Domingo, Dominican Republic, and to satisfy $141,000 in personal financial obligations Carrion owed to Banco De Reservas in Santo Domingo, Dominican Republic related to gifts, business expenses, and personal travel.

63.     Carrion's fraudulent scheme, and unequivocal breach of the Management Agreement and his fiduciary duties to the Counter-Plaintiffs, as outlined herein, have resulted, and will result, in Counter-Plaintiffs losing millions of dollars for which they are rightfully entitled.

### COUNT I
### (Fraud)
### (against Carrion)

64.     Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

---

[13] Counter-Plaintiffs are informed and believe that there are a number of other fraudulent unauthorized uses of Company funds by Carrion between approximately 2018 and present day, which Counter-Plaintiffs are unaware of at this time. Counter-Plaintiffs reserve the right to amend this Countercomplaint at such time as Counter-Plaintiff becomes aware of said additional fraudulent unauthorized uses through discovery, as well as through Counter-Plaintiffs' ongoing investigation into, including discussions with third parties in connection with, Carrion's acts.

65.    In connection with the foregoing scheme, and as outlined above, Frabian made numerous false statements of material fact, including but not limited to, informing third parties that he had authority to perform certain actions and transfer funds from the Company Account without Artist's knowledge, written consent or approval.

66.    Further, among other things, Carrion fraudulently executed the Kobalt Amendment and letter of direction attached thereto in Counter-Plaintiffs' name, and purchased vehicles in Counter-Plaintiffs' name, including the 2012 Lamborghini Aventador from Irenko, without Artist's knowledge, consent or ratification.

67.    Indeed, Carrion was aware at all times that his statements, and his authority to execute those documents in Counter-Plaintiffs' name, was false and/or did not exist.

68.    Carrion intended that his representations, as outlined herein, would be relied on by third parties, and purposely hid his actions from Plaintiff, for the sake of inducing third parties to act or not act, and inducing Plaintiff into, among other things, not terminating the Management Agreement, keeping Carrion on as the CEO of the Company, and keeping Carrion as an authorized person on the Company's Account.

69.    As a result of the foregoing fraudulent scheme, Counter-Plaintiffs were damaged in an amount to be determined at trial.

**WHEREFORE**, Counter-Plaintiffs request that this Court find the conduct of Carrion constitutes fraud, and award Counter-Plaintiffs appropriate damages, including monetary and punitive damages, interest, costs, attorney's fees and other expenses incurred by Defendants as a result of the foregoing, including significant expenses incurred, and to be incurred, in investigating the extent of the financial harm caused by Plaintiff, as well as any other legal or equitable relief this Court deems just and proper.

## COUNT II
### (Constructive Fraud)
### (against Carrion)

70.     Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

71.     As Artist's manager in the entertainment industry, and as the CEO, and a manager, of the Company, Carrion was in a confidential and fiduciary relationship with the Counter-Plaintiffs.

72.     Carrion's acts, as outlined herein, unequivocally constitute an abuse of those relationships, and evidence Carrion taking unconscionable advantage of those relationships, and the trust Artist placed in him.

73.     In doing so, Carrion caused the Counter-Plaintiffs to suffer significant damages, in an amount to be determined at trial.

**WHEREFORE**, Counter-Plaintiffs request that this Court find the conduct of Carrion constitutes constructive fraud, and award Counter-Plaintiffs appropriate damages, including monetary and punitive damages, interest, costs, attorney's fees and other expenses incurred by Defendants as a result of the foregoing, including significant expenses incurred, and to be incurred, in investigating the extent of the financial harm caused by Plaintiff, as well as any other legal or equitable relief this Court deems just and proper.

## COUNT III
### (Fraudulent Misrepresentation)
### (against Carrion)

74.     Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

75.     In furtherance of his fraudulent scheme, and as outlined above, Frabian made numerous false statements of material fact, including but not limited to, informing third parties that he had

authority to perform certain actions and transfer funds from the Company Account without Artist's knowledge, written consent or approval.

76.    Carrion was aware at all times that his statements, and his authority to execute documents in Counter-Plaintiffs' name, was false and/or did not exist.

77.    Carrion intended that his representations, as outlined herein, would be relied on by third parties, and purposely hid his actions from Plaintiff, for the sake of inducing third parties to act or not act, and inducing Plaintiff into, among other things, not terminating the Management Agreement, keeping Carrion on as the CEO of the Company, and keeping Carrion as an authorized person on the Company's Account.

78.    As a result of the foregoing fraudulent representations, Counter-Plaintiffs were damaged in an amount to be determined at trial.

**WHEREFORE**, Counter-Plaintiffs request that this Court find the conduct of Carrion constitutes fraudulent misrepresentation, and award Counter-Plaintiffs appropriate damages, including monetary and punitive damages, interest, costs, attorney's fees and other expenses incurred by Defendants as a result of the foregoing, including significant expenses incurred, and to be incurred, in investigating the extent of the financial harm caused by Plaintiff, as well as any other legal or equitable relief this Court deems just and proper.

**COUNT IV**
**(Breach of Contract)**
**<u>(against Carrion)</u>**

79.    Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

80.    The Management Agreement was a valid contract between Artist and Carrion.

81.    By, among other things, executing documents in Counter-Plaintiffs' name without Artist's knowledge, written consent or ratification, and transferring significant funds from the Company

Account, which Carrion used to fund his own extravagant lifestyle; to satisfy his and his family's personal and professional obligations unrelated to the Counter-Plaintiffs; and otherwise to benefit himself to the detriment of the Counter-Plaintiffs, Carrion materially breached the Management Agreement.

82.     As a result of Carrion's numerous breaches of the Management Agreement, Counter-Plaintiffs were damaged in an amount to be determined at trial.

**WHEREFORE**, Counter-Plaintiffs request that this Court find that Carrion breached the Management Agreement, and award Counter-Plaintiffs appropriate damages, including monetary and punitive damages, interest, costs, attorney's fees and other expenses incurred by Defendants as a result of the foregoing, including significant expenses incurred, and to be incurred, in investigating the extent of the financial harm caused by Plaintiff, as well as any other legal or equitable relief this Court deems just and proper.

## COUNT V
### (Breach of Fiduciary Duty)
### (against Carrion)

83.     Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

84.     Counter-Plaintiffs placed significant trust and confidence in Carrion by allowing him to act as Artist's manager and representative in the entertainment industry, adding him as a manager, and naming him the CEO of the Company, and adding him as an authorized person on the Company Account.

85.     Carrion accepted the responsibility and Counter-Plaintiffs' trust in him, and assumed a number of duties, including the duty to advise, protect, and act in the best interests of the Counter-Plaintiffs.

86.     By engaging in the acts herein alleged, Carrion breached those duties to Counter-Plaintiffs and as a result, caused Counter-Plaintiffs to suffer damages in an amount to be determined at trial.

**WHEREFORE**, Counter-Plaintiffs request that this Court find that Carrion breached his fiduciary duties to the Counter-Plaintiffs, and award Counter-Plaintiffs appropriate damages, including monetary and punitive damages, interest, costs, attorney's fees and other expenses incurred by Defendants as a result of the foregoing, including significant expenses incurred, and to be incurred, in investigating the extent of the financial harm caused by Plaintiff, as well as any other legal or equitable relief this Court deems just and proper.

## COUNT VI
### (Conversion)
### (against Carrion)

87.     Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

88.     Carrion's acts, including transferring significant funds from the Company Account to himself and other third parties were unauthorized in that each occurred without Artist's knowledge, consent or ratification, and in contravention of his obligations under the Management Agreement, as CEO of the Company, and otherwise.

89.     By engaging in the foregoing conduct, Carrion deprived Counter-Plaintiffs of millions of dollars for which they are rightfully entitled, and Carrion maintains possession of, or has already expended significant funds belonging to Counter-Plaintiffs such that Counter-Plaintiffs have been deprived of such funds.

90.     As a result, Counter-Plaintiffs have been damaged in an amount to be determined at trial.

**WHEREFORE**, Counter-Plaintiffs request that this Court find that Carrion converted funds rightfully belonging to the Counter-Plaintiffs, and award Counter-Plaintiffs appropriate damages, including monetary and punitive damages, interest, costs, attorney's fees and other

expenses incurred by Defendants as a result of the foregoing, including significant expenses incurred, and to be incurred, in investigating the extent of the financial harm caused by Plaintiff, as well as any other legal or equitable relief this Court deems just and proper.

**COUNT VII**
**(Civil Conspiracy)**
**(against Carrion)**

91.    Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

92.    Upon information and belief, Carrion conspired with a number of third parties, including but not limited to, SST, Singh, Zuzolo, Parra, Kobalt and others, to carry out his fraudulent scheme and to convert monies rightfully belonging to Plaintiffs, as outlined herein.

93.    In further of the fraudulent scheme, Carrion, among other things, executed agreements on behalf of the Counter-Plaintiffs without Artist's knowledge, consent or ratification, and converted millions of dollars in Company funds for his own use, as well as for use by other third parties unassociated with the Counter-Plaintiffs.

94.    As a result of Carrion's conspiracy with the above parties and others, Counter-Plaintiffs have been damaged in an amount to be determined at trial.

**WHEREFORE**, Counter-Plaintiffs request that this Court find that Carrion engaged in a civil conspiracy to Counter-Plaintiffs detriment, and award Counter-Plaintiffs appropriate damages, including monetary and punitive damages, interest, costs, attorney's fees and other expenses incurred by Defendants as a result of the foregoing, including significant expenses incurred, and to be incurred, in investigating the extent of the financial harm caused by Plaintiff, as well as any other legal or equitable relief this Court deems just and proper.

**COUNT VIII**
**(Accounting)**
**(against Carrion)**

95.     Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

96.     As Artist's manager in the entertainment industry, and as the CEO, and a manager, of the Company, Carrion was in a confidential and fiduciary relationship with the Counter-Plaintiffs.

97.     As explained above, Carrion actively failed to disclose, and instead to hide, his acts, as provided above, from Counter-Plaintiffs at all times.

98.     Because of such, a remedy at law is inadequate, and Carrion must account to Counter-Plaintiffs for all funds rightfully belonging to Counter-Plaintiffs, as well as any tangible and/or intangible things Carrion is in possession of as a result of his unauthorized use of Company funds and exploitation of Counter-Plaintiffs.

WHEREFORE, Counter-Plaintiffs request that this Court find that Carrion must account to Counter-Plaintiffs, as described above, and award Counter-Plaintiffs any other legal or equitable relief this Court deems just and proper.

**COUNT IX**
**(Constructive Trust)**
**(against Carrion)**

99.     Counter-Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

100.    As Artist's manager in the entertainment industry, and as the CEO, and a manager, of the Company, Carrion was in a confidential and fiduciary relationship with the Counter-Plaintiffs.

101.    Through such confidential and fiduciary relationship, Carrion owed a number of duties, and made a number of expressed and implied promises to Counter-Plaintiffs, including the

promises that he would transfer monies rightfully belonging to Counter-Plaintiffs to the Counter-Plaintiffs, and not convert such funds.

102.   As a result of his actions, Carrion has been unjustly enriched to the detriment of the Counter-Plaintiffs, thus justifying the imposition of a constructive trust.

**WHEREFORE**, Counter-Plaintiffs request that this Court find that the imposition of a constructive trust is necessary under the circumstances described herein, and award Counter-Plaintiffs any other legal or equitable relief this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Counter-Plaintiffs hereby request a trial by jury on all issues so triable.

Dated: November 11, 2022.

Respectfully Submitted:

**LALCHANDANI SIMON PL**
25 S.E. 2nd Avenue, Suite 1020
Miami, Florida 33131
(305) 999-5291
(305) 671-9282 (fax)
*Attorneys for Defendants/Counter-Plaintiffs*

By: */s/ Kubs Lalchandani*
  Kubs Lalchandani, Esq.
  Florida Bar No.: 63966
  kubs@lslawpl.com
  Bibiana Pesant, Esq.
  Florida Bar No.: 1011081
  bibiana@lslawpl.com

**SALZANO ETTINGER LAMPERT & WILSON, LLP**
275 Madison Ave., Floor 35
New York, New York 10016
Tel: (646) 863-1883
Fax: (646) 365-3119
*Attorneys for Defendants/Counter-Plaintiffs*

By:  <u>/s/ Frank Salzano</u>
        Frank Salzano, Esq. (*pro hac vice
        forthcoming*)
        fsalzano@selwlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished this 11th day of November, 2022, via the Florida e-filing portal to: Kendrick Almaguer, Esq., kendrick@hachargroup.com, counsel for Plaintiff/Counter-Defendant Frabian Eli Carrion.

By: */s/ Kubs Lalchandani*
Kubs Lalchandani

# EXHIBIT A

**English Translation / Management Letter of Intent
between Frabian Eli Carrion and Emmanuel Gazmey Santiago**

June 20, 2018

Emmanuel Gazmey Santiago

Miami Florida

Re: Letter of Intent

Dear Emma

According to our conversations, I attach the terms and conversations through which the undersigned will work as exclusive manager (hereinafter the manager) of Emmanuel Gazmey-Santiago, artistically known as Anuel AA ("Anuel"):

1. The term of this Agreement shall be 5 years from the date of this Agreement. The effectiveness of the Agreement will be subject to pending litigation in Puerto Rico where it is claimed if there is indeed a valid record management contract.

2. During the term of the Agreement, the undersigned will act as the sole and exclusive representative and/or manager of all business in Anuel's entertainment industry. These businesses include all recording business, publishing, artistic presentations, tours, sponsorships, merchandise, acting and any other present or future business related to the entertainment industry.

3. The manager will collect ten percent (10%) of the gross income earned by Anuel from the businesses described in paragraph 2 once they have been collected.

4. The manager will seek the consent or ratification of Anuel for each business before approving it.

5. The manager represents that it is not a Talent Agency as such term is known under the laws of the State of Florida.

6. The laws of the State of Florida govern this Letter of Intent and only the courts in that state shall have jurisdiction and venue to adjudicate any dispute arising under this Agreement.

7. This letter of intent will be replaced by a Formal Agreement within the next 30 days. Otherwise, this Letter of Intent will govern between the parties.

If you agree, please sign it.

Cordially,

Frabian Eli Carrion 20 de Junio de 2018

Emmanuel Gazmey Santiago

Miami, Florida

Re: Carta de Intencion

Estimado Emma

Segun nuestras conversaciones adjunto los terminos y conversaciones mediante el cual el subscribiente trabajara como manejador exclusive ( en adelante el manejador) de Emmanuel Gazmey- Santiago artisticamente conocido como Anuel AA ("Anuel"):

1. El termino de este acuerdo sera de 5 años partir de la fecha de este Acuerdo. La efectividad del Acuerdo estara sujeto al litigio pendiente en Puerto Rico donde se reclama si en efecto existe un contrato de manejo disquero valido.

2. Durante el termino del Acuerdo el subscribiente fungira como el unico y exclusivo representante y/o manejador de todos los negocios en la industria de entretenimiento de Anuel. Estos negocios incluyen todo negocio discografico, editorial,presentaciones artisticas, giras, auspicios, mercaderia, actuacion y cualquier otro negocio presente o future relacionado a la industria de entretenimiento.

3. EL manejador cobrara un diez porceinto (10%) de los ingresos brutos devengados por Anuel de los negocios descritos en el parrafo 2 una vez se hayan cobrado.

4. El manejador procurara el consentimiento o ratificacion de Anuel para cada negocio antes de aprobarlo.

5. El manejador representa que no es una Agencia de Talento segun se conoce dicho termino bajo las leyes del Estado De Florida.

6. Las leyes de Estado de Florida rigen esta Carta de Intencion y solo los tribunales en dicho estado tendran competencia y jurisdiccion para adjudicar cualquier contraversia que surja bajo este Acuerdo.

7. Esta carta de intencion sera sustituida por un Acuerdo Formal dentro de los proximos 30 dias. De lo contrario esta carta de Intencion regira entre la partes.

De usted estar de acuerdo favor de suscribir la misma.

Cordialmente,

Frabian Eli Carrion

# EXHIBIT B

# Electronic Articles of Organization For
# Florida Limited Liability Company

L18000181805
FILED 8:00 AM
July 30, 2018
Sec. Of State
tscott

## Article I

The name of the Limited Liability Company is:

REAL HASTA LA MUERTE, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

4751 DISTRIBUTION CT.
#15
ORLANDO, FL. US  32822

The mailing address of the Limited Liability Company is:

4751 DISTRIBUTION CT.
#15
ORLANDO, FL. US  32822

## Article III

Other provisions, if any:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

EMMANUEL  GAZMEY
4751 DISTRIBUTION CT.
#15
ORLANDO, FL.   32822

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   EMMANUEL GAZMEY

# Article V

The name and address of person(s) authorized to manage LLC:

**L18000181805**
**FILED 8:00 AM**
**July 30, 2018**
**Sec. Of State**
**tscott**

    Title:  AMBR
    EMMANUEL  GAZMEY
    4751 DISTRIBUTION CT., #15
    ORLANDO, FL.  32822  US

## Signature of member or an authorized representative

Electronic Signature: EMMANUEL GAZMEY

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# EXHIBIT C



### SINGH, SINGH & TRAUBEN, LLP
#### ATTORNEYS AT LAW
#### BEVERLY HILLS

SIMRAN A. SINGH, ESQ. *
DAL SINGH, ESQ. ^
MICHAEL A. TRAUBEN, ESQ. +
THOMAS K. RICHARDS, ESQ. ~
JUSTIN R. TRAUBEN, ESQ.
DANIEL M. SILVERMAN, ESQ.

\* Admitted in California and Florida.
~ Admitted in California and New York.
^ Admitted in California, Florida and Washington.
+ Admitted in California, Florida and Michigan.

August 30, 2018

***VIA ELECTRONIC MAIL***
Real Hasta La Muerte LLC and
Mr. Emmanuel Gazmey Santiago
p/k/a "Anuel AA"
c/o Mr. Frabian Eli Carrion
frabianeli@gmail.com

### ATTORNEY-CLIENT CONTINGENCY FEE AGREEMENT

**SINGH, SINGH & TRAUBEN, LLP** ("Attorney"), on one hand, and **Emmanuel Gazmey Santiago p/k/a "Anuel AA" and Real Hasta La Muerte LLC** (hereinafter individually and collectively referred to as "Client"), on the other hand, hereby agree on this August 30, 2018, that Attorney will provide legal services to Client on the terms set forth below.

1. **LEGAL SIGNIFICANCE OF THIS AGREEMENT.** Client understands and agrees that this Agreement has important legal significance. Client understands and agrees that Client should consider consulting with another attorney before signing this Agreement, as it would be inappropriate for Attorney to render legal advice concerning this Agreement.

2. **CONDITIONS**. This Agreement will not take effect, and Attorney will have no obligation to provide legal services, until Attorney receives a copy of this Agreement signed by Client.

3. **SCOPE OF SERVICES**. Client is hiring Attorney to represent Client, and any affiliated entities owned or controlled by Client, in connection with any and all agreements and transactional matters (specifically excluding any and all litigation, securities, tax, estate planning, wills, trust, corporate, mergers & acquisitions, real estate, trademark, copyright, or patent representation (collectively "Other Matters")), including the negotiation and review of such agreements.

4. **RESPONSIBILITIES OF THE PARTIES**. Attorney will provide those legal services reasonably required to represent Client as described in Paragraph 3 and will take reasonable steps to keep Client informed of progress and developments, and to respond promptly to inquiries and communications. Client agrees to be truthful with Attorney, to cooperate, to keep Attorney informed of any information and developments which may come to Client's attention, to abide by this Agreement, and to keep Attorney advised of Client's address, telephone number and whereabouts.



5.  **LEGAL FEES**. Client shall pay Attorney a fee equal to **seven percent (7%)** of all Compensation, earned or accrued by Client, or any of Client's affiliated companies, <u>arising out of or in connection with any agreement for which Attorney has rendered any services</u> (the "Fee") during Attorney's representation of Client hereunder. "Compensation" shall include any and all forms of payments, consideration, compensation, salaries, bonuses, shares of stock, stock options, or sums, including but not limited to all advances (whether or not recoupable) and royalties, whether paid as a to you or applied to you or on your behalf directly or indirectly, as a lump sum or accrued over time.

In the event of Attorney's discharge or withdrawal as provided in Paragraph 8, Client agrees that, upon payment of the settlement, arbitration award or judgment in Client's favor in this matter, Attorney shall be entitled to be paid by Client a reasonable fee for the legal services provided.  Such fee shall be determined by considering the following factors:  (a) The actual number of hours expended by Attorney in performing legal services for Client; (b) Attorney's hourly rates: $525/hour for partners and $395/hour for associates; (c) The extent to which Attorney's services have contributed to the result obtained; (d) The amount of the fee in proportion to the value of the services performed; (e) Time limitations imposed on Attorney by Client or by the circumstances; (f) The amount of recovery obtained; *and* (g) The experience, reputation and ability of personnel performing the services.

6.  **NEGOTIABILITY OF FEES**.  The rates set forth above are not set by law, but are negotiable between an attorney and Client. Attorney believes that the fee arrangement set forth herein is fair and reasonable under California law, including the California Rules of Professional Conduct. **<u>Attorney urges Client to consult with an independent lawyer of Client's choice about this fee arrangement. Client acknowledges that Client has had the opportunity to consult with the counsel of Client's choice other than Attorney, and Client has done so or decided not to, even though Attorney has encouraged Client to do so</u>**.

7.  **LIMITATION OF REPRESENTATION**.  Attorney is representing Client only on the matter described in Paragraph 3.  Attorney's representation does not include independent or related matters that may arise, including, among other things, litigation matters. This Agreement does not apply to any other legal matters.  If any such matters arise later, Attorney and Client will either negotiate a separate agreement if Client and Attorney agree that Attorney will perform such additional legal work or Client will engage separate counsel with respect to the cross-claim or counter-claim or additional legal work.

8.  **DISCHARGE AND WITHDRAWAL**.  Client may discharge Attorney at any time, upon written notice to Attorney.  Attorney may withdraw from representation of Client with Client's consent or for good cause and upon reasonable notice to Client. Good cause includes Client's breach of this contract, Client's refusal to cooperate with Attorney or to follow Attorney's advice on a material matter, or any other fact or circumstance that would render Attorney's continuing representation in any particular matter or transaction unlawful or unethical, or any circumstance where Attorney deems withdrawal is warranted without materially adverse effect to Client. Notwithstanding Attorney's withdrawal or Client's notice of discharge, and without regard to the reasons for the withdrawal or discharge, Client will remain obligated to pay Attorney for all costs incurred prior to the termination and, in the event that there is any Compensation, earned or accrued by Client, or any of Client's affiliated companies, arising out of or in connection with any agreement for which Attorney has rendered any services after conclusion of Attorney's services, Client remains obligated to pay Attorney for the reasonable value of all services rendered from the effective date of this Agreement to the date of discharge (provided that such amount shall not exceed the Fee). Attorney is authorized to use any funds held in Attorney's trust account as a deposit against costs to apply to such unpaid charges.  After any

**SINGH, SINGH & TRAUBEN, LLP**

400 S. BEVERLY DRIVE • SUITE 240 • BEVERLY HILLS, CA 90212 • TEL 310.856.9705 • FAX 888.734.3555
WWW.SINGHTRAUBENLAW.COM



termination of this Agreement, upon request, Client's file and property will be delivered to Client, or Client's other attorney, whether or not Client has paid any fees and/or costs owed to Attorney.

9.  **COSTS AND OTHER CHARGES**. Attorney will incur various costs and expenses in performing legal services under this Agreement.  Client understands that these are actual hard costs, not legal fees, and Client agrees to pay for all costs, disbursements and expenses incurred by Attorney in furtherance of the services hereunder.  The costs and expenses commonly include, document filing fees, long distance telephone charges, messenger and other delivery fees, postage, photocopying and other reproduction costs, and if any travel is requested and/or required, travel costs including parking, mileage, transportation, meals and hotel costs. Attorney may, in its discretion (but shall not be obligated to), deduct any costs and expenses owed to Attorney hereunder from the remaining balance of the Gross Receipts payable to Client after deduction of the Fee.

10.  **LIEN**.  Client hereby grants Attorney a lien on any and all agreements and Compensation that are the subject of Attorney's representation under this Agreement.  Attorney's lien will be for any sums owing to Attorney for any unpaid costs, or attorneys' fees, at the conclusion of Attorney's services. The lien will attach to any Compensation Client may obtain, whether by arbitration award, judgment, settlement or otherwise.  The effect of such a lien is that Attorney may be able to compel payment of fees and costs from any such funds recovered on behalf of Client even if Attorney has been discharged before the end of the matter/case.  Because a lien may affect Client's property rights, Client may seek the advice of an independent lawyer of Client's own choice before agreeing to such a lien.  By initialing this paragraph, Client represents and agrees that Client has had a reasonable opportunity to consult such an independent lawyer and—whether or not Client has chosen to consult such an independent lawyer—Client agrees that Attorney will have a lien as specified above.

11.  **RECEIPT OF COMPENSATION**.  Unless Attorney receives the Fee paid directly from the applicable source of the Compensation, all Compensation derived by Client or any of Client's companies in connection with the subject agreements (i.e. agreements for which Attorney has rendered services) shall be deposited into Attorney's trust account.  Specifically, Client shall direct all sources of such Compensation to make all payments and/or compensation that is attributable to Client directly to Attorney's trust account.  Upon Attorney's receipt of any of Client's Compensation, Attorney shall deduct its Fee from such Compensation and remit the balance to Client.  In the event that Client receives any Compensation directly from third parties, Client will use best efforts to provide documentation from such third party, to the extent available, which will verify all Compensation received directly by Client. Likewise, Client will promptly pay the Fee to Attorney as and when any such Compensation is received by Client.

_____   **(Client Initials Here)**       _____   **(Attorney Initials Here)**

12.  **DISCLAIMER OF GUARANTEE**.   Nothing in this Agreement and nothing in Attorney's statements to Client will be construed as a promise or guarantee about the outcome of any agreement or negotiation with which Attorney assists, the procurement of any agreements, or the success of any project or endeavor related to any agreement with which Attorney assists. Attorney makes no such promises or guarantees.  Attorney's comments about the outcome or the results of Attorney's services hereunder are expressions of opinion only, and should not be construed to promise or guarantee a specific outcome or result with respect to such services. Client acknowledges that Attorney has made no promise or guarantees about the outcome.

13.  **ENTIRE AGREEMENT**.  This Agreement contains the entire agreement of the parties. No other agreement, statement or promise made on or before the effective date of this Agreement will be binding on the parties.

14.  **SEVERABILITY IN EVENT OF PARTIAL INVALIDITY**.  If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

15.  **MODIFICATION BY SUBSEQUENT AGREEMENT**.  This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them or an oral agreement only to the extent that the parties carry it out.

16.  **ARBITRATION AND WAIVER OF JURY TRIAL.** THIS SECTION EVIDENCES AN ADDITIONAL AGREEMENT BETWEEN US TO ARBITRATE DISPUTES.

BOTH ATTORNEY AND CLIENT AGREE THAT ANY DISPUTE BETWEEN ATTORNEY AND CLIENT (INCLUDING, WITHOUT LIMITATION, ANY INDIVIDUAL ATTORNEY AT THE FIRM) ARISING OUT OF OR RELATING IN ANY WAY TO OUR REPRESENTATION OF CLEINT, INCLUDING BUT NOT LIMITED TO DISPUTES REGARDING ATTORNEY'S SERVICES, FEES AND COSTS, SHALL BE RESOLVED BY BINDING ARBITRATION.

THIS MEANS, AMONG OTHER THINGS, THAT ANY DISPUTE, BETWEEN ATTORNEY AND CLIENT, INCLUDING, WITHOUT LIMITATION, IN CONTRACT OR TORT, BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR TO THE RELATIONSHIP OF THE PARTIES, ATTORNEY'S ENGAGEMENT AND/OR ATTORNEY's PERFORMANCE OR FAILURE TO PERFORM SERVICES (INCLUDING, WITHOUT LIMITATION, CLAIMS OF BREACH OF FIDUCIARY DUTY OR PROFESSIONAL NEGLIGENCE) IS SUBJECT TO BINDING ARBITRATION. IN ADDITION, ALL QUESTIONS REGARDING THE ARBITRABILITY OF THE DISPUTE, INCLUDING WHETHER THE PARTIES HAVE AGREED TO ARBITRATE THE DISPUTE, SHALL BE DECIDED BY SUCH ARBITRATION. THIS AGREEMENT TO ARBITRATE ALL DISPUTES BETWEEN THE PARTIES APPLIES EVEN IF SOME PERSON OR ENTITY CLAIMS THAT THIS AGREEMENT IS VOID, VOIDABLE OR UNENFORCEABLE FOR ANY REASON.

BY AGREEING TO ARBITRATE, ALL PARTIES ARE WAIVING THEIR RIGHT TO JURY TRIAL AND THEIR RIGHT TO CONDUCT DISCOVERY (EXCEPT AS THE ARBITRATOR MAY PERMIT).

**Further, by agreeing to arbitrate, all parties are agreeing to pay an equal portion of the arbitrator's fees.**

**The arbitration shall be held in the County of Los Angeles, California before a retired California superior or appellate court judge or federal court judge pursuant to the Standard Arbitration Rules of ADR Services, Inc. and shall be administered by ADR Services, Inc. Client irrevocably and unconditionally consent to personal jurisdiction in California and venue in Los Angeles, California, in any action to compel arbitration and to enforce the arbitration award.**

**The arbitration, and all aspects thereof (arguments, testimony, evidence, the decision, etc.), shall be confidential, except when used in the course of a judicial proceeding (e.g., to confirm, vacate or**

**SINGH, SINGH & TRAUBEN, LLP**

400 S. BEVERLY DRIVE • SUITE 240 • BEVERLY HILLS, CA 90212 • TEL 310.856.9705 • FAX 888.734.3555
WWW.SINGHTRAUBENLAW.COM



SINGH, SINGH & TRAUBEN, LLP

Contingency Fee Agreement
August 30, 2018
Page 5 of 5

modify the award) or regulatory proceeding, as may be requested by a governmental entity or as otherwise may be required by law.

Judgment on the arbitrator's award shall be final and binding and may be entered in any competent court. By agreeing to arbitrate, all parties acknowledge that an appeal or challenge of an arbitrator's award may occur only under limited circumstances.

This agreement to arbitrate shall survive the termination of Attorney's representation or this Agreement.

As provided under California Code of Civil Procedure section 1290.4, the parties further agree that notice and service of any petition or other pleading in connection with an arbitration pursuant to this clause shall be sufficient if served by regular mail.

17.    **EFFECTIVE DATE**.  This Agreement will govern all legal services performed by Attorney on behalf of Client commencing with the date Attorney first performed services.  The date at the beginning of the Agreement is for reference only.  Even if this Agreement does not take effect, Client will be obligated to pay Attorney the reasonable value of any services Attorney may have performed for Client.

THE PARTIES HAVE READ AND UNDERSTOOD THE FOREGOING TERMS AND AGREE TO THEM, AS OF THE DATE ATTORNEY FIRST PROVIDED SERVICES. IF MORE THAN ONE CLIENT SIGNS BELOW, EACH AGREES TO BE LIABLE JOINTLY AND SEVERALLY FOR ALL OBLIGATIONS UNDER THIS AGREEMENT. THE CLIENT SHALL RECEIVE A FULLY EXECUTED DUPLICATE OF THIS AGREEMENT.

ACCEPTED AND AGREED TO:

DATED:  08/30/18

By: _____
EMMANUEL GAZMEY SANTIAGO P/K/A "ANUEL AA", INDIVIDUALLY, AND AS AN AUTHORIZED REPRESENTATIVE OF REAL HASTA LA MUERTE LLC

Address:_____
_____
Telephone:_____
Email: _____

SINGH, SINGH & TRAUBEN, LLP

DATED:  8/30/2018

By:_____
An Authorized Representative

# EXHIBIT D

Administration Agreement ("Agreement")

THIS AGREEMENT SHALL FORM A BINDING CONTRACT UNDER NEW YORK LAW BETWEEN THE PARTIES. THE SCHEDULES ATTACHED FORM AN INTEGRAL PART OF THE AGREEMENT FOR ALL PURPOSES. PLEASE NOTE THAT ANY DELAY IN COMPLETING THE INFORMATION SCHEDULES MAY DELAY THE REGISTRATION OF THE COMPOSITIONS AND THE COLLECTION AND PAYMENT OF MONIES RELATING THERETO.

FROM:      Real Hasta La Muerte LLC f/s/o Emmanuel Gazmey-Santiago, p/k/a "Anuel AA", both individually and on behalf of its music publishing designee(s) and so-called "d/b/as", including but not limited to Gazmey Music Publishing (ASCAP) c/o Singh, Singh & Trauben, LLP, ATTN: Simran Singh, Esq., 400 South Beverly Drive, Suite 240, Beverly Hills, CA 90212 (**Owner including all successors in title/heirs**)

TO:        Kobalt Music Services America, Inc. of 2 Gansevoort Street, 6th Floor, New York, NY 10014 (**Administrator**)

DATE:       October 25, 2018

## 1      Territory

The World, which is made up of Territory One and Territory Two comprising:

(i)     **Territory One** (comprising those countries directly administered by Administrator):

United Kingdom, Eire, France, Germany, Austria, Switzerland, Luxembourg, Netherlands, Belgium, Denmark, Norway, Sweden, Finland, Iceland, Latvia, Lithuania, Estonia, Italy, Spain, Portugal, Mexico, Singapore, Vietnam, Brazil, Australia, New Zealand, the Philippines, Thailand, Argentina, Peru, Chile, Ecuador, Colombia, Uruguay, Hong Kong, Macau, China, the United States of America and Canada.

(ii)    **Territory Two** (comprising those countries administered by Administrator via third parties):

The rest of the world excluding Territory One.

If at any time during the Term hereunder Administrator directly administers the Compositions and collects monies in any country in Territory Two and no longer via a third party publisher, licensee or agent then as from the commencement of the next accounting period thereafter such country shall be deemed part of Territory One hereunder for the purposes of the royalty computation of monies which are directly collected and which relate to monies arising from such country.

## 2      Term

(i)     The term of this Agreement (the "**Term**") shall be for a period ("the **Initial Period**") of three (3) years from the date hereof provided that if the last day of the Initial Period shall not otherwise fall on 31st March, 30th June, 30th September or 31st December (each an "**Accounting Date**") then the Term shall be deemed extended until the next such Accounting Date. In the absence of written notice from either party terminating the Initial Period a minimum of thirty (30) days prior to the last date of the Initial

DocuSign Envelope ID: 318CA313-17A5-40A6-883E-0D50F6A71FCF

Period the Term shall automatically continue until either party provides the other party with thirty (30) days written notice of termination provided that if such notice would not otherwise expire on an Accounting Date then it shall be deemed extended until the next Accounting Date.

Notwithstanding the foregoing if at the date the Term would otherwise expire the Advance (as defined in clause 5(i)) remains unrecouped (taking into account a bona fide estimate of pipeline income which for the purposes of this clause shall mean royalties and fees which the Administrator has actually received but not yet accounted to the Owner for hereunder ("**Pipeline Income**")) then the Term shall automatically extend to the Accounting Date following recoupment of the Advance (taking into account a bona fide estimate of Pipeline Income).

In such circumstances the Owner has the right to terminate the Term during the extended period of the Term prior to recoupment of the Advance by making payment to the Administrator of one hundred twenty five percent (125%) of the unrecouped balance (taking into account a bona fide estimate of Pipeline Income) of the Advance at any time following the date of expiry of the Initial Period of the Term. In such event the Term shall automatically expire at the end of the Accounting Period in which such repayment by the Owner to the Administrator takes place. For the avoidance of doubt the Rights Period (if applicable) and the Collection Period (as defined below) shall follow any such termination of the Term.

(ii)     Intentionally deleted.

(iii)    There shall be a collection period for two (2) years following the expiration of the Term (or Rights Period, as applicable) during which the Administrator shall have the right to collect monies which arise from the exploitation of the Compositions occurring prior to or during the Term (or Rights Period) (the "**Collection Period**"). Notwithstanding the foregoing, with respect to any synchronisation licenses which are properly issued by the Administrator during the Term (or Rights Period), it is agreed that if such license is renewed (or if an option is exercised under such license) during the Term (or Rights Period) or the two (2) year period immediately following the Term (or Rights Period), then the Administrator shall be entitled to collect such monies and the Collection Period with respect to any payment to be made pursuant to the renewal or option exercise shall be for two (2) years following the effective date of the renewal or option exercise.

(iv)    If at the date the Initial Period would otherwise expire, the Owner's account remains unrecouped (taking into account a bona fide estimate of Pipeline Income), then the Administrator shall be granted all exclusive rights hereunder in all Compositions for the duration of the Rights Period. The "**Rights Period**" shall mean the Term with an additional consecutive two (2) year period.  Notwithstanding the foregoing, solely in the event that Owner's account is fully recouped (taking into account a bona fide estimate of Pipeline Income) as of the end of the Initial Period, then the Rights Period shall not apply.  For the avoidance of doubt, the Collection Period shall follow expiration of the Rights Period (if applicable) or the Term (if there is no Rights Period).

During the Rights Period:

(a)     the Administrator shall continue to be entitled to any and all identifiable monies arising from the Compositions; and

DocuSign Envelope ID: 318CA313-17A5-40A6-889E-0D50E6A71ECF

(b)   to continue to administer related rights thereto and all such monies in accordance with the terms of this Agreement (for example, if, during the Rights Period, a third party wished to exploit a Composition for a synchronisation use, the Administrator would have the exclusive right to issue the relevant synchronisation licence).

## 3   Subject Matter

(i)   The **Compositions** shall mean each musical composition (both music and lyrics) adapted, arranged, written and/or composed in whole or in part by the Writer (and if in part to the extent of the Writer's interest therein) prior to and/or during the Term (including those that may be unfinished), including without limitation those compositions (both music and lyrics) which are set out in the attached Schedule One Part (i), but specifically excluding the Excluded Compositions (as defined in clause 3(ii)). For the avoidance of doubt, all compositions adapted, arranged, written and/or composed by the Writer during the Term shall be immediately notified to Administrator by email by Owner or Owner's Authorised Representatives (as defined in clause 4(iv) hereof) as specified in clause 4(iv) hereof.

(ii)   Notwithstanding clause 3(i), it is hereby acknowledged that certain compositions (the "**Excluded Compositions**") set out in Schedule One Part (ii) shall not qualify as "Compositions" and shall be excluded from this Agreement.

(iii)   The **Writer** shall mean Emmanuel Gazmey-Santiago, p/k/a "Anuel AA".

## 4   Grant of Rights

(i)   Subject to the provisions of clause 4(vii) below, the Owner hereby exclusively grants and licences to the Administrator the full and entire copyright (and including any and all possible renewals revivals reversions and extensions of copyright as may be applicable in any country in the Territory which occur during the Term) and all other rights of whatever kind and nature in the Compositions including without limitation rental and lending rights, rights of communication to the public and the right to collect and receive during the Term, Rights Period (where relevant) and Collection Period one hundred per cent (100%) of moneys arising from any and all exploitation of the Compositions (whether the exploitation of the Compositions takes place before or during the Term or Rights Period (where relevant) unless otherwise expressly provided herein) throughout the Territory including, without limitation, private copying levies and any monies previously paid to or collected by third parties in error and to authorise third parties to do the foregoing throughout the Territory for the Term. Notwithstanding the foregoing, for avoidance of doubt, nothing contained herein shall be construed to assign, transfer or grant any of Owner's copyright ownership in and to any of the Compositions to Administrator.

(ii)   The Administrator shall obtain the Owner's prior written approval in respect of:

(a)   save with respect to short form videos released by an artist or label in conjunction with a bona fide commercial release of a recording embodying a Composition, the synchronisation of any Composition with any audio-visual media;

(b)   the exploitation of the title of any Composition separate from such Composition;

   (c)     any licence or permission for the use of any Composition as a so-called "sample" in another musical composition;

   (d)     the authorisation of any fundamental change to the music and/or lyrics of any Composition but excluding arrangements, remixes and faithful translations where the arranger, remixer or translator does not claim a share of the copyright;

   (e)     the grant by Administrator of a mechanical licence at less than one hundred percent (100%) of the prevailing or statutory rate unless issued pursuant to controlled compositions clauses as per clause 4(viii) below; and

   (f)     any merchandising or product tie-ins.

(iii)   Notwithstanding anything to the contrary contained elsewhere in this Agreement including, without limitation, clause 4(ii) above, the Administrator shall not be required to obtain the Owner's approval with respect to:

   (a)     those rights and uses granted under licences issued to third parties by collection societies (including, without limitation, the American Music Rights Association, Inc. ("**AMRA**")) or similar bodies including, without limitation, under so-called blanket licences; or

   (b)     any license issued by Administrator which applies to all (or substantially all) musical works administered by Administrator (including the Compositions) for which Administrator controls the applicable right in the applicable territory covered by said license.

(iv)   The Owner shall act reasonably and in good faith in exercising its discretion in granting or withholding approvals hereunder. Any written approval granted by those representatives of the Owner whose details are set out in Schedule Two Part (iv) or such other parties as may be reasonably notified to Administrator by Owner from time to time in writing (the "**Authorised Representatives**") shall constitute the Owner's approval hereunder.

(v)   Approval provided by email shall be sufficient evidence of any such approval being granted hereunder.

(vi)   For the avoidance of doubt, subject to the approval provisions set out elsewhere in this Agreement, licences may be granted by the Administrator hereunder (and by third parties authorised by the Administrator) in which the relevant term of such licence(s) exceeds the Term or Rights Period (if applicable) of this Agreement (e.g. synchronisation licences). For clarity and subject to clause 2(iii), the fact that an approved license granted by Administrator contains a term which exceeds the Term or Rights Period (if any) of this Agreement, will not operate to extend the duration of Administrator's overall rights in and to the underlying Composition which is the subject of such license.

(vii)   For the avoidance of doubt this Agreement constitutes the granting of an exclusive licence of rights to the Administrator in respect of the Compositions and the copyright ownership of all Compositions remains vested in the Owner hereunder.

    The Owner hereby as between the Owner and the Administrator reserves to the Owner the right to exercise all so-called "grand rights" with respect to the Compositions and to collect all monies arising therefrom. As used herein, "grand rights" refers solely to

the use of one or more Compositions in an opera, musical play or work of musical theatre. For clarity, "grand rights" shall not extend to the use of any Composition(s) in audiovisual works.

(viii)    Owner shall provide Administrator with complete copies of any so called "controlled composition clause" contained in recording, production or licensing agreements (whether in existence at the commencement of the Term or entered into during the Term) with third parties which may affect the Compositions (each a "**Controlled Compositions Clause**"). The Owner will not purport to grant rights directly pursuant to any Controlled Compositions Clause entered into by Owner following the commencement of the Term; rather, such Clause shall be phrased as an undertaking by Owner to cause its administrator to grant the applicable license, which grant shall be subject to the remaining terms of this subparagraph.  On a case by case basis, provided that Administrator has received a copy of it and that the mechanical rates payable under the applicable Controlled Composition Clause are no worse than a per physical unit rate of not less than the full statutory rate prevailing at the date of release payable on not less than eleven (11) tracks per physical album (i.e. no caps for a digital album) and that the rest of the provisions are on reasonable commercial terms (i.e in line with the prevailing market rate) then Administrator agrees to grant licenses in accordance with such Controlled Composition Clause.

(ix)    The Administrator shall, in accordance with Administrator's policy in effect from time to time (currently, Administrator's policy is to file a copyright registration with the U.S. Copyright Office with respect to (a) any Composition that appears on the Billboard Hot 100 chart or the Billboard Latin Airplay 50 Chart (each a "**Charting Composition**"), (b) any other Compositions then administered by Administrator in the United States which are likewise embodied on the same long-playing album on which the Charting Composition is initially embodied and (c) all of the Compositions then administered by Administrator in the United States which are embodied on any long-playing album that appears in the top fifty (50) of the Billboard 200 chart), endeavour to file copyright registrations on behalf of Owner in respect of certain qualifying Compositions with the   U.S. Copyright   Office (Administrator's inadvertent failure to do so not shall not be deemed a material breach of this Agreement) and shall be entitled to recoup one hundred percent (100%) of any and all verifiable out of pocket costs (such costs to be reflected in the relevant accounting statement to Owner) incurred solely in connection therewith from any and all royalties otherwise payable by the Administrator to the Owner hereunder (including, without limitation, any filing fees charged by the US Copyright Office and the cost of purchasing any so-called "deposit copies" of the applicable CD on which the respective qualifying Composition is embodied, but specifically excluding legal fees).

## 5    Advance and Royalties

(i)    (a)    In consideration of the Owner's grant of rights herein the Administrator shall, during the Term, pay to the Owner an advance of up to Three Million Two Hundred Fifty Thousand U.S. Dollars ($3,250,000) (the "**Advance**") which shall be fully recoupable against all royalties, fees and other monies payable to the Owner hereunder.

(b)    The Owner gives the following specific warranties with respect to the Advance:

(I)    the Owner shall own or control and deliver to Administrator, for administration under this Agreement no less than the percentages of the Compositions attributed to Owner's ownership as set forth on

Schedule One, attached hereto and made part hereof by this reference, as of the commencement of the Term and performed by the artists also set forth on Schedule One Part (i) (together the "**Subject Compositions**");

(II)   Administrator shall be able to collect, from inception, all royalties, fees and other monies (excluding only the so-called "writer's share" of public performance income) arising in the Territory in connection with Owner's share of the **Subject Compositions**. In the event that the Owner, or a licensee, assignee or representative of the Owner has previously collected any of the royalties, fees and/or other monies described in the foregoing, the Advance shall be reduced by the amount of the royalties collected; and

(III)   the gross mechanical royalty rate payable in the USA and Canada in respect of the Subject Compositions shall be not less than one hundred percent (100%) of the minimum statutory rate per composition at the relevant time with no caps or restrictions whatsoever;

If the warranty set out in clauses 5(i)(b)(I) or 5(i)(b)(II) are breached, the Advance shall be reduced by the amount that Administrator is unable to collect as a result. If any of the other warranties set out in this clause 5(i)(b) are breached, the Advance shall be reduced on a pro-rata basis. If, by the time it becomes clear that said warranty or warranties have been breached, the Advance has already been paid in full or the amount by which the Advance(s) is due to be reduced as a result of the such breach exceeds the amount of the Advance payments which are yet to be paid, the Administrator shall have the right to make a written demand upon Owner repayment of such amounts as are appropriate in the circumstances (and upon such written demand the Owner shall make such payment within twenty (20) business days after receipt of the written demand).

(c)   The Advance shall be payable during the Term and as follows:

(I)   Two Million Two Hundred Fifty Thousand U.S. Dollars ($2,250,000), inclusive of a one hundred fifty-seven thousand five hundred U.S. dollar ($157,500) payment payable directly to SST as defined in and pursuant to the Override as defined in Schedule Five attached to this Agreement (the "**Signing Advance**") shall be payable within fourteen (14) days of the later of

(aa)   full execution of this Agreement;

(bb)   Administrator's receipt of confirmation, to its reasonable satisfaction, that the warranties set out in paragraph 5(i)(b) above are accurate; and

(cc)   Administrator's receipt of a completed W9 tax form; and as to

(II)   One Million U.S dollars ($1,000,000) (the "**Second Advance Payment**") shall be payable to Owner within fourteen (14) days of the provision by Administrator to the Owner (if at all) of the first accounting statement which shows that 75% (seventy-five percent) of the Signing Advance has been recouped (the "**Qualifying Statement**"), provided that such Qualifying Statement is provided by

Administrator to the Owner within the first thirty (30) months of the Initial Period. Owner may notify Administrator in writing that Owner elects to forego the Second Advance Payment in which case the Second Advance Payment will (notwithstanding the terms set forth herein) not be paid to Owner.

(d) No payment of royalties to the Owner shall be made until one hundred percent (100%) of the Advance has been recouped by the Administrator out of royalties and other monies accruing to the Owner's royalty account hereunder. For the purposes of this Agreement the **Qualifying Recoupment Date** shall mean the date of commencement of the Accounting Period in which the accounting statement provided to the Owner in respect of the previous Accounting Period shows that the Advance has been recouped by the Owner from royalties and fees arising hereunder relating to the exploitation of the Compositions throughout the Territory and not further or otherwise.

(ii) Royalties are to be computed on an **At Source** basis where provided below.

**At Source Revenue** shall mean one hundred per cent (100%) of all moneys actually received by Administrator or an Affiliate (as defined below) (or credited to Administrator's or an Affiliate's account in reduction of an advance against royalties) which is directly and identifiably attributable to the exploitation of the Compositions after deduction only of:

(a) bona fide arm's length performing rights or mechanical rights societies (or the equivalent thereof, including, without limitation, the Harry Fox Agency, the Canadian Musical Rights Reproduction Agency Ltd and AMRA) commissions/fees (or the equivalent thereof); and

(b) VAT and any other taxes properly required to be deducted in any part of the Territory; and

(c) any amounts paid by way of remuneration to arrangers, adaptors and translators such deductions being subject to the Owner's prior written approval or in accordance with local society rules or regulations or otherwise in accordance with statute in each instance.

As used herein, the term "**Affiliate**" refers to an entity which (i) is majority owned and/or controlled by Administrator; (ii) owns a majority of the capital stock of Administrator; or (iii) is under common majority ownership or control with Administrator. Notwithstanding the foregoing AMRA will not be deemed an Affiliate hereunder.

For the avoidance of doubt:-

(I) any costs and expenses incurred by the Administrator or an Affiliate in providing its administration services as expressly set out hereunder (including monies payable to third parties in this regard) save as expressly provided under sub clauses (a), (b) and (c) above and sub-clause 5(iii)(b)(II) shall be the sole responsibility of Administrator hereunder; and

(II) monies which are received by Administrator or an Affiliate which are net of any retained amounts by a sub publisher in respect of its share shall be grossed up by such netted amount in computing the At Source Revenue hereunder.

(iii)    In consideration of the rights granted Administrator shall pay the Owner the following royalties and fees in respect of the exploitation of the Compositions in the Territory:

(a)    **Print:** Seventy five percent (75%) of all receipts actually received by the Administrator from third parties which are attributable to the reproduction/representation of the musical score and/or lyrics of the Compositions as physical sheet music, in books/magazines or in digital reproduction services where such exploitation takes place/originates in Territory One or Territory Two (save that in respect of royalties received by the Administrator after the Qualifying Recoupment Date (regardless of when the exploitation took place) the rate in Territory One shall be increased to ninety per cent (90%) and the rate in Territory Two shall be increased to eighty five per cent (85%) in lieu of the foregoing.

(b)    **Mechanicals (Originals):**

(I)    In connection with the manufacture of mechanical devices (whether embodying sound alone or sound synchronised with visual images) for sale to the public and/or from the sale lease grant or other disposition of mechanical electrical digital or electronic reproduction (including by means of so called downloading, streaming, ring tones or otherwise) to the public to the extent that royalties arising therefrom are attributable to the mechanical element therefrom, seventy five per cent (75%) of At Source Revenue where in all instances such royalties are attributable to exploitation taking place in Territory One or Territory Two (save that in respect of royalties received by the Administrator after the Qualifying Recoupment Date (regardless of when the exploitation took place) the rate in Territory One shall be increased to ninety per cent (90%) and the rate in Territory Two shall be increased to eighty five per cent (85%) in lieu of the foregoing, both of which shall be calculated based upon At Source Revenue.

(II)    In addition to clause 5(iii)(b)(I) above, the parties hereby acknowledge that the Administrator (either directly or via an Affiliate) currently engages in direct mechanical licensing to record companies and certain digital service providers in the United States.  In consideration of the Administrator providing such services, the Owner agrees that the Administrator shall be entitled to deduct five percent (5%) of any mechanical royalties which it collects directly from a record company or digital service provider to whom the Administrator has issued a direct license *provided that* reporting and accountings under the applicable license are made directly to the Administrator (and not via a third party royalty processing intermediary retained by the licensee (e.g., MRI or the Harry Fox Agency)) (hereinafter, a "**Direct License**" and the "**Direct Licensing Fee**", respectively).  Such deduction shall be made "off the top" from At Source Revenue.

In the event that the Administrator retains a third party mechanical licensing agent (including but not limited to the Harry Fox Agency) to license any record company or digital service in the United States then no Direct Licensing Fee will be applied to the royalties collected by the Administrator from such agent (i.e. such collected royalties will be treated as At Source Revenue).

In the event that the Administrator enters into a license which would not otherwise qualify as a Direct License by reason of the licensee using a third party royalty processing intermediary, it is nonetheless agreed that if the Administrator is able to receive usage data which enables the Administrator to perform royalty processing analysis at a level of detail commensurate with the analysis the Administrator would be able to perform under a Direct License, then the Administrator will be entitled to deduct a Direct Licensing Fee (not to exceed 5% of At Source Revenue attributable to mechanical royalties under the applicable license), provided that such fee percentage is also applied by the Administrator to all or substantially all of the Administrator's clients in connection with such license.

(c)     **Synchronisation Fees**:

In respect of the use and synchronisation of the Compositions in connection with any audio-visual media where in all instances such fees arise from licences granted in respect of productions originating in either Territory One or Territory Two, eighty per cent (80%) of At Source Revenue provided that the issuing of synchronisation licences in respect of which Administrator would be due to earn a commission of one hundred U.S dollars ($100) or less (a "**Low Value Synch Licence**") shall be at the Administrator's absolute discretion. If Administrator elects not to issue a Low Value Synch Licence, Administrator shall refer the potential licensee under such Low Value Synch Licence to Owner within a reasonable period of receiving the request for such Low Value Synch Licence and Owner shall have the right to issue such Low Value Synch Licence and to retain one hundred per cent (100%) of the synchronisation fee related thereto. For the avoidance of doubt, Administrator shall remain exclusively entitled to collect and receive all mechanical and performing right (with respect to the so-called "publisher's share") royalties and fees with respect to any consequential exploitation of the Composition under the Low Value Synch Licence in the Territory.

(d)     **Any other income (Originals)**: (excluding performance royalties)

(I)     Seventy five percent (75%) of At Source Revenue (other than performing right fees) directly and identifiably from any other source whatsoever from use and/or exploitation of the Compositions where such royalties are attributable to exploitation taking place in Territory One or Territory Two (save that in respect of royalties received by the Administrator after the Qualifying Recoupment Date (regardless of when the exploitation took place) the rate in Territory One shall be increased to ninety per cent (90%) and the rate in Territory Two shall be increased to eighty five per cent (85%) in lieu of the foregoing, both of which shall be calculated based upon At Source Revenue.

(e)     **Cover Recordings and Co- Written Compositions**: in lieu of the rate set forth in sub clauses 5(iii)(b) and 5(iii)(d) with respect to royalties received after the Qualifying Recoupment Date, only - eighty per cent (80%) of At Source Revenue in the Territory. For the avoidance of doubt it is confirmed that it is only the exploitation of the Composition as it is embodied on the Cover Recording or Co-Written Composition that attracts the royalty rates set out in this sub clause (e);

"**Cover Recordings**" shall mean any recording of a Composition recorded by a recording artist during the Term or within a period of one (1) year following the last day of the Term and released for general sale to the public on record or by way of digital download or electronic methods or means which recording has been procured by the direct efforts of the Administrator and/or its licensees and/or sub-publishers and/or agents acting on its behalf;

"**Co Written Composition**" shall mean any Composition written by the Writer with a third party which "co-write" results from the direct efforts of the Administrator and/or its licensees and/or sub-publishers and/or agents acting on its behalf.

(f)     **Performance Fees**: The so-called "writer's share" shall be fifty per cent (50%) and the so-called "publisher's share" shall be fifty per cent (50%) and the writer's share shall be paid to the Writer (it being understood that if the Administrator receives such writer's share in any case, the same will be paid either to the Writer or to the Writer's performing right organization (as more specifically referred to in clause 7(xii)(a) below), as appropriate in Administrator's good faith business judgement) without regard to the recoupment status of the Owner's account and without deduction of an administration fee by Administrator hereunder). Administrator shall receive the publisher's share and shall pay the Owner fifty per cent (50%) of At Source Revenue for such share hereunder where such monies are attributable to exploitation taking place in Territory One or Territory Two (save that in respect of royalties received by the Administrator after the Qualifying Recoupment Date (regardless of when the exploitation took place) the rate in Territory One shall be increased to eighty per cent (80%) and the rate in Territory Two shall be increased to seventy percent (70%), in lieu of the foregoing, both of which shall be calculated based upon At Source Revenue; save that where Administrator can identify performing right fees and royalties which are attributable to exploitation of Cover Recordings and Co-Written Compositions, Administrator agrees to credit the Owner's royalty account with seventy per cent (70%) of Administrator's share in lieu of the foregoing rates applicable to royalties received after the Qualifying Recoupment Date.

(g)     **"Black Box Funds"**

(I)     The Relevant Percentage (as defined below) of gross monies collected or received by Administrator from any so-called "black box" funds or any funds paid by any collection society or otherwise to Administrator by way of general distribution on a country by country basis. In the event that such funds are not wholly identifiable and attributable to the Compositions then the proportion of such funds to which this sub-clause shall apply shall be calculated by multiplying such funds by a fraction the numerator of which shall be the total At Source Revenue received by Administrator arising from the applicable country in Territory in respect of the Compositions for the preceding twelve (12) month period and the denominator of which shall be the total income received by Administrator arising from the applicable country in Territory in respect of the Compositions and any other compositions not the subject of this Agreement for the preceding twelve (12) month period (the "**Black Box Percentage**") such computation to be made on a twelve (12) monthly basis and otherwise accounted pursuant to the terms hereof.

(II)    The Relevant Percentage shall be the average royalty rate accounted to the Owner by Administrator for all the Compositions during the relevant twelve (12) month period from all forms of exploitation hereunder arising from the Territory excluding "Black Box" funds.

(III)    For the avoidance of doubt no representation is made by Administrator to the Owner hereunder that Administrator will be entitled to such "Black Box" funds during the Term and will not be otherwise accountable for such funds save as arise hereunder.

(IV)    Notwithstanding the provisions set out above if the Black Box Percentage as computed above would be less than one per cent (1%) for the relevant period of computation of the total At Source Revenue received by Administrator arising from the applicable country in Territory then no "Black Box" funds will be allocated or accounted to the Owner in respect of such period of computation.

(h)    **Unallocated Advance Balances / Unallocated Minimum Income Guarantee Payment Balances**

(I)    If, at any time during the Term, there is an advance or a minimum income guarantee payment which the Administrator has received from a third party licensee which is not a collection society or similar body in respect of the catalogue of compositions which it controls and which, at the end of the relevant period of the license, has not been and cannot be attributed to the exploitation of one or more specific compositions forming part of the Administrator's catalogue (each an "**Unallocated Advance Balance**" or "**Unallocated Minimum Income Guarantee Payment Balance**", as appropriate), the Administrator will, subject to the following, distribute a portion of such Unallocated Advance Balance / Unallocated Minimum Income Guarantee Payment Balance to the Owner on the following basis:

(aa)    To determine the portion of the relevant Unallocated Advance Balance or Unallocated Minimum Income Guarantee Payment Balance which may be distributed to the Owner (the "**Shared Unallocated Balance**"), the Administrator shall multiply the relevant Unallocated Advance Balance or Unallocated Minimum Income Guarantee Payment by a fraction, the numerator of which shall be the total At Source Revenue received by Administrator under the relevant licence for the period of exploitation to which the relevant advance or minimum income guarantee payment related and the denominator of which shall be the total income received by Administrator under the relevant licence for the same period (such fraction shall be known as the "**Owner's Pro-Rata Fraction**");

(bb)    Provided that the Owner's Pro-Rata Fraction is larger than one over two hundred (1/200), the Shared Unallocated Balance shall be processed by the Administrator as though it were At Source Revenue received under the relevant licence and the Owner's portion paid/credited to the Owner in the normal accounting cycle set out in Clause 6(i) below;

        (cc)     For the avoidance of doubt, no representation is made by Administrator to the Owner hereunder that Unallocated Advance Balances and/or Unallocated Minimum Income Guarantee Payment Balances shall arise under this Agreement.

        (II)     Notwithstanding Clause 5(iii)(h)(I) above, if a licensee does not provide sufficient usage data to allow Administrator to calculate Owner's Pro-Rata Fraction as contemplated, Administrator will have the right, acting in its reasonable discretion, to apply a different methodology for distributing the relevant Unallocated Advance Balance or Unallocated Minimum Income Guarantee Payment, and Administrator will disclose such methodology to Owner upon written request.

(iv)     Intentionally deleted.

(v)     Notwithstanding anything to the contrary contained in the foregoing, the parties hereto acknowledge that it may be impossible for Administrator to collect one hundred per cent (100%) (fifty per cent (50%) in the case of performance) of all royalties due in respect of exploitation of the Compositions in various countries throughout the Territory as a result of the rules or practices of the collection society of which the Writer is a member. In each instance wherein the Administrator is paid less than one hundred per cent (100%) (fifty per cent (50%) in the case of performance) of any royalties due in respect of exploitation of the Compositions as a result of such rules or practices, the Administrator shall be entitled to "gross up" the commission to be deducted by Administrator when calculating the amount of such royalties to be paid to the Owner hereunder to the effect that the Administrator shall always be entitled to retain a percentage of the total gross royalties paid out by the relevant collection society commensurate with the rates for the corresponding territory set out in clause 5(iii)(f) in respect of performance and the rates set out in clause 5(iii)(b) with respect to all other exploitation of the Compositions.

## 6    Accounting

(i)     Quarterly annual accounting within sixty five (65) days of each of the quarterly periods ending on each Accounting Date (the "**Accounting Period(s)**"). The Owner hereby requests and authorizes that the Administrator, solely as an accommodation to the Owner, shall pay the Override as directed and defined in Schedule Five to the SST (also as defined in Schedule Seven attached hereto).

(ii)     A statement of account shall be made available electronically to the Owner pursuant to clause 6(i) by way of a downloadable secure "pdf" file (or similar format) which may be accessed only by the Owner (and the Administrator and the Administrator's employees) on the Administrator's website [**www.kobaltmusic.com**] or such other website address as the Administrator may notify to the Owner from time to time. In the event that a statement of account is not available on Administrator's website when due, pursuant to clause 6(i), Administrator shall use reasonable endeavours to provide such statement to Owner via email upon request. The Administrator shall update the information contained on the Owner's statement of account no less than quarterly in respect of each Accounting Period save that Administrator shall not be obliged to provide such statement of account in respect of the first (1st) Accounting Period following the date hereof since no royalties are likely to have accrued in such period due to the time it takes for the Compositions to be registered at the societies and the first distributions to be made. For the avoidance of doubt, any monies that have accrued during the first (1st) Accounting Period will be carried forward to the next

Accounting Period. The Owner hereby acknowledges and agrees that the process set out in this clause fulfils the Administrator's accounting obligations to the Owner and that the Owner will comply with the terms and conditions of use as published on the Administrators website (as applicable).

(iii)   Payment of royalties due to the Owner shall be made by wire transfer to the Owner in accordance with the bank details provided by the Owner as contained in Part 4 of Schedule Two save where the amount to be paid is less than two hundred and fifty U.S dollars ($250) in which case such amount shall not be paid but shall be carried forward to the end of the next Accounting Period until the aggregated sum(s) of such royalties carried forward is two hundred and fifty U.S dollars ($250) or more. Each party shall be responsible for their own banking charges.

(iv)   Save as set out in sub-clauses 5(iii)(g) and 5(iii)(h) above, Administrator shall only account for moneys received by Administrator wholly identifiable (in terms of the writer(s) and composition(s) to which it relates) and attributable to the exploitation of the Compositions hereunder (subject to withholding taxes).

(v)   Owner shall have the right to appoint an independent chartered accountant to audit the Administrator's books and records solely to the extent that they relate to the Compositions once per annum on giving reasonable notice at the Owner's cost and expense. In the event that any such audit reveals an underpayment to the Owner of five percent (5%) or more of the sums received by the Administrator and due to the Owner for the Accounting Periods which are the subject of such audit (and such five per cent (5%) is not less than five thousand U.S dollars ($5,000)) then Administrator shall reimburse Owner for the reasonable costs incurred relating to such audit subject in any event to a maximum sum in respect of such reasonable audit costs of two thousand U.S dollars ($2,000). No statement shall be objected to later than three (3) years after being submitted hereunder nor any legal action taken with respect thereto.

(vi)   Administrator shall be entitled to deduct or authorise the deduction of any sums which may be demanded from Administrator or its licensees by the governments or other fiscal authorities of the respective countries in which the Compositions are exploited. It is also acknowledged that some such deductions may be made by Administrator's licensees under the laws of the country in which they are domiciled without prior reference to the Administrator. Administrator shall use reasonable commercial endeavours to obtain the benefit of so called "double tax treaties" to prevent or reduce any such deductions. Administrator shall upon request use reasonable commercial endeavours to provide the Owner with a certificate or other evidence of any deduction or withholding and shall, on request, further provide the Owner with such reasonable assistance as may be practicable for the Owner to seek to reclaim such deduction or withholding or obtain a credit for the same.

(vii)   Owner shall complete a "W9" tax form as set out in Schedule Four hereto and return the same to the Administrator at the time of execution of the Agreement.

(viii)   Owner will remain solely liable and responsible for any and all accounting and payment obligations with the Writers (including any audit claims) both under contract and at common law and hereby undertakes to Administrator that it shall pay the Writers as per the Writer Agreements (as defined in clause 7(i) below) and hereby indemnifies, on demand, the Administrator against any loss or damage or cost or liability or expense (including all out of house legal expenses) suffered by the Administrator by virtue of the Owner's failure to do so.

DocuSign Envelope ID: 318CA313-17A5-40A9-899E-9D56E6A71EC5

## 7    Warranties

The Owner hereby warrants undertakes and represents that:

(i)    Owner is free to enter this Agreement and make these grants herein contained free and clear from all liens claims and encumbrances and gives all necessary consents required under the laws of any country in the Territory to exploit the Compositions in accordance with the terms hereof.

(ii)    The Compositions are unencumbered and original copyright works and are neither defamatory nor obscene and will not infringe the rights or copyright of any third party.

(iii)    There are no Writer or third party legal proceedings or claims or disputes in existence (whether pending or threatened) relating to any of the Compositions as at the date of this Agreement and the Owner shall immediately put the Administrator upon formal written notice should any such circumstances arise hereafter during the Term either in respect of any existing Compositions or any new Compositions (without prejudice to the Administrator's ongoing right to fully rely upon the indemnity from the Owner to the Administrator as provided hereunder in any and all such circumstances).

(iv)    Administrator shall be entitled to use Writer's name, approved likenesses and approved biographies throughout the Territory in connection with the promotion and exploitation of the Compositions and in the promotion of the music publishing business of the Administrator. Notwithstanding the foregoing, neither party shall issue any press releases or make any other announcements (including, without limitation, posts on social media sites or apps) with regard to the existence of this Agreement without the prior written approval of the other.

(v)    The Writer shall not assert any and all so-called moral rights arising under this Agreement against the Administrator and/or its licensees and/or agents authorised by the Administrator (whether under a specific licence or a blanket licence).

(vi)    All information provided for and on behalf of the Owner to the Administrator with respect to the Compositions; the interest of the Writers therein; or to the Writers, shall be true, complete and accurate and all such information shall be provided by the Owner as soon as the Compositions are made available to the Administrator for administration hereunder.

(vii)    The Schedules shall be deemed to form an integral part of this Agreement and shall be completed by the Owner and returned to the Administrator at the time of execution of the Agreement. All information included therein and any amendments thereto which may be communicated to the Administrator by or on behalf of the Owner from time to time shall be true accurate and complete and the Administrator shall be entitled to rely upon all such information for all purposes in order to provide its services hereunder unless and until the Owner notifies Administrator in writing to the contrary (without prejudice to the Administrator's ongoing right to fully rely upon the indemnity from the Owner to the Administrator as provided hereunder in any and all such circumstances).

(viii)    During and at all times after the Term of this Agreement the Owner undertakes not to disclose or publish or negligently cause any unauthorised disclosure to

any third party (save its own professional advisors where necessary or where required to be disclosed by law or order of a court of competent jurisdiction or a regulatory/governmental body, or in connection with a legal process arising out of a litigation related to this Agreement (collectively, "**Legal Process**")) any Confidential Information without the prior written approval of the Administrator. To the extent not prevented by law, if the Owner intends to disclose Confidential Information pursuant to a Legal Process it will give the Administrator prompt notice of such intended disclosure so that the Administrator may seek (at its sole expense) an appropriate protective order or other appropriate remedy. For the purposes hereof "**Confidential Information**" shall include without limitation all the specific terms of this Agreement and any information relating to Administrator's business, financial, technical or other affairs disclosed to Owner indirectly or directly by Administrator which is not in the public domain.

(ix)    Owner shall not take or authorize or permit to be taken any action in derogation of Administrator's rights hereunder.

(x)     Owner shall complete the Letter of Direction set out in Schedule Three hereto at the time of execution hereof and shall return a signed copy of the same with each partially-executed Agreement.

(xi)    Neither the Owner, the Writer nor any assignee, licensee, agent or other representative of the Owner or Writer has taken or shall take any advance(s) or guarantee payments of any kind against the so-called "publisher's share" of any monies which are attributable to the exploitation of one or more Compositions in the form of public performance from a collection society, agency or similar body.

(xii)   (a)   the Owner and the Writer are  members of ASCAP (hereinafter, the "**PRO**");

(b)   the Owner and the Writer registered the so-called "d/b/a names" set out in part (ii) of Schedule Two hereto (the "**Owner's D/B/A Names**" and the "**Writer's D/B/A Names**" respectively) with the PRO;

(c)   the Owner is the sole entity that formed/owns the Owner's D/B/A Names and the Writer is the sole entity that formed/owns the Writer's D/B/A Names; and

(d)   unless Administrator otherwise consents in writing, the Owner will remain a member of either the PRO or BMI/SESAC  or another performing rights organization which provides equivalent protection to Administrator with respect to licensing and collection of performing rights as are accorded to Administrator by thePRO. Without limiting the foregoing, in the event that the Owner or Writer joins a different performing rights organization during the Term (a "**New PRO**"), the Owner and the Writer will promptly notify Administrator of such occurrence and cooperate with Administrator in order to effectuate the new PRO's rights with respect to the Compositions in a manner which is not less favourable to Administrator than the rights enjoyed by Administrator when the Owner was affiliated with ASCAP, BMI or SESAC.

(xiii)   The Writer shall, during the Term, remain an active songwriter with an output which is reasonably commensurate with the Writer's average level of activity over the three (3) years which preceded the execution of this Agreement.

(ix)   The Letter of Inducement set out in Schedule Six shall be executed by Emmanuel Gazmey-Santiago upon the date of signature hereof.

**7A    Administrator's Warranties and Representations**

(i)   The Administrator hereby warrants and represents that:

(a)   During the Term the Administrator shall use all reasonable efforts to promptly ensure that all Compositions are correctly registered with all the applicable collection societies throughout the Territory, and that all Compositions are properly licensed by the record labels or owners of any released master recordings embodying the Compositions, and account to Administrator for the same.

(b)   During the Term the Administrator shall use all reasonable efforts to ensure that its sub-publishers account to Administrator no less frequently than on a quarter-annual calendar basis in respect of income arising from the exploitation of the Compositions received by the applicable sub-publisher within the immediately preceding accounting period.

(c)   Administrator agrees to indemnify Owner and hold Owner harmless from any and all loss, liability and expense incurred by reason of any third party claim arising from a breach of Administrator's warranties, representations and undertakings herein PROVIDED THAT such indemnity shall be limited to sums incurred pursuant to the adverse judgement of a court or tribunal of competent jurisdiction or a settlement or compromise entered into with Administrator's prior written consent (which consent shall not be unreasonably withheld or delayed).

(d)   During the Term the Administrator shall use reasonable efforts to maintain and continue to provide a digitally based automated efficient, accurate and transparent registration, administration and collection service under the Agreement, including with regards to registration of the Compositions and the royalty tracking and reporting thereof.

(e)   During the Term the Administrator shall ensure that its online portal (including any of its features therein, whether now included or added in the future), is and remains available and accessible. Notwithstanding the foregoing, if the online portal becomes in accessible through no fault of Administrator, Administrator shall not be in breach of this Agreement.

**8    Indemnity and Third Party Claims**

(i)   The Owner shall fully indemnify the Administrator on an indemnity basis for any loss or damage or cost or liability or expense (including all reasonable out of house legal expenses on an indemnity basis) suffered by Administrator resulting directly or indirectly from a breach or alleged breach of the grant of rights and/or warranties and/or representations provided herein by the Owner which arise from any third party dispute, claim, or action ("**Third Party Claim**")

subject to the occurrence of one (1) of the following events and subject to clause 8(iii):-

(a) any such Third Party Claim being reduced to a judgment in a court of competent jurisdiction; or

(b) any such Third Party Claim being settled with the Owner's prior written approval which approval shall not be unreasonably withheld or delayed; or

(c) any such Third Party Claim being withdrawn or not proceeded with (as determined by the Administrator acting reasonably and in good faith) by the third party claimant.

(ii) The Administrator shall put the Owner upon written notice of a Third Party Claim and shall thereafter have the right to withhold the payment of any and all monies to the Owner in an amount commensurate with the relevant Third Party Claim and (without prejudice to its other rights of recovery hereunder) to use and apply any and all such monies pursuant to the terms of this indemnity provision.

Subject to clause 8(iii):

(a) if, at any time, one of the events referred to under clause 8(i)(a), 8(i)(b) or 8(i)(c) occurs all monies so withheld shall be released to Owner without prejudice to the right of the Administrator to continue to rely upon this indemnity provision with respect to the relevant Third Party Claim thereafter but subject to:

(I) any payment obligations the Owner or the Administrator may have in connection with the relevant Third Party Claim in accordance with the provisions of clause 8(i); and

(II) the Administrator's right to continue to withhold monies in an amount commensurate with the Third Party Claim to the extent the claimant has filed (or may legally still file) a valid notice of appeal or its substantial equivalent; and

(b) if none of the events referred to under clause 8(i)(a), 8(i)(b) or 8(i)(c) occur within twelve (12) months of the Administrator's notice of Third Party Claim to the Owner hereunder then (unless settlement negotiations are current at such time or Administrator believes reasonably that the applicable Third Party Claim remains active) all monies so withheld shall be released to Owner without prejudice to the right of the Administrator to continue to rely upon this indemnity provision with respect to the relevant Third Party Claim thereafter.

(iii) Without prejudice to the foregoing immediately upon the Administrator's service of notice of Third Party Claim to the Owner, the Owner shall use its best efforts to directly deal with the Third Party Claim and the third party claimant at its own cost and expense unless otherwise mutually agreed by the parties. To the extent that the Administrator has to deal with any such Third Party Claim it shall have the right to demand and be paid its actual out of pocket expenses on an on-going basis without prejudice to such right to rely upon the provisions of sub clause 8(ii). If the Owner does not pay the Administrator such out of pocket expenses within seven (7) days of the Administrator's demand therefore then in addition to the right to withhold monies

under the provisions of sub clause 8(ii) the Administrator shall have the automatic right to apply any withheld monies against such out of pocket expenses.

(iv)     The provisions of this clause 8 shall survive expiry or earlier termination (for any reason whatsoever) of this Agreement and shall continue to have full legal force and effect without limit in time.

**9      Protection of Rights**

(i)      Administrator shall have the exclusive right (but not the obligation) to take such action as it deems necessary against any third party to protect all rights and interests acquired by Administrator under this Agreement. The Administrator shall consult with the Owner before taking any such action and take its views into account at all times.

(ii)     If the Administrator notifies the Owner in writing that it does not wish to take any action pursuant clause 9(i) in respect of a particular third party then the Owner may take such action as the Owner deems reasonably necessary at its own expense provided that Owner shall consult with the Administrator before taking any such action and take its views into account at all times.

(iii)    Notwithstanding the foregoing Administrator shall, either itself directly or indirectly by giving its approval of class actions or actions brought by industry bodies/agencies, be able to settle disputes/claims (including, without limitation, audits) on behalf of all the compositions (including the Compositions) in its catalogue (each a "**Catalogue Wide Settlement**") without being required to obtain the Owner's prior approval. Such settlements may be on basis of any of the following:

(a)     If the Administrator has directly incurred any out of pocket expenses in securing a Catalogue Wide Settlement it shall be entitled to reimburse itself "off the top" of any proceeds it receives in respect of such Catalogue Wide Settlements with any balance being treated as "At Source Revenue" if Administrator receives usage data from the party settling the dispute or if not then treated as Black Box income as per Clause 5(iii)(g) above;

(b)     If the Administrator has approved a class action Catalogue Wide Settlement then it is acknowledged that the attorneys who brought the class action shall be entitled to deduct their legal fees "off the top" of the proceeds before Administrator is paid any share in respect of its catalogue. The monies that Administrator actually receives shall be treated as "At Source Revenue" if Administrator receives usage data from the party settling the dispute or if not then treated as Black Box income as per Clause 5(iii)(g) above; and

(c)     If Administrator has approved an action brought by an industry body/agency which has resulted in a Catalogue Wide Settlement then it is acknowledged that the industry body may be entitled to deduct their out of pocket expenses or membership fees for the Administrator's membership of such industry body/agency "off the top" of the proceeds before Administrator is paid any share in respect of its catalogue. The monies that Administrator actually receives shall be treated as "At Source Revenue" if Administrator receives usage data from the party settling the dispute or if not then treated as Black Box income as per Clause 5(iii)(g) above.

## 10   Termination

(i)    Notwithstanding the provisions herein, if either party materially defaults in the performance of any of its material obligations or duties and such default is either not capable of being cured or such default continues for a period of forty-five (45) days (thirty (30) days with respect of non-payments of monies) after receipt by the other party of notice in writing from such party alleging such default, such party shall be entitled to terminate the Term, Collection Period and Rights Period of this Agreement immediately thereafter without prejudice to any and all other remedies that may be available to it.   Notwithstanding the foregoing, a failure by Administrator to obtain approval or agreement in accordance with this Agreement, which failure is therefore prima facie incapable of cure, will not in and of itself give rise to a termination right as set forth in the immediately preceding sentence provided that such failure is inadvertent and non-repetitive.

(ii)   If Administrator files a petition in bankruptcy which is not dismissed within sixty (60) days, is adjudicated as bankrupt, or makes an arrangement or assignment for the benefit of creditors which is not dismissed within sixty (60) days then Owner shall have the right by providing written notice to terminate the Term, Collection Period and Rights Period (if any) of this Agreement provided that if at the expiry of the relevant sixty (60) period the Advance is not fully recouped then Owner shall not have such right..

(iii)  It is the Owner's sole responsibility to make the necessary arrangements for post Collection Period payments to be made directly to Owner by the relevant third parties (as the case may be) and at the Owner's request the Administrator shall give its reasonable assistance to give effect to the same in line with industry practice.

(iv)   Notwithstanding the foregoing in the event that following the expiry of all the rights of the Administrator hereunder (including the right of the Administrator to collect monies during the Collection Period referred to in sub clause 2(iii)) the Administrator shall continue, through no fault of the Administrator, to receive fees and royalties derived from the use and/or exploitation of the Compositions, the Administrator shall account to the Owner as provided herein for one hundred per cent (100%) of any and all such monies received subject to the deduction of the commission to which Administrator would be entitled under clause 5(iii) had such monies been collected by Administrator during the Term/Collection Period.

## 11   Notices

All notices (save as otherwise expressly provided herein) under this Agreement shall be sent by courier or by recorded mail with proof of delivery to the addresses set forth on page 1 and shall be deemed served on the date signed for by the recipient party. Notices served on Administrator shall be sent to the Director of Business Affairs at the address set forth on page 1 of this Agreement or such address as may otherwise be notified by Administrator to the Owner in writing during the Term. Notices served on Owner shall, in addition to the address set forth above (as may be updated by Owner in writing to Administrator), include a courtesy copy to Singh, Singh & Trauben, LLP, 400 S. Beverly Dr, Suite 240, Beverly Hills, CA 90212, Attn: Simran Singh, Esq., unless otherwise notified by Owner to Administrator in writing during the Term, provided that the inadvertent failure to provide such courtesy copy shall not indicate the original notice. For the avoidance of doubt notification of new Compositions and approval notices shall be satisfied by compliance with the provisions of clause 3 and clause 4(iv).

## 12    Miscellaneous

(i)    This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York without regard to choice of laws principles. The state courts of the State of New York in New York County, and the Federal Courts for the Southern District of New York, shall have sole and exclusive jurisdiction and venue of any and all controversies regarding or arising from this Agreement (a "**Related Action**"). Any Related Action will be brought in those courts, and not elsewhere. In connection with any Related Action, the parties hereto expressly consent to personal jurisdiction in the State of New York and hereby agree to waive any objections based upon lack of personal jurisdiction, lack of subject matter jurisdiction, forum non conveniens or any similar ground.

(ii)    The parties hereto acknowledge and agree that:

(a)    each party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision;

(b)    the rule of construction that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and

(c)    the terms and provisions of this Agreement shall be construed fairly as to all parties, regardless of which party was generally responsible for the preparation of this Agreement.

(iii)    This Agreement may be assigned in whole or in part by the Administrator to:

(a)    any parent subsidiary or associated company of the Administrator (including, without limitation, Kobalt Music Copyrights SARL and KMR Music Royalties II SCSp) or to any subsidiary of the Administrator's parent company or to any other company with which the Administrator may merge or which acquires a controlling interest in or a substantial portion of the stock or the business or the catalogue of the Administrator, save that Administrator shall remain secondarily liable in the event of any such assignment unless the assignee (or acquirer, as applicable) has agreed in writing to assume the obligations of Administrator hereunder; and

(b)    by way of a charge in favour of a bank or institution that provides financing for the Administrator or the corporate group of which it is a part, to any such bank or institution (or its nominee) upon exercise of remedies in respect of such charge, and to any third party designated by such bank or institution (or nominee) in connection with a disposition of this Agreement  after an exercise of remedies.

Nothing in this clause shall serve to prevent or restrict the Administrator from licensing the rights granted to it under this Agreement in the Compositions in the ordinary course of business. The Owner shall not assign transfer license or charge in whole or in part this Agreement (or any of the Compositions or any of the rights therein) without the prior written consent of the Administrator (provided that Administrator shall not unreasonably withhold or delay written approval over any assignment by Owner). Any such purported transaction that is not approved in writing by Administrator shall automatically be deemed invalid and ineffective hereunder.

(iv)    The Owner shall do all further things or execute any further documentation reasonably required by the Administrator for the purposes of giving effect to the terms of this Agreement.

(v)    It is acknowledged that the Administrator collects and processes personal data of the Writer for the purposes of carrying out its services under this Agreement and shall use such data in accordance with the Kobalt Group Privacy Statement attached hereto at Schedule Seven.

(vi)    This Agreement shall not constitute a partnership or joint venture between the parties.

(vii)    This Agreement and the Schedules hereto, which are hereby incorporated by reference, constitute the entire agreement between the parties. This Agreement supersedes any and all prior negotiations understandings and agreements between the parties with respect to the subject matter of this Agreement. Each of the parties acknowledges and agrees that neither party has made any representations or promises in connection with this Agreement or its subject matter which is not contained in this Agreement. No modification, amendment, waiver, termination, or discharge of this Agreement or of any provision hereof shall be effective unless confirmed by a written instrument signed by both parties hereto. The waiver by either party of any breach of this Agreement shall not be deemed to be a waiver of any subsequent breach, whether or not of a similar nature. No waiver or failure to exercise any party's rights hereunder shall prejudice the future rights of either party under this Agreement.

(viii)    This Agreement has been made up in two (2) originals whereof the parties have taken one each.  In addition, the parties agree that a photographic, electronic or facsimile copy of the signature evidencing a party's execution of this Agreement shall be effective as an original signature and may be used in lieu of the original for any purpose.

(ix)    The prevailing party in any legal action (after all appeals have been taken or the time for taking such appeals has expired) brought by one party against the other and arising out of this agreement shall be entitled, in addition to any other rights and remedies available to it at law or in equity, to reimbursement for its costs and expenses (including court costs and reasonable fees for attorneys and expert witnesses) incurred with respect to bringing and maintaining any such action. The term "prevailing party" for the purposes of this paragraph shall include a defendant who has by motion, judgment, verdict or dismissal by the court, successfully defended against any claim that has been asserted against it.

(x)    Owner hereby irrevocably constitutes, authorizes, empowers and appoints Administrator (and any of Administrator's officers) Owner's true and lawful agent and attorney-in-fact (with full power of substitution and delegation) to make, execute, sign, acknowledge and deliver any and all documents, instruments and writings in Owner's and/or Writer's name and to take any other action in Owner's and/or Writer's name that in the reasonable business judgment and discretion of Administrator is reasonably necessary or desirable solely in connection with the following, subject always to the terms of this Agreement:

(a)    to prepare, execute, file and register claims of copyright in the Compositions and, to the extent applicable, renewals and extensions thereof;

(b)    to register the Compositions with all mechanical and performing rights societies throughout the Territory;

DocuSign Envelope ID: 318CA313-17A5-40A6-898E-AD50E6A71FCF

(c)      to collect royalties, monies, payments and all other compensation and/or advances throughout the Territory, to receive all accounting and royalty statements in connection with the foregoing and to execute and deliver receipts for any and all such collections if necessary to do so; and

(d)      to endorse all checks and drafts received by Administrator with respect to the Compositions and to deposit all such checks, drafts and other receipts in Administrator's account.

(xi)    All rights and licenses in and to the Compositions granted to Administrator pursuant to this Agreement are, and shall be deemed to be, licenses of rights to intellectual property subject to 11 United States Code §365 (n). Administrator shall be entitled to all rights, remedies and elections under the Bankruptcy Code including, but not limited to, 11 USC §365. In the event of any bankruptcy filing and/or in the event this Agreement is rejected by Owner and Administrator makes an election under 11 USC §365 (n)(1), Owner will perform under this Agreement and shall not interfere with rights granted to Administrator hereunder.

(xii)   Except where expressly provided to the contrary, this Agreement and all provisions of this Agreement shall inure to the benefit of and be binding upon the parties to this Agreement and their respective successors, heirs and permitted assigns.

(xiii)  Each and every provision of this Agreement shall be considered severable, and if for any reason any provision or  provisions herein are determined to be indefinite, invalid, contrary to any applicable existing or future laws or otherwise unenforceable under applicable law or by a court of competent jurisdiction, that shall not impair the operation or effect of any other portion of this Agreement, and this Agreement shall be deemed modified, but only to the extent necessary to make the provision enforceable.

(xiv)  In this Agreement references to the Owner include references to a person:-

(a)      who for the time being is entitled (by permitted assignment, novation, probate, or otherwise to the Owner's rights under this Agreement (or any interest in those rights); or

(b)      who as administrator, liquidator, or otherwise, is entitled to exercise those rights howsoever arising.

**THE OWNER HEREBY CONFIRMS THAT IT HAS BEEN ADVISED TO TAKE INDEPENDENT EXPERT LEGAL ADVICE AND HAS DONE SO AND UNDERSTANDS THE CONTENTS AND IMPLICATIONS OF THIS EXCLUSIVE CONTRACT**

The above terms have been read and agreed by each of the parties set out below:-

Signed,                                     Signed,

*Jim Arnay*                                         

DDA40546726C47D...                           EC022D22A5DD425...

Name: Jim Arnay                             Name: Emmanuel Gazmey-Santiago

For and on behalf of                      For and on behalf :

**Kobalt Music Services America, Inc.**    **Real Hasta La Muerte LLC f/s/o Emmanuel Gazmey Santiago p/k/a  "Anuel AA" d/b/a Gazmey Music Publishing**

**SCHEDULE ONE Part (i)**

**The Compositions**

**SCHEDULE ONE - THE COMPOSITIONS**
Emmanuel Gazmey Santiago, p/k/a "Anuel AA"

| SONG TITLE | ARTIST | RELEASE DATE | ALBUM | LABEL | Name of Writer(s) | % Control |
|---|---|---|---|---|---|---|
| Culpables | Karol G, Anuel | 9/14/2018 | SINGLE | UNIVERSAL MUSIC | Emmanuel Gazmey | 35% |
| | | | | | Carolina Giraldo Navarro | 25% |
| | | | | | Carlos E. Ortiz Rivera | 15% |
| | | | | | Juan G. Rivera Vazquez | 15% |
| | | | | | Daniel Echavarria Oviedo | 10% |
| Bebe | TEKASHI69 FT ANUEL AA | 8/31/2018 | SINGLE | TEN THOUSAND PROJECT LLC | Emmanuel Gazmey (ASCAP) | 30% |
| | | | | | Daniel Hernandez (BMI) | 20% |
| | | | | | Ronald Spence Jr. (BMI) | 50% |
| Bandolera | Anuel AA | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 60% |
| | | | | | CARLOS ENRIQUE ORTIZ-RIVERA(ASCAP) | 15% |
| | | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 5% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 10% |
| | | | | | NINO KARLO SEGARRA (ASCAP) | 10% |
| Brindemos | Anuel AA, Ozuna | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 40% |
| | | | | | CARLOS ENRIQUE ORTIZ-RIVERA(ASCAP) | 15% |
| | | | | | JAN CARLOS OZUNA ROSADO (BMI) | 14% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 15% |
| | | | | | VICENTE SAAVEDRA | 6% |
| | | | | | JEAN PIERRE SOTO PASCUAL | 10% |
| Espina | Anuel AA | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 60% |
| | | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 10% |
| | | | | | CARLOS ENRIQUE ORTIZ-RIVERA (ASCAP) | 15% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 15% |
| Hipocrita | Anuel AA Ft Zion | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 45% |
| | | | | | TORRES FELIX ORTIZ (BMI) | 20% |
| | | | | | CARLOS ENRIQUE ORTIZ-RIVERA (ASCAP) | 15% |
| | | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 5% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 15% |
| Modo De Avion | Anuel AA | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 60% |
| | | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 10% |
| | | | | | CARLOS ENRIQUE ORTIZ-RIVERA (ASCAP) | 15% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 15% |
| Na Nuevo | Anuel AA | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 60% |
| | | | | | CARLOS ENRIQUE ORTIZ-RIVERA (ASCAP) | 17.5% |
| | | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 5% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 17.5% |
| Naturaleza | Anuel AA | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 60% |
| | | | | | RAMON ENRIQUE CASILLAS-RIOS (ASCAP) | 40% |
| Pensando En Ti | Anuel AA Ft Wisin | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 45% |
| | | | | | JUAN LUIS MOREIRA (BMI) | 20% |
| | | | | | CARLOS ENRIQUE  ORTIZ-RIVERA (ASCAP) | 15% |
| | | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 5% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 15% |
| Quiere Beber | Anuel AA | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 50% |
| | | | | | JOAN ANTONIO GONZALEZ MARRERO | 15% |
| | | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 10% |
| | | | | | CARLOS ENRIQUE  ORTIZ-RIVERA (ASCAP) | 15% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 10% |
| Te Necesito | Anuel AA | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 50% |
| | | | | | UNKNOWN WRITER | 50% |
| Tu No Lo Amas | Anuel AA | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 60% |
| | | | | | FRABIAN ELI CARRION BARRETO | 5% |
| | | | | | CARLOS ENRIQUE  ORTIZ-RIVERA (ASCAP) | 15% |
| | | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 5% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 15% |
| Yeezy | Anuel AA Ft Nengo Flow | 7/17/2018 | Real Hasta La Muerte | Real Hasta La Muerte/Glad Empire | EMMANUEL GAZMEY (ASCAP) | 50% |
| | | | | | ARMANDO HERNANDEZ | 20% |
| | | | | | CARLOS ENRIQUE  ORTIZ-RIVERA (ASCAP) | 5% |
| | | | | | JUAN G RIVERA VAZQUEZ (BMI) | 5% |
| | | | | | EDWIN ROSA VAZQUEZ (SESAC) | 20% |

| Title | Artists | Date | | Publisher | Writers | % |
|---|---|---|---|---|---|---|
| La Ocasion | Anuel AA Feat. Arcangel, De La Ghetto, Ozuna | 3/16/2018 | | Hear This Music/Sony | EMMANUEL GAZMEY (ASCAP) | 8% |
| | | | | | RAMON L AYALA (ASCAP) | 8% |
| | | | | | RAFAEL CASTILLO-TORRES (ASCAP) | 8% |
| | | | | | PABLO FUENTES (BMI) | 7% |
| | | | | | LUIAN MALAVE (BMI) | 7% |
| | | | | | FELIX ORTIZ (BMI) | 8% |
| | | | | | JOSE ALVARO OSORIO BALVIN (BMI) | 8% |
| | | | | | JAN CARLOS OZUNA ROSADO (BMI) | 8% |
| | | | | | CARLOS EFREN REYES-ROSADO (ASCAP) | 8% |
| | | | | | NICK RIVERA-CAMINERO (SESAC) | 8% |
| | | | | | AUSTIN SANTOS (ASCAP) | 8% |
| | | | | | XAVIER ALEXIS SEMPER-VARGAS (ASCAP) | 7% |
| | | | | | EDGAR WILMER SEMPER-VARGAS (ASCAP) | 7% |
| Rojo | Anuel AA, Arcangel | 10/2/2017 | | Pina Records/Sony | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | UNKNOWN WRITER | 75% |
| Tu No Metes Cabra | Bad Bunny | 7/1/2017 | | Rimas Music/Hear This Music | EMMANUEL GAZMEY (ASCAP) | 40% |
| | | | | | RAMON L AYALA (ASCAP) | 20% |
| | | | | | BENITO ANTONIO MARTINEZ OCASIO (ASCAP) | 40% |
| Oscurida | Anuel AA, Farruko | 7/1/2017 | TrapXficante | Sony Music | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | FRANKLIN MARTINEZ (_____) | 10% |
| | | | | | CARLOS EFREN REYES-ROSADO (ASCAP) | 35% |
| | | | | | ELIJAH A SARRAGA (BMI) | 30% |
| Jersey | Anuel AA Feat. Nengo Flow, Alexio, Bryant Myers, Darell, Juanka | 9/3/2017 | | The Secret Panda | EMMANUEL GAZMEY (ASCAP) | 50% |
| | | | | | KARL RAYMOND SORIANO (ASCAP) | 50% |
| Me Quieren Matar | Anuel AA Feat. Farruko, Kendo Kaponi, Ozuna, | 7/18/2017 | | Kendo Kaponi Music | EMMANUEL GAZMEY (ASCAP) | 20% |
| | | | | | UNKNOWN WRITER | 80% |
| 23 | Anuel AA & Cosculluela | 7/11/2017 | | Rottweilas & Mueca Music | EMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | JOSE F COSCULLUELA (BMI) | 65% |
| | | | | | JOSE ANGEL HERNANDEZ (ASCAP) | 10% |
| Bebe | Anuel AA & Ozuna | 6/21/2017 | | Dimel VI | EMMANUEL GAZMEY (ASCAP) | 35% |
| | | | | | MICHAEL BRYAN MASIS (ASCAP) | 10% |
| | | | | | JAN CARLOS OZUNA ROSADO (BMI) | 31.5% |
| | | | | | VICENTE SAAVEDRA (BMI) | 13.5% |
| | | | | | JEAN PIERRE SOTO PASCUAL (BMI) | 10% |
| Cuentale | Casper Magico & Anuel AA | 6/20/2017 | | Los Magicos | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | CEDENO URBANI MOTA (ASCAP) | 25% |
| | | | | | LUIS JORGE ROMERO (ASCAP) | 25% |
| | | | | | JULIO A CRUZ GARCIA (ASCAP) | 25% |
| Si Tu Quieres | Anuel AA, Pusho, Ozuna | 4/1/2017 | | Ozuna Producciones | EMMANUEL GAZMEY (ASCAP) | 20% |
| | | | | | UNKNOWN WRITER | 80% |
| Ayer Remix (2) | Anuel, Dj Nelson, Nicky Jam, Cosculluela, J Balvin | 6/16/2017 | | Real Hasta La Muerte/Flow Music | EMMANUEL GAZMEY (ASCAP) | 30% |
| | | | | | MARTINEZ NELSON DIAZ | 50% |
| | | | | | CARLOS EFREN REYES-ROSADO (ASCAP) | 20% |
| Los Intocables | Anuel AA Feat. Nengo Flow | 4/1/2016 | | 360 Ent/Sinfonico Music | CARLOS EFREN REYES-ROSADO (ASCAP) | 50% |
| | | | | | MANUEL G LIMERY (ASCAP) | 25% |
| | | | | | KEVIN DANIEL ORTIZ-MEDINA (ASCAP) | 25% |
| Amen | Anuel AA, Kendo Kaponi | 4/7/2017 | Amen | Kendo Kaponi Music | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | UNKNOWN WRITER | 75% |
| Tentandome | Anuel AA, J Alvarez | 2/24/2017 | | On Top Of The World Music | EMMANUEL GAZMEY (ASCAP) | 50% |
| | | | | | MICHAEL BRYAN MASIS (ASCAP) | 50% |
| Power Remix | Benny Benni Feat. Anuel AA, Gotay, Daddy Yankee, Alexio, Kendo Kaponi, Pusho, Almighty, DoZi | 1/15/2017 | | Benny Benni | EMMANUEL GAZMEY (ASCAP) | 10% |
| | | | | | JESUS MANUEL BENITEZ-HIRALDO (ASCAP) | 25% |
| | | | | | RICHY CARMONA (ASCAP) | 25% |
| | | | | | WILBERTO GUERRIDO (BMI) | 20% |
| | | | | | ALEXIS GOTAY (ASCAP) | 20% |
| Liberace | Anuel AA | | | | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | DE LA PRIDA HENRY (ASCAP) | 12.5% |
| | | | | | CARLOS EFREN REYES-ROSADO (ASCAP) | 50% |
| | | | | | EZEQUIEL RIVERA (ASCAP) | 12.5% |
| Liberace Remix 1 | Anuel Fat Joe, Arcangel | | | | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | DE LA PRIDA HENRY (ASCAP) | 12.5% |
| | | | | | CARLOS EFREN REYES-ROSADO (ASCAP) | 50% |
| | | | | | EZEQUIEL RIVERA (ASCAP) | 12.5% |
| Liberace Remix 2 | Anuel AA Feat. Farruko, De La Ghetto, Arcangel, Nengo Flow, Alexio, Bryant Myers, Bad Bunny, Noriel, Darell | 1/1/2017 | | Carbon Fiber Music | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | DE LA PRIDA HENRY (ASCAP) | 12.5% |
| | | | | | CARLOS EFREN REYES-ROSADO (ASCAP) | 50% |
| | | | | | EZEQUIEL RIVERA (ASCAP) | 12.5% |
| No Forcen Remix | Anuel AA Feat. Ozuna | 12/24/2016 | | Rimas Music | EMMANUEL GAZMEY (ASCAP) | 20% |
| | | | | | DAVID ERIC LOWEN (BMI) | 40% |
| | | | | | JAN CARLOS OZUNA ROSADO (BMI) | 40% |
| La Noche Oscura | Anuel AA Feat. Jory | 12/2/2016 | | Otra Liga Young Boss Ent/Cinq Music | EMMANUEL GAZMEY (ASCAP) | 30% |
| | | | | | CRUZ JOSIAS GABRIEL DE LA (BMI) | 25% |
| | | | | | CHRISTOPHER RUIZ (BMI) | 22.5% |
| | | | | | BENITEZ FERNANDO SIERRA (ASCAP) | 22.5% |
| 47 | Anuel AA Feat. Nengo Flow | 11/25/2016 | | 360 Ent | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | | LIL GENIUS (BMI) | 35% |
| | | | | | MANUEL G LIMERY (ASCAP) | 15% |
| | | | | | EDWIN ROSA VAZQUEZ (SESAC) | 25% |

| Title | Artists | Date | Publisher | Writers | % |
|---|---|---|---|---|---|
| Diablita | Anuel AA Feat. Noriel, Baby Rasta | 10/7/2016 | Trap Capos Season 1 Sony Music | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | JONATHAN DE JESUS GANDARILLA (SESAC) | 28.12% |
| | | | | SHARON RAMIREZ LOPEZ (SESAC) | 28.12% |
| | | | | JUAN JESUS SANTANA-LUGO (ASCAP) | 18.76% |
| Las Babys Me Llaman | Anuel AA Feat. Carly | 7/1/2016 | Hustler For Life | EMMANUEL GAZMEY (ASCAP) | 30% |
| | | | | UNKNOWN WRITER | 70% |
| Amor de Calle | Anuel AA Feat. Anonimus, Alexis | 8/6/2016 | La Commission | EMMANUEL GAZMEY (ASCAP) | 20% |
| | | | | UNKNOWN WRITER | 80% |
| Snapchat Remix | Anuel AA Feat. Lary Over | 6/22/2016 | Young Hollywood | EMMANUEL GAZMEY (ASCAP) | 33.32% |
| | | | | RAYMOND LOUIS GUEVARA (BMI) | 33.34% |
| | | | | ELIJAH A SARRAGA (BMI) | 33.34% |
| Hablame | Anuel AA Feat. Lyan, Juanka, Bryant Myers | 5/1/2016 | Global Boyz/Cinq Music | EMMANUEL GAZMEY (ASCAP) | 30% |
| | | | | GERARDO JERRY JR GRAUPERA (BMI) | 70% |
| Esta Cabron Remix | Anuel AA Feat. Nejo, Gotay, Pusho, Almighty, DoZi, Yomo, Jamby, | 4/23/2016 | La Fama All Stars | EMMANUEL GAZMEY (ASCAP) | 10% |
| | | | | CRUZ JOSIAS  DE LA (BMI) | 22.5% |
| | | | | HECTOR DAVID LAMBOY (BMI) | 22.5% |
| | | | | CARLOS DANIEL CRESPO-PLANAS (ASCAP) | 22.5% |
| | | | | ALEXIS GOTAY (ASCAP) | 22.5% |
| Tu Me Enamoraste Remix | Anuel AA Feat. Bryant Myers, Brytiago, Almighty, Lary Over | 4/2/2016 | Young Hollywood | EMMANUEL GAZMEY (ASCAP) | 10% |
| | | | | BRYAN CANCEL (BMI) | 10% |
| | | | | RAYMOND LOUIS GUEVARA (BMI) | 10% |
| | | | | ALEJANDRO SR MOSQUEDA (BMI) | 10% |
| | | | | BRYAN ROBERT ROHENA PEREZ (ASCAP) | 10% |
| | | | | ELIJAH A SARRAGA (BMI) | 50% |
| Volverte A Ver | Anuel AA Feat. Nio Garcia, Bryant Myers | 3/4/2016 | Flow Music/ Cinq | EMMANUEL GAZMEY (ASCAP) | 16.66% |
| | | | | MARTINEZ NELSON DIAZ | 50% |
| | | | | LUIS QUIONES (ASCAP) | 16.68% |
| | | | | BRYAN ROBERT ROHENA PEREZ (ASCAP) | 16.66% |
| Ella Y Yo | Anuel AA Feat. Farruko, Bryant Myers, Tempo, Almighty | 1/27/2016 | Una Vision Quintana | EMMANUEL GAZMEY (ASCAP) | 15% |
| | | | | PEDRO JUAN FIGUEROA-QUINTANA (ASCAP) | 45% |
| | | | | EDGAR WILMER SEMPER-VARGAS (ASCAP) | 20% |
| | | | | XAVIER ALEXIS SEMPER-VARGAS (ASCAP) | 20% |
| Culpable | Anuel AA Feat. Myke Duran | 9/11/2015 | The Entity Music | EMMANUEL GAZMEY (ASCAP) | 25% |
| | | | | FRANCISCO MELENCIANO (_____) | 75% |
| Te Sigo Amando | Anuel AA | | | EMMANUEL GAZMEY (ASCAP) | 60% |
| | | | | CARLOS ENRIQUE ORTIZ-RIVERA(ASCAP) | 10% |
| | | | | JUAN G RIVERA VAZQUEZ (BMI) | 10% |
| | | | | NINO KARLO SEGARRA SANCHEZ ( ASCAP) | 10% |
| | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 10% |
| Con Silenciador | Anuel, El Alfa | | | EMMANUEL GAZMEY (ASCAP) | 33% |
| | | | | CHAEL EUGENIO BETANCES ALEJO (BMI) | 33% |
| | | | | EMANUEL HERRERA BATISTA (BMI) | 34% |
| Y.O.L.O. | Anuel AA | | | EMMANUEL GAZMEY (ASCAP) | 50% |
| | | | | KARL RAYMOND SORIANO (ASCAP) | 50% |
| Pasado y Presente | Anuel AA | | | EMMANUEL GAZMEY (ASCAP) | 20% |
| | | | | JOSE ANTONIO APONTE (BMI) | 5% |
| | | | | DIEGO FERNANDO CAVIEDES-FRANCO (ASCAP) | 6% |
| | | | | CARLOS ENRIQUE ORTIZ-RIVERA (ASCAP) | 7.5% |
| | | | | JAN CARLOS OZUNA ROSADO (BMI) | 30% |
| | | | | YAZID RIVERA LOPEZ (ASCAP) | 6% |
| | | | | JUAN G RIVERA VAZQUEZ (BMI) | 7.5% |
| | | | | BRYAN ARGENIS TAVERAS (BMI) | 18% |
| Tu No Lo Amas | Anuel AA | | | EMMANUEL GAZMEY (ASCAP) | 60% |
| | | | | FRABIAN ELI CARRION BARRETO | 5% |
| | | | | CARLOS ENRIQUE ORTIZ-RIVERA (ASCAP) | 15% |
| | | | | LUIS E ORTIZ-RIVERA (ASCAP) | 5% |
| | | | | JUAN G RIVERA VAZQUEZ (BMI) | 15% |
| Jodedor Remix | Anuel AA, Gotay, Farruko, Almight, Juanka El Problematic, Benny Benni, Dozi | | | ANUEL AA (ASCAP) | 7% |
| | | | | ENRIQUE BERNARDO SEGUI RABASSA (SGAE) | 18% |
| | | | | JESUS MANUEL BENITEZ-HIRALDO (ASCAP) | 40% |
| | | | | DOZI (BMI) | 7% |
| | | | | FARRUKO (ASCAP) | 7% |
| | | | | ALEXIS GOTAY(ASCAP) | 7% |
| | | | | JUANKA EL PROBLEMATIK (ASCAP) | 7% |
| | | | | ALEJANDRO SR MOSQUEDA (BMI) | 7% |
| Me Contagie | Anuel AA | | | EMMANUEL GAZMEY (ASCAP) | 100.00% |
| No Me Hables De Amor | Anuel AA, Casper Magico | | | EMMANUEL GAZMEY (ASCAP) | 37.5% |
| | | | | JOSE MARTIN VELAZQUEZ (BMI) | 37.5% |
| | | | | JULIO A CRUZ GARCIA (ASCAP) | 25% |

## SCHEDULE ONE Part (i)

### Excluded Compositions

a.  Conversaciones con dios
b.  Bella y la bestia
c.  La mas bella
d.  Salvaje freestyle
e.  Vanidad aa
f.  Ella tiene novio
g.  Hay rumores
h.  Rasta faray
i.  Ripbig
j.  Cristiniando
k.  Sexo con Cristina
l.  Ella anda sola
m.  3 some
n.  Amiga
o.  Uhhh
p.  Street poem
q.  Nacimos pa morir
r.  Soldado y profeta
s.  Soldado y profeta remix
t.  Nunca sapo
u.  Sola
v.  Sola remix
w.  Cenzia en cenicero
x.  Coronamos
y.  Coronamos Remix
z.  No love
aa. Mi vida
bb. Armao siempre andamos / Armao 100pre Andamos
cc. Anoche sone
dd. Thinkin
ee. Tentandome
ff. Te propongo
gg. Maliante HP
hh. Maliante HP Remix
ii.  47 Remix

DocuSign Envelope ID: 318CA813-17A5-40A6-889E-3D50E6A71ECE

**SCHEDULE TWO**

**INFORMATION SCHEDULE**
**PART (i)**
**PRIOR ADMINISTRATOR(S)/DISPUTES**

**IF YOU HAD MORE THAN ONE PRIOR AGREEMENT, PLEASE COPY THIS TABLE AND COMPLETE IT FOR EACH AGREEMENT**

| | |
|---|---|
| **PREVIOUS PUBLISHERS/ADMINISTRATORS** (if any)**: N/A** | |
| **NAME** | |
| **WHICH TERRITORIES DID THIS AGREEMENT COVER?** | |
| **WHEN DID/DOES THEIR TERM END?** | |
| **WHEN DID/DOES THEIR RIGHTS PERIOD END?** | |
| **WHEN DID/DOES THEIR COLLECTION PERIOD END?** | |
| **IS THIS PUBLISHER ENTITLED TO RETAIN ANY PORTION OF THE COPYRIGHT IN YOUR SHARE OF THE COMPOSITIONS OR ANY ADMINISTRATION RIGHTS?** | |

**ARE ANY OF THE WORKS IN THE SCHEDULE THE SUBJECT OF A PAST OR ONGOING DUPLICATE CLAIM OR DISPUTE?**

If so, please give full details

**No.**

**SCHEDULE TWO**

**INFORMATION SCHEDULE**
**PART (ii)**
**ADMINISTRATIVE INFORMATION**

| |
|---|
| **IPI/CAE OF CONTRACTING PARTY/PARTIES:** |
| **Emmanuel Gazmey - IPI  #812054675** |
| **Gazmey Music Publishing – IPI #626435841** |

| |
|---|
| **PLEASE PROVIDE FULL NAMES AND CAE NUMBERS OF ANY DBAs, Alternative Names, Pseudonyms or PKAs:** |
| In particular note that any companies affiliated to ASCAP, BMI or SESAC should be listed |
| **Anuel AA – IPI #812054773** |

| |
|---|
| **PLEASE CONFIRM THE COLLECTION SOCIETY OR SOCIETIES OF WHICH YOU AND ANY RELEVANT WRITERS ARE MEMBERS AND, IF MORE THAN ONE, THE TERRITORIES FOR WHICH YOU (OR THE RELEVANT WRITER) ARE A MEMBER:** |
| If different compositions need to go to different societies, please indicate this on Schedule One. |
| **ASCAP** |

| |
|---|
| **IF YOU HAVE NOT ALREADY NAMED A US PERFORMING SOCIETY IN THE SECTION ABOVE, PLEASE CONFIRM WHETHER YOU HAVE A PREFERENCE AS TO WHICH ONE WE USE TO COLLECT YOUR PERFORMANCE INCOME:** |
| For publishing companies with more than one writer, indicate this on Schedule One. |
| **N/A** |

**SCHEDULE TWO**

**INFORMATION SCHEDULE**
**PART (iii)**
**PAYMENT INSTRUCTIONS**

---

**PLEASE CONFIRM YOUR COUNTRY OF DOMICILE FOR TAX PURPOSES:**

---

| **PLEASE SELECT ONE PAYMENT CURRENCY:** | |
|---|---|
| **CANADIAN DOLLARS (CAD)** | |
| **EUROPEAN UNION EUROS (EUR)** | |
| **SWEDISH KRONOR (SEK)** | |
| **UNITED KINGDOM POUNDS (GBP)** | |
| **UNITED STATES DOLLARS (USD)** | **USD** |

---

| **IF PAYMENTS ARE TO BE TRANSFERRED INTO A BANK ACCOUNT BASED IN THE UNITED STATES:** | |
|---|---|
| **ACCOUNT/PAYEE NAME:** | **Real Hasta La Muerte LLC** |
| **BANK NAME & LOCATION:** | **JP Morgan Chase Bank, N.A.**<br>**Doral Isles**<br>**10795 NW 58th St.**<br>**Doral, FL 33178** |
| **ROUTING NUMBER:** | **021000021** |
| **ACCOUNT NUMBER:** | **309360565** |
| **SWIFT / BIC CODE:** | **CHASUS33** |
| **ACCOUNT TYPE:** | **Checking** |
| **PAYEE TYPE:** | **Company** |

---

Please sign here to confirm that the bank details set out above are accurate *(please note that, for agreements with service/furnishing companies, this should be signed by the writer(s) personally, even if the company has other signatories).*

DocuSigned by:

EC022D22A5DD425...          …………………..

**SCHEDULE TWO**

**INFORMATION SCHEDULE PART (iv)**

**THE AUTHORISED REPRESENTATIVES**

*\* If the Agreement is for a writer, production team or band, whether using one or more service/furnishing companies or not, for the Writer(s) to have access to his/her/their area of the portal and the app, you need to include each such Writer as an authorised representative (with full authorisation) and include an email address for him/her/them.*

---

**AUTHORISED REPRESENTATIVE (<u>FULL AUTHORISATION</u>):**

**THIS CONTACT WILL BE AUTHORISED TO:**

- **ACCESS YOUR AREA OF THE PORTAL WHERE THEY CAN VIEW STATEMENTS AND OTHER FINANCIAL INFORMATION;**

- **PROVIDE/AMEND PAYMENT INSTRUCTIONS ON YOUR BEHALF;**

- **GRANT OR WITHHOLD APPROVAL FOR USES OF YOUR COMPOSITIONS; AND**

- **DELIVER NEW COMPOSITIONS.**

| | |
|---|---|
| **NAME:** | Emmanuel Gazmey-Santiago |
| **ROLE:** | Writer |
| **ADDRESS:** | c/o Singh, Singh & Trauben, LLP, 400 South Beverly Drive, Suite 240, Beverly Hills, CA 90212, ATTN: Simran Singh, Esq. |
| **EMAIL ADDRESS:** | <u>gazmeymusic@gmail.com</u> |
| **PHONE NUMBER:** | (787) 462-5789 |

---

**AUTHORISED REPRESENTATIVE (<u>FULL AUTHORISATION</u>):**

**THIS CONTACT WILL BE AUTHORISED TO:**

- **ACCESS YOUR AREA OF THE PORTAL WHERE THEY CAN VIEW STATEMENTS AND OTHER FINANCIAL INFORMATION;**

- **PROVIDE/AMEND PAYMENT INSTRUCTIONS ON YOUR BEHALF;**

- **GRANT OR WITHHOLD APPROVAL FOR USES OF YOUR COMPOSITIONS; AND**

- **DELIVER NEW COMPOSITIONS.**

| | |
|---|---|
| **NAME:** | Simran Singh, Esq |

| ROLE: | Attorney |
|---|---|
| ADDRESS: | 400 South Beverly Drive, Suite 240, Beverly Hills, CA 90212 |
| EMAIL ADDRESS: | ssingh@singhtraubenlaw.com |
| PHONE NUMBER: | (310) 856-9705 |

Please sign here to confirm that you instruct us to treat the people named above as Authorised Representatives with respect to financial matters (as described above) as well as approvals & delivery.

DocuSigned by:

EC022D22A5DD425…       …………………

**AUTHORISED REPRESENTATIVE (<u>APPROVALS / DELIVERY ONLY</u>):**

**THIS CONTACT WILL ONLY BE AUTHORISED TO:**

- **GRANT OR WITHHOLD APPROVAL FOR USES OF YOUR COMPOSITIONS; AND**

- **DELIVER NEW COMPOSITIONS.**

| NAME: | Frabian Eli Carrion |
|---|---|
| ROLE: | Manager |
| ADDRESS: | c/o Singh, Singh & Trauben, LLP, 400 South Beverly Drive, Suite 240, Beverly Hills, CA 90212, ATTN: Simran Singh, Esq. |
| EMAIL ADDRESS: | frabianeli@gmail.com |
| PHONE NUMBER: | |

Please sign here to confirm that you instruct us to treat the people named above as Authorised Representatives with respect to approvals & delivery.

DocuSigned by:

EC022D22A5DD425...          . . . . . . . . . . . . . . . . . . . .

---

**AUTHORISED REPRESENTATIVE (<u>APPROVALS / DELIVERY ONLY</u>):**

**THIS CONTACT WILL ONLY BE AUTHORISED TO:**

- **GRANT OR WITHHOLD APPROVAL FOR USES OF YOUR COMPOSITIONS; AND**

- **DELIVER NEW COMPOSITIONS.**

| NAME: | |
|---|---|
| ROLE: | |
| ADDRESS: | |
| EMAIL ADDRESS: | |
| PHONE NUMBER: | |

## SCHEDULE THREE

### Letter of Direction

As of    October 25, 2018

To:    ALL RECORD MANUFACTURERS
       LICENSED TO MECHANICALLY
       REPRODUCE THE COMPOSITIONS
       SPECIFIED HEREINBELOW

       THE HARRY FOX AGENCY
       ALL OTHER PARTIES IN INTEREST

Please be advised that effective as of date hereof we have granted to Kobalt Music Services America, Inc. and its licensees and assigns, the exclusive right, throughout the world, in respect of compositions of which the undersigned is the copyright proprietor, including those compositions listed on Schedule One annexed (the "**Compositions**"):

(i)      to license and cause others to license the use of the Compositions; and

(ii)     to administer and grant rights in and to the Compositions and the copyrights therein; and

(iii)    to publish and sell sheet music and/or folios of the Compositions if it so elects; and

(iv)     to collect all monies payable with respect to the Compositions, including monies earned but not paid prior to the effective date hereof; and

(v)      to otherwise administer the Compositions and the copyrights therein and to act as the publisher thereof.

Yours faithfully,

Name: Emmanuel Gazmey-Santiago
For and on behalf of:
**Real Hasta La Muerte LLC f/s/o Emmanuel Gazmey Santiago**
**p/k/a  "Anuel AA" d/b/a Gazmey Music Publishing**

## **SCHEDULE FOUR**

### **W9 Form**

**SCHEDULE FIVE**

**SST Override Letter Of Direction**

Real Hasta La Muerte LLC f/s/o
Emmanuel Gazmey Santiago p/k/a "Anuel AA"
d/b/a Gazmey Music Publishing
c/o Singh, Singh & Trauben, LLP
400 South Beverly Drive
Suite 240
Beverly Hills, CA 90212

Kobalt Music Services America, Inc.
2 Gansevoort
6th Floor
New York, NY 10014
Attn: Royalty Department

Date: October 25, 2018

Dear Ladies and Gentlemen:

1       I have engaged Singh, Singh, & Trauben, LLP ("**SST**") to perform certain legal services in connection with my publishing catalogue, including negotiation of my administration agreement with you, dated October 25, 2018 (the "**Kobalt Agreement**").

2.      I hereby request and authorize you to make payment of the Override (as defined in clause 3 below), on my behalf and from the royalties, fees and other monies which you are due to pay to me under the terms of the Kobalt Agreement in respect of the exploitation of the Compositions (as defined in the Kobalt Agreement) throughout the Territory (as defined in the Kobalt Agreement), to SST by way of consideration from me to SST in respect of the services referred to in clause 1 above.

3.      The "**Override**" shall, unless otherwise advised in writing, mean seven percent (7%) of all monies which are attributable to exploitation of the Compositions (as defined in the Kobalt Agreement) and which become due to me pursuant to the Kobalt Agreement (for the avoidance of doubt, after the deduction of Kobalt's commission) from all sources (including, without limitation, seven percent (7%) of any advances which may become due to me, after the date hereof, over the course of the Kobalt Agreement).

4.      Payments to SST should be made at the same time and on the same basis as payments are rendered to me (i.e. quarterly within 65 days) including, without limitation, being subject to your right to use such monies to recoup advances paid to me or on my behalf under the Kobalt Agreement and/or being subject to your right to withhold such monies in connection with a claim relating to the Compositions in accordance with clause 8(ii) of the Kobalt Agreement.

5.      Your compliance with this authorisation will constitute an accommodation to me alone. All payments to SST under this authorisation will constitute payment to me and you will have no liability by reason of any erroneous payment or failure to comply with this authorization. For the avoidance of doubt, SST will not be deemed a third party beneficiary of the Kobalt Agreement, and SST will have no rights whatsoever as against Kobalt thereunder. I will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses you incur by reason of any such payments or otherwise in connection herewith.

DocuSign Envelope ID: 318CA843-17A5-40A6-888E-0D50E6A71ECE

6.      All monies becoming payable under this authorization will be remitted to SST by electronic transfer into the account the details of which are set out below and will not, for the avoidance of doubt, be accompanied by statements with respect to those payments.

Bank Name:      1st Century Bank
Acct #:         2100057534
Routing #:      122243761
Acct Name:      Singh Singh & Trauben LLP

Yours faithfully,

Name: Emmanuel Gazmey-Santiago
For and on behalf of:
**Real Hasta La Muerte LLC f/s/o Emmanuel Gazmey Santiago p/k/a  "Anuel AA" d/b/a Gazmey Music Publishing**

## **SCHEDULE SIX**

### **Letter of Inducement**

Dated  October 25, 2018

Ladies and Gentlemen,

**Re: Administration agreement between Kobalt Music Services America Inc (Kobalt) and real Hasta La Muerte LLC (the Company) dated October 25, 2018  (the Agreement). Unless otherwise specified by the context herein, all defined terms shall have the meanings attributed to them in the Agreement.**

By way of further inducement for Kobalt to enter the Agreement and in consideration of the sum of one U.S. dollar ($1) (the receipt and sufficiency of which is hereby acknowledged):

▪ I acknowledge and agree to the contents and the obligations entered into on my behalf by the Company in the Agreement. I furthermore warrant that I have an exclusive song writing agreement with the Company for a period being no less than the Term/Rights Period (if applicable)/Collection Period of the Agreement.

▪ In the event that the Company is no longer entitled to the interest in the Compositions provided therein or is otherwise unable to fulfil its obligations to Kobalt during the Term/Rights Period (if applicable)/Collection Period of the Agreement I agree that Kobalt shall have the absolute right to elect to substitute me as the direct contracting party to the Agreement on written notice from Kobalt in the place and instead of the Company (the "**Substitution**").

▪ Until the Substitution I acknowledge that all payments made under the Agreement shall be made to the Company on my behalf in absolute discharge of Kobalt's obligations arising under the Agreement.

▪ I acknowledge that all rights and licenses in and to the Compositions granted to Kobalt pursuant to the Agreement are, and shall be deemed to be, licenses of rights to intellectual property subject to 11 United States Code §365 (n). Kobalt shall be entitled to all rights, remedies and elections under the Bankruptcy Code including, but not limited to, 11 USC §365. Following the Substitution, in the event of any bankruptcy filing and/or in the event the Agreement is rejected by me and Kobalt makes an election under 11 USC §365 (n)(1), I agree that I will perform under the Agreement and shall not interfere with rights granted to Kobalt under it.

I acknowledge that I have been advised to take independent expert legal advice and that I fully understand and agree to the contents of the Agreement.

Yours faithfully,                                                Read and agreed,

EC022D22A5DD425...

**Emmanuel  Gazmey-Santiago**

DDA40546726C47D...

For and on behalf of
**Kobalt Music Services America, Inc.**

## SCHEDULE SEVEN

### Kobalt Group Privacy Statement

**Kobalt Group Privacy Statement**

This Privacy Statement describes the information Kobalt Music Group Limited and our affiliates, including without limitation AWAL Digital Limited, Kobalt Music Services Limited, Kobalt Neighbouring Rights Limited and AWAL Recordings Limited (collectively, "Kobalt", "we" and "us"), collect when a person or business enters into a client agreement with us.

You (which for the purposes of this Privacy Statement shall include any data subject (from within/contracted to your organisation to the extent you are entering into the client agreement on behalf of a group of individuals or an organisation) whose personal data is shared with us at any time) should read this Privacy Statement before submitting personal data to us.

You confirm that before you submit personal data to us, you have read and understood the practices set out in this Privacy Statement.

To the extent you are contracting on behalf of an organisation, you warrant that you have obtained such confirmation from all relevant data subjects within/contracted to your organisation and have received the necessary confirmation to enable Kobalt to process their data in accordance with this Privacy Statement.

*Personal data we collect about you*

The types of personal data typically we collect about you include: (i) contact information, such as title, name, postal address, email address, telephone number and company name; (ii) financial information, such as bank account details; (iii) online identifiers, such as IP address, and user IDs and passwords; and (iv) in certain cases limited identification documents, such as passport, driving licence, credit card statement(s) and social security/national insurance number, strictly for the purposes of registering your details with the collection societies as per their registration requirements (as applicable).

As you use our websites or Apps, some additional personal data may be collected using various tracking technologies, such as cookies and pixel tags. Please click on the relevant link to our cookie policy for further information about how we use cookies and how to block or delete them.

*How we use your personal data*

We use your personal data to verify your identity, to perform our obligations under the client agreement, to respond to any requests you may make, to follow up with you after you have communicated with us or submitted information to us, for our legitimate interests to improve our services and website, to notify you about important changes to our services and updates to this Privacy Statement, to communicate with you via our newsletters (depending on your marketing preferences), and as otherwise specified in our privacy policies made available to you at the point we collect your personal data on any of our websites or via our Apps.

You can tell us whether you would like us to contact you with email updates or information regarding our services, at the point such information is collected on our websites or Apps or, where you do not wish us to continue to use your information in this way, by following the unsubscribe instructions on any communications sent to you. You can also exercise this right at any time by contacting us (using the details set out in this Privacy Statement).

*When we share your personal data*

We may share personal data you provide to us with: (i) other companies within the Kobalt Group; (ii) pursuant to our obligations under the client agreement, any third party to whom disclosure is necessary to enable us to provide you with any services which you have requested, including consultants, collection societies and digital service providers (who will have agreed to keep the information confidential and use it only to provide the applicable service); (iii) where required to do so by court order or where we are under a duty to disclose or share your information in order to comply with (and/or where we believe we are under a duty to comply with) any legal obligation; (iv) with any person to whom disclosure is necessary to enable us to enforce our rights under this Privacy Statement or under the client agreement or to protect our rights or the rights of third parties. This includes exchanging information with law enforcement agencies or other similar government bodies; and (v) to any company or prospective buyer of all or substantially all of Kobalt Music Group Limited's assets in connection with the sale or transfer of those assets to any prospective buyer.

We may transfer your personal data outside of the European Economic Area. This may include transferring it to or accessing it from other jurisdictions that may not provide a level of protection equivalent to the laws in your jurisdiction. Where we transfer personal data we will seek to take account of any applicable statutory obligations relevant to personal data transfers and, in the absence of an European Commission (EC) adequacy decision, we will seek to rely on appropriate safeguards, including Privacy Shield certification or EC approved standard contractual clauses: (see http://ec.europa.eu/justice/data-protection/international-transfers/transfer/index_en.htm).

We take appropriate steps to protect personal data from loss, misuse and unauthorised access, disclosure, alteration or destruction, whether in transmission or storage. Please keep in mind, however, that there is no such thing as perfect security, and no Internet transmission is ever completely secure or error-free. Moreover, you are responsible for maintaining the confidentiality of any user ID and password you use.

Your personal data will be retained by us for the duration of your account and may be retained for a period after this time as necessary and relevant to our legitimate operations, the terms of the client agreement and in accordance with applicable legal obligations. This may include retention necessary to meet our tax reporting requirements as well as time required to enforce the relevant terms of the client agreement or to identify, issue or resolve legal proceedings.

You have options and choices over how we use your personal data. These include the right to see the personal data we hold about you, and the right to request that we correct, erase and cease processing the data (in certain circumstances). You may also be entitled to receive the data or ask us to transfer it to a third party, in a commonly used electronic format.

Please contact us if you have any questions relating to these rights or this Privacy Statement in general, by email at: SAR@kobaltmusic.com or by writing to us, for the attention of our Data Protection Officer, Christiaan Winchester, at: Kobalt Music Group, 1 Cousin Lane, London EC4R 3TE.

If you remain unhappy with a response you receive from us, you can also refer the matter to your data protection supervisory authority: http://ec.europa.eu/justice/data-protection/bodies/authorities/index_en.htm.

# EXHIBIT E

**2019  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L18000181805

**Entity Name:** REAL HASTA LA MUERTE, LLC

**FILED**
**Apr 30, 2019**
**Secretary of State**
**3709592810CC**

**Current Principal  Place of Business:**

7520 NW 104TH AVE. SUITE 103
#132
DORAL , FL  33178

**Current Mailing Address:**

7520 NW 104TH AVE. SUITE 103
#132
DORAL,  FL  33178  US

**FEI Number: 83-1389094**                          **Certificate of Status Desired:**  No

**Name and Address of Current Registered Agent:**

GAZMEY, EMMANUEL
7520 NW 104TH AVE. SUITE 103
#132
DORAL, FL  33178  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

       Electronic Signature of Registered Agent                                                Date

**Authorized Person(s) Detail :**

| | | | | |
|---|---|---|---|---|
| Title | AMBR | | Title | AMBR |
| Name | GAZMEY, EMMANUEL | | Name | CARRION, FRABIAN ELI |
| Address | 7520 NW 104TH AVE. SUITE 103 #132 | | Address | 7520 NW 104TH AVE. SUITE 103 #132 |
| City-State-Zip: | DORAL  FL  33178 | | City-State-Zip: | DORAL  FL  33178 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EMMANUEL GAZMEY                                        AMBR                          04/30/2019

       Electronic Signature of Signing Authorized Person(s) Detail                                                Date

# EXHIBIT F

THIS INSTRUMENT PREPARED BY:
Scott Weisburd, Esq.
Weisburd, Eisen & Possenti, P.A.
2751 Executive Park Drive, Suite 104
Weston, Florida 33331

CFN: 20200700381 BOOK 32225 PAGE 1058
DATE:12/07/2020  09:52:46 AM
DEED DOC 19,020.00
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

## SPECIAL WARRANTY DEED

This Deed, made this *18* day of *November*, 2020, between **GRAND FLORIDIAN AT DORAL, LLC, a Florida Limited Liability Company**, hereinafter referred to as "Grantor", whose post office address is 7774 N.W. 46th Street, Miami, Florida 33166, and **FRABIAN ELI CARRION BARRETO, a single man**, whose post office address is **6811 NW 104th Court, Doral, Florida 33178**, hereinafter referred to as "Grantee".

WITNESSETH

That **Grantor**, for and in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable considerations to it in hand paid by **Grantee**, the receipt of which is hereby acknowledged, has granted, bargained, conveyed and sold to **Grantee**, and **Grantee's** heirs and assigns forever, the following described real property (the "Property") situated, lying and being in Miami-Dade County, Florida to wit:

**LOTS 1 AND 2, BLOCK 8, GRAND FLORIDIAN ESTATES, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 170, AT PAGE 92, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.**

This conveyance is made subject to the following:

1.  Real estate taxes for the year of the effective date hereof and subsequent years;
2.  All of the covenants, agreements, conditions, restrictions, reservations, dedications, plats and easements of record, if any, which may now affect the Property;
3.  Zoning restrictions, prohibitions and other requirements imposed by governmental authority;
4.  All of the terms, provisions, conditions, rights, privileges, obligations, and liens set forth and contained in that certain Declaration of Covenants, Conditions, Restrictions and Easements, recorded in Official Records Book 29796, at Page 1270, of the Public Records of Miami-Dade County, Florida, as may be amended (the "Declaration of Covenants").
5.  Rights of ingress and egress over and across any and all roads contained within the Community, including without limitation, the Bikeway (as defined in the Declaration of Covenants);
6.  All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded or to be recorded in the public records;
7.  Pending governmental liens for public purposes as of closing;
8.  Minor encroachments resulting from errors in surveying or construction, including but not limited to fence encroachments; and,
9.  All of the exceptions to title as more particularly set forth on Exhibit "A" attached hereto and made a part hereof.

Property Tax Folio No.:      **35-3017-039-0640**

CFN: 20200700381 BOOK 32225 PAGE 1059

**TO HAVE AND TO HOLD**, the above granted, bargained and described Property in fee simple forever.

**Grantee**, by acceptance and recordation hereof, and by agreement with **Grantor**, hereby expressly assumes and agrees to be bound by and to comply with all of the covenants, terms, conditions, and provisions set forth and contained in the above described Declaration of Covenants, as amended, including, but not limited to, the obligation to make payments of assessments for maintenance which may be levied against the Property, pursuant to the terms and provisions thereof.

AND **Grantor**, for itself and for its successors and assigns, does hereby fully warrant title to said Property, and will defend the same against the lawful claims of all persons claiming by, through or under Grantor.

<table>
<tr><td><u>**WITNESSES:**</u></td><td><u>**GRANTOR:**</u></td></tr>
</table>

**GRAND FLORIDIAN AT DORAL, LLC,**
**a Florida Limited Liability Company**

Name: _Suzanne Soriano_
**Please Print**

**By Its Manager:**

**GRAND FLORIDIAN GP, LLC,**
**a Florida limited liability company**

Name: _Yenis Machin_
**Please Print**

By: _____
**JUAN CARLOS TOVAR, Manager**

STATE OF FLORIDA        }
COUNTY OF MIAMI-DADE    }

I HEREBY CERTIFY that, on this day, before me, an officer duly authorized in the State and County aforesaid to administer oaths and take acknowledgments, personally appeared **JUAN CARLOS TOVAR, the Manager of GRAND FLORIDIAN GP, LLC, a Florida limited liability company, the Manager of GRAND FLORIDIAN AT DORAL, LLC, a Florida Limited Liability Company,** who, after being duly sworn, acknowledged before me, by means of __X__ physical presence or _____ online notarization, the execution of the foregoing instrument for the purposes therein expressed, and who is known to me personally.

WITNESS my hand and official seal in the County and State last aforesaid this _18th_ day of _November_, 2020.

_Yenis Machin_
NOTARY PUBLIC, STATE OF FLORIDA
Name: _Yenis Machin_
Please Print
My commission expires:

YENIS MACHIN
Notary Public - State of Florida
Commission # GG 949500
My Comm. Expires Jan 21, 2024
Bonded through National Notary Assn.

2

CFN: 20200700381 BOOK 32225 PAGE 1060

## EXHIBIT "A" TO SPECIAL WARRANTY DEED

      1.      Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of Florida Fruit Lands Company's Subdivision No. 1, as recorded in Plat Book 2, Page(s) 17;

      2.      Easement granted to Florida Power & Light Company by Right-of-Way Agreement recorded in Official Records Book 6101, Page 438;

      3.      Easement granted to Florida Power & Light Company by Right-of-Way Agreement recorded in Official Records Book 6170, Page 624;

      4.      Grant of Easement in favor of Miami-Dade Water and Sewer Authority recorded in Official Records Book 9001, Page 1416;

      5.      Covenant Running With the Land in favor of Miami-Dade County recorded in Official Records Book 22982, Page 697;

      6.      Covenant Running With the Land of 102 Ave LLC regarding storm water management system recorded December 27, 2007 in Official Records Book 26129, Page 3875, as modified by Modification of Covenant recorded in Official Records Book 29826, Page 4595;

      7.      Terms and conditions of Environmental Resource Permit No. 13-04110-P of the South Florida Water Management District as evidenced by that Environmental Resource Permit Notice recorded in Official Records Book 26415, Page 672;

      8.      Agreement for Water and Sanitary Sewage Facilities between Miami-Dade County and Grand Floridian at Doral, LLC recorded in Official Records Book 28660, Page 4735;

      9.      Covenant Running With the Land of Grand Floridian at Doral, LLC regarding storm water management system recorded in Official Records Book 28990, Page 4155;

      10.     Terms, conditions and provisions of that Grand Floridian Estates Master Development Agreement recorded, in Official Records Book 26149, Page 676, as affected by First Amendment to Grand Floridian Estates Master Development Agreement recorded in Official Records Book 29003, Page 3129;

      11.     Terms and conditions of Environmental Resource Permit No. 13-05517-P of the South Florida Water Management District as evidenced by that Environmental Resource Permit Notice recorded in Official Records Book 29036, Page 4312;

      12.     Grant of Easement to Miami-Dade Water and Sewer Authority recorded in Official Records Book 8837, at Page 497;

      13.     Agreement for Water and Sanitary Sewer Facilities between Miami-Dade County and City of Doral, recorded in Official Records Book 29441, at Page 796;

      14.     Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of Grand Floridian Estates, as recorded in Plat Book 170, at Page 92;

      15.     Grant of Easement recorded in Official Records Book 29737, at Page 4260;

      16.     Ordinance recorded in Official Records Book 29780, at Page 3194;

      17.     Resolution recorded in Official Records Book 29780, at Page 3235; and,

      18.     Solid Waste Facility Notification, Acknowledgment Waiver and Release of Proximity to Solid Waste Facility to be recorded against the Property simultaneously herewith.

all of which are recorded in the Public Records of Miami-Dade County, Florida.

3

# EXHIBIT G



October 31, 2020 through November 30, 2020

Account Number:     000000309360565

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/12 | Orig CO Name:Att        Orig ID:9864031004 Desc Date:111020 CO Entry Descr:Payment  Sec:PPD   Trace#:031100200751586 Eed:201112   Ind ID: Ind Name:Eli Entertainment Trn: 3170751586Tc | 223.14 |
| 11/12 | Orig CO Name:Hotwire Communic      Orig ID:0010744734 Desc Date:111220 CO Entry Descr:Hotwire Cosec:PPD   Trace#:236073802678452 Eed:201112   Ind ID: Ind Name:Esantiago Trn: 3172678452Tc | 61.75 |
| 11/13 | Quickpay With Zelle Payment To Loly Jpm470602388 | 3,150.00 |
| 11/13 | Quickpay With Zelle Payment To Brandom Seguridad De Anuel Jpm470906680 | 5,000.00 |
| 11/16 | Quickpay With Zelle Payment To Angel Carritos Jpm471897962 | 5,000.00 |
| 11/16 | Orig CO Name:Rbi Alliance        Orig ID:37-1760432 Desc Date:201113 CO Entry Descr:Carpaymt  Sec:CCD   Trace#:091408599024679 Eed:201116   Ind ID: Ind Name:A1746 - Eli Entertainm | 2,096.93 |
| 11/16 | Orig CO Name:Fpl Direct Debit      Orig ID:3590247775 Desc Date:11/20 CO Entry Descr:Elec Pymt Sec:Web   Trace#:111000011542887 Eed:201116   Ind ID:3427815299 Webi Ind Name:Priscilla P Carrasco-S | 335.92 |
| 11/17 | 11/17 Domestic Wire Transfer Via: City Nb of Fla/066004367 A/C: Weisburd, Eisen & Possenti, PA Imad: 1117B1Qgc04C010959 Trn: 3369360322Es | 613,528.51 |
| 11/17 | Orig CO Name:Fpl Direct Debit      Orig ID:3590247775 Desc Date:11/20  CO Entry Descr:Elec Pymt Sec:Web   Trace#:111000018218103 Eed:201117   Ind ID:3427815299 Webi Ind Name:Priscilla P Carrasco-S | 175.79 |
| 11/18 | Quickpay With Zelle Payment To Eq Jpm473753590 | 5,000.00 |
| 11/18 | Orig CO Name:Rbi Alliance        Orig ID:37-1760432 Desc Date:201117 CO Entry Descr:Carpaymt  Sec:PPD   Trace#:091408598532460 Eed:201118   Ind ID: Ind Name:A2278 - Eli Entertainm Trn: 3238532460Tc | 2,211.18 |
| 11/23 | Orig CO Name:Rbi Alliance        Orig ID:37-1760432 Desc Date:201120 CO Entry Descr:Carpaymt  Sec:PPD   Trace#:091408590285544 Eed:201123   Ind ID: Ind Name:Real Hasta LA Muerte L Trn: 3280285544Tc | 4,242.27 |
| 11/27 | Orig CO Name:Rbi Alliance        Orig ID:37-1760432 Desc Date:201125 CO Entry Descr:Carpaymt  Sec:PPD   Trace#:091408593745824 Eed:201127   Ind ID: Ind Name:Eli Entertainment LLC Trn: 3323745824Tc | 1,478.03 |
| 11/30 | Orig CO Name:American Express      Orig ID:2005032111 Desc Date:201130 CO Entry Descr:ACH Pmt  Sec:Web   Trace#:021000025864220 Eed:201130   Ind ID:M8764 Ind Name:Emmanuel Santiago | 11,047.72 |
| **Total Electronic Withdrawals** | | **$872,316.95** |

## FEES

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/02 | Service Charges For The Month of October | $275.00 |
| 11/17 | Foreign Exch Rt ADJ Fee 11/16 The Whisky Shop Glasgow Card 3633 | 6.92 |
| **Total Fees** | | **$281.92** |

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|---|---|---|---|---|---|
| 11/02 | $987,656.73 | 11/12 | 789,623.01 | 11/20 | 92,103.78 |
| 11/03 | 952,453.67 | 11/13 | 781,473.01 | 11/23 | 308,630.14 |
| 11/04 | 942,161.42 | 11/16 | 726,286.42 | 11/24 | 306,830.14 |
| 11/05 | 936,351.89 | 11/17 | 112,522.33 | 11/25 | 1,226,342.70 |
| 11/06 | 932,438.90 | 11/18 | 101,911.15 | 11/27 | 1,220,796.68 |
| 11/09 | 924,811.44 | 11/19 | 94,157.73 | 11/30 | 1,216,102.37 |
| 11/10 | 918,840.44 | | | | |



# EXHIBIT H

9/23/22, 12:58 AM

Check Details - chase.com

# CHASE *for* BUSINESS

**$100,000.00**
Total

Dec 24, 2020
Post date

1332
Check #

---

**REAL HASTA LA MUERTE, LLC**

1332

63-8413/2670

DATE *12-18-20*

PAY
TO THE
ORDER OF  *Grand Floridian at Doral LLC*         $ *100,000.00*

*Cien mil dolers con cero centavos*                    **DOLLARS**

**CHASE** 🅾
JPMorgan Chase Bank, N.A.
www.Chase.com

FOR *Pago Deciembre Frabin Cancion*

⑈001332⑈ ⑆267084131⑆   ⑆3093605⑈

---

JPMorgan Chase Bank, N.A. Member FDIC         ©2022 JPMorgan Chase & Co.         Equal Opportunity Lender

https://secure05b.chase.com/web/auth/dashboard#/dashboard/overviewAccounts/overview/accountSummaryDetail;flyout=transactionImageDetails,depositAccountServicingArea,923031029,9070530767   1/1

9/23/22, 12:47 AM

Check Details - chase.com

# CHASE *for* BUSINESS

**$200,000.00**
Total

Mar 10, 2021
Post date

1346
Check #

---

1346

**REAL HASTA LA MUERTE, LLC**

63-8413/2670

DATE 2-28-21

PAY TO THE ORDER OF *Grand Floridian at Doral, LLC*          $ 200,000.00

*doscientos mil dolares con cero centavos*                    DOLLARS

**CHASE** ⬤
JPMorgan Chase Bank, N.A.
www.Chase.com

FOR *Pago*

⑆001346⑆ ⑈267084131⑈ 309360565⑈

---

JPMorgan Chase Bank, N.A. Member FDIC                    ©2022 JPMorgan Chase & Co.                    Equal Opportunity Lender

9/23/22, 12:53 AM                                          Check Details - chase.com

# CHASE *for* BUSINESS

**$90,391.78**          May 27, 2021                    1355
Total                   Post date                      Check #

REAL HASTA LA MUERTE, LLC                                            1355

                                                    DATE  5-18-21      53-8413/2670

PAY
TO THE
ORDER OF   *Grand Floridian at Doral LLC*              | $ *90,391.78*

*noventa mil trecientos noventa y un dolares con setenta y ocho centavos*  DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

FOR *Payment*

⑈0013 55⑈  ⑆26708413⑆  309360565⑈

# EXHIBIT I



Enero 01, 2019 a Enero 31, 2019
Número De Cuenta:   000000309360565

## RETIROS ELECTRÓNICOS

| FECHA | DESCRIPCIÓN | CANTIDAD |
|---|---|---|
| 01/04 | 01/04 transferencia electrÓnica bancaria saliente.  Online domestic wire transfer via: valley passaic/021201383 a/c: el russo & CO enterprise, inc new york NY 10036 US ref: anuel aa payment/bnf/anuel aa payment/time/12:23  imad: 0104b1qgc07c005870 trn: 4834100004es | $50,000.00 |
| 01/09 | 01/09 transferencia electrÓnica bancaria saliente.  Online domestic wire transfer via: valley passaic/021201383 a/c: el russo & CO enterprise, inc new york NY 10036 US ref: anuel aa payment/bnf/anuel aa payment/time/10:52  imad: 0109b1qgc05c005604 trn: 4016400009es | 50,000.00 |
| 01/10 | 01/10 pago preautorizado.  Online transfer to mma ...6718 Transaction#: 7835496882 | 300,000.00 |
| 01/11 | 01/11 transferencia electrÓnica bancaria saliente.  Online international wire transfer a/c: banco popular dominicano, s.A., Santo domingo dominican republic ref: taxid40227568850/tel8093904711/employee salaries trn: 3083800011es | 8,000.00 |
| 01/11 | 01/11 transferencia electrÓnica bancaria saliente.  Online domestic wire transfer via: wells fargo NA/121000248 a/c: lips marketing CO alpharetta GA 30022 US ref: anuel aa show/bnf/anuel aa show/time/06:39 imad: 0111b1qgc05c001036 trn: 3067400011es | 35,000.00 |
| 01/11 | DÉbito de cÁmara de compensaciÓn automatizada.  Fpl direct debit elec pymt  5158102037 webi web ID: 3590247775 | 291.68 |
| 01/14 | 01/14 online domestic wire transfer via: wells fargo NA/121000248 a/c: irenko auto sales corporation miami FL 33166 US ref: range rover sport red - anuel aa/acc/org CR pty aba/063107513 wellsfar go bank, national associat 174 5 e nine mile rd/bnf/range rover sport red/time/10:06  imad: 0114b1qgc08c004834 trn: 3835100014es | 12,000.00 |
| 01/16 | 01/16 transferencia electrÓnica bancaria saliente.  Online domestic wire transfer via: wells fargo NA/121000248 a/c: irenko auto sales corporation miami FL 33166 US ref: frabian eli - range rover 2018 black/acc/org CR pty aba/063107513 well sfargo bank, national associat 174 5 e nine mile rd/time/08:49 imad: 0116b1qgc07c006177 trn: 3241700016es | 21,000.00 |
| 01/17 | 01/17 transferencia electrÓnica bancaria saliente.  Online domestic wire transfer via: wells fargo NA/121000248 a/c: irenko auto sales corporation miami FL 33166 US ref: anuel hummer truck/acc/org CR pty aba/063107513 wellsfargo bank, natio nal associat 174 5 e nine mile r/t ime/17:19 imad: 0117b1qgc08c010728 trn: 5453200017es | 50,000.00 |
| 01/18 | 01/18 pago preautorizado.  Online transfer to mma ...6718 Transaction#: 7860046381 | 500,000.00 |
| 01/22 | 01/22 transferencia electrÓnica bancaria saliente.  Online domestic wire transfer via: bank of america, n.A./0959 A/c: barnett bank of jacksonville jacksonville FL 32256-0708 ben: travelmax global LLC richmond VA 23261 US ref: anuel airplane tickets/bnf/anuel airplane tickets ssn: 0412478 trn: 4357400022es | 28,000.00 |
| 01/22 | 01/22 transferencia electrÓnica bancaria saliente.  Online domestic wire transfer via: banco popular PR/021502011 a/c: francisco ramos lizardi san juan PR 00936 US ref: pago servicios profesionales anuel/bnf/pago servicios profesionales a uel imad: 0122b1qgc01c003142 trn: 4926300022es | 4,400.00 |
| 01/22 | 01/22 transferencia electrÓnica bancaria saliente.  Online international wire transfer a/c: bancolombia s.A. Medellin colombia ref: pago video musical anuel secreto taxid1115077000/tel3002280771/persona l expenses/int/pipeorviatgmail.Com/bnf/pago  video musical anuel trn: 4919200022es | 3,500.00 |
| 01/29 | 01/29 transferencia electrÓnica bancaria saliente.  Domestic wire transfer via: ocean bank mia/066011392 a/c: irenko auto sales corporation ref:/time/16:48 imad: 0129b1qgc03c013641 trn: 5723300029es | 80,000.00 |
| 01/29 | 01/29 transferencia electrÓnica bancaria saliente.  Domestic wire transfer via: valley passaic/021201383 a/c: el russo & CO enterprise, inc ref:/time/16:48 imad: 0129b1qgc03c013649 trn: 5722300029es | 152,000.00 |
| 01/29 | 01/29 transferencia electrÓnica bancaria saliente.  Domestic wire transfer via: bk amer nyc/026009593 a/c: germania hernandez imad: 0129b1qgc03c014351 trn: 5721400029es | 130,044.00 |
| | **Total de retiros electrónicos** | **$1,424,235.68** |

## OTROS RETIROS

| FECHA | DESCRIPCIÓN | CANTIDAD |
|---|---|---|
| 01/30 | 01/30 retiro.  Withdrawal | $4,012.50 |
| 01/30 | 01/30 retiro.  Withdrawal | 3,750.00 |
| | **Total Otros retiros** | **$7,762.50** |

# EXHIBIT J

| CONTRACT DATE: 08/21/2020 | RETAIL INSTALLMENT CONTRACT | FZ-FL-RIC-SIA |
|---|---|---|
| ACCOUNT #: 15535 | SIMPLE INTEREST | |

| Buyer Name and Address | Birth Month: | Seller Name and Address |
|---|---|---|
| REAL HASTA LAMUERTE LLC<br>4751 DISTIBUTION CT<br>ORLANDO, FL 32822<br>County: ORANGE | | IRENKO AUTO SALES, INC<br>7436 NW 55TH ST<br>MIAMI, FL 33166<br>County: MIAMI-DADE |
| Co-Buyer Name and Address | Birth Month: OCTOBER | |
| FRABIAN ELI CARRION<br>9910 MW 74 TER<br>MIAMI, FL 33178<br>County: MIAMI-DADE | | |

In this contract, "you" and "your" refer to the Buyer or Buyers signing below. "Seller," "we" and "us" refer to the Seller shown above. "Holder" is the Seller, or, if this contract has been assigned, the party who has been assigned this contract. "Vehicle" refers to the vehicle described below. "Buyer," "you" and "your" shall include the plural. You promise to pay to the order of the Holder (at its office or at such other place as the Holder may designate and instruct you) the Amount Financed and the Finance Charge (see below) as outlined in the schedule of payments below and as described in this contract.

| New/Used | Year | Make | Model | Vehicle Identification Number | Mileage | ☒ Personal, Family or Household Use |
|---|---|---|---|---|---|---|
| Used | 2012 | LAMBORGHINI | AVENTADOR | ZHWUC1ZD8CLA01270 | 9998 | ☐ Business Use |

| Description of Trade-In(s): 2018 NISSAN GT-R VIN: JN1AR5EF9JM710371 |
|---|

## FEDERAL TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>THE COST OF YOUR CREDIT AS A YEARLY RATE. | FINANCE CHARGE<br>THE DOLLAR AMOUNT THE CREDIT WILL COST YOU. | AMOUNT FINANCED<br>THE AMOUNT OF CREDIT PROVIDED TO YOU OR ON YOUR BEHALF. | TOTAL OF PAYMENTS<br>THE AMOUNT YOU WILL HAVE PAID AFTER YOU HAVE MADE ALL PAYMENTS AS SCHEDULED. | TOTAL SALE PRICE<br>THE TOTAL COST OF YOUR PURCHASE ON CREDIT, INCLUDING YOUR DOWN PAYMENT OF |
|---|---|---|---|---|
| 13.99 % | $ 72,192.11 | $ 182,344.09 | $ 254,536.20 | $ 100,000.00 IS<br>$ 354,536.20 |

Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 60 | $ 4,242.27 | MONTHLY beginning September 21, 2020 |

**Late Charge:** If payment is not received in full within 10 days after it is due, you will pay a late charge in the amount of 5% of the scheduled payment in default.
**Prepayment:** If you pay off all or any part of your debt early, you will not have to pay a penalty.
**Security Interest:** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, our right to accelerate the maturity of this obligation, any required repayment in full before the scheduled date, prepayment refunds and penalties, and our security interest.

HOW THIS CONTRACT CAN BE CHANGED. This contract and the related documents that you sign contemporaneously with this contract contain the entire agreement between you and us relating to the sale and financing of the motor vehicle. Any change to this contract must be in writing and we must sign it. If any part of this contract is not valid, all other parts stay valid.

Buyer Signs X *Frabian Carrion*          Co-Buyer Signs X *Frabian Carrion*

### NOTICE TO THE BUYER
(1) Do not sign this contract before you read it or if it contains any blank spaces.
(2) You are entitled to an exact copy of the contract you sign. Keep it to protect your legal rights.

**Signed, sealed and delivered by the Buyer, who hereby acknowledges receipt of a completed copy of this contract and agrees to its terms.**

Buyer Signs X *Frabian Carrion* Date 08/21/2020  Co-Buyer Signs X *Frabian Carrion* Date 08/21/2020
Buyers and Other Owners - A buyer is a person who is responsible for paying the entire debt. An "other owner" is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X_____ Date_____ Address_____

Seller Signs X_____ Date 08/21/2020 Printed Name_____ Title_____

**This contract consists of 5 pages. Be sure to initial pages 2 through 5 as indicated.**

**THIS CONTRACT CONTAINS AN ARBITRATION CLAUSE ON PAGE 5**

Page 1 of 5 (of document 680208)

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

Florida documentary stamp tax required by law in the amount of $ __638.40__ has been paid or will be paid directly to the Department of Revenue. Certificate of Registration No. _____

INSURANCE: CREDIT LIFE INSURANCE AND CREDIT DISABILITY INSURANCE ARE NOT REQUIRED TO OBTAIN CREDIT AND WILL NOT BE PROVIDED UNLESS YOU SIGN AND AGREE TO PAY THE ADDITIONAL COST. WE MAY RETAIN OR RECEIVE A PORTION OF THIS AMOUNT.

| TYPE OF CREDIT INSURANCE | ORIGINAL TERM | COST FOR THE ORIGINAL TERM |
|---|---|---|
| ☐ CREDIT LIFE | N/A | N/A |
| ☐ CREDIT DISABILITY | N/A | N/A |

CHOICE OF COVERAGE AS SPECIFIED IS ACKNOWLEDGED BY BUYER'S SIGNATURE

Buyer Signs **X**_____ N/A_____

Date____ N/A____ Date of Birth____ N/A____

Co-Buyer Signs **X**_____ N/A_____

Date____ N/A____ Date of Birth____ N/A____

COMPREHENSIVE AND COLLISION INSURANCE IS REQUIRED: You may obtain or provide through an existing policy, or a policy you independently obtain and pay for, the required insurance through any duly licensed agent or broker, subject to our right to refuse to accept an insurer you offer for reasonable cause.
LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT PROVIDED UNDER THIS CONTRACT.

OPTIONAL GAP WAIVER (DEBT CANCELLATION AGREEMENT). A Guaranteed Asset Protection ("GAP") or Debt Cancellation Agreement is not required to obtain credit and will not be provided unless you sign below and agree to pay the additional cost. If you agree to buy a GAP Waiver, the charge is shown below and in item of the Itemization of Amount Financed. Your GAP Waiver Agreement is a part of this contract. See your GAP Waiver Agreement for details on the protection it provides.

_____ N/A _____
Name of GAP Waiver Agreement

Price: $____ N/A____ Term:____ N/A____

You want to purchase the optional GAP Waiver:

**X**_____ N/A_____       ____ N/A____
Signature of Buyer Requesting Coverage       Date

**X**_____ N/A_____       ____ N/A____
Signature of Co-Buyer Requesting Coverage       Date

☐ **VENDOR'S SINGLE INTEREST (VSI) INSURANCE.** If the preceding box is checked, you are required to purchase VSI insurance as part of this sale. VSI insurance is for the sole protection of the Holder against loss of or damage to the vehicle. **You may purchase VSI insurance through any insurance company or agency you choose who is reasonably acceptable to us.** If you choose to finance the insurance as part of this contract, you will pay $____ N/A____ . The coverage is for the initial term of the contract. Any insurer issuing VSI insurance waives its rights of subrogation against the Buyer.

## ITEMIZATION OF AMOUNT FINANCED

(1) CASH PRICE

   a. Vehicle — 249,973.58

   b. Sales Tax — 11,837.11

   c. Predelivery Service Fee/ Dealer Service Fee — 895.00
This charge represents costs and profit to the dealer for items such as inspecting, cleaning, and adjusting vehicles, and preparing documents related to the sale.

   CASH PRICE [(a)+(b)+(c)] — 262,705.69 (1)

(2) DOWN PAYMENT

   d. Cash Down payment — 90,000.00

   e. Deferred Down payment — N/A

   Net Trade In Allowance

    Gross Trade In — 73,000.00

    Less Payoff — 63,000.00

   f. Net Trade In — 10,000.00

TOTAL DOWN PAYMENT [(d)+(e)+(f)] — 100,000.00 (2)
If Total Down Payment is negative enter $0.00 and insert that amount on (4)r below

(3) UNPAID BALANCE OF CASH PRICE [(1)-(2)] — 162,705.69 (3)

(4) OTHER CHARGES INCLUDING AMOUNTS PAID TO OTHERS ON YOUR BEHALF

   g. To Insurance Company for Credit Life Premium* — N/A

   h. To Insurance Company for Credit Disability Premium* — N/A

   i. To Government Agency for Documentary Stamp Taxes — 638.40

   j. Government License and/or Registration Fees — N/A

   k. Government Certificate of Title Fees — N/A

   l. To ____ N/A ____ for Extended Service Contract* — N/A

   m. Accesories Taxable* — 19,000.00

   n. ____ N/A ____ — N/A

   o. ____ N/A ____ — N/A

   p. ____ N/A ____ — N/A

   q. ____ N/A ____ — N/A

   r. ____ N/A ____ — N/A

TOTAL OTHER CHARGES AND AMOUNTS PAID TO OTHERS ON YOUR BEHALF
[(g)+(h)+(i)+(j)+(k)+(l)+(m)+(n)+(o)+(p)+(q)+(r)] — 19,638.40 (4)

(5) AMOUNT FINANCED (Principal Balance) [(3)+(4)] — 182,344.09 (5)

*Seller May Retain A Portion of These Amounts

Initials ____ / ____ / ____  Page 2 of 5 (of document 680208)
    Buyer   Co-Buyer   Seller

FZ-FL-RIC-SIA   05/19   Simple Interest Retail Installment Contract   © 2019 Frazer Computing, Inc.

# ADDITIONAL TERMS AND CONDITIONS

**INSURANCE YOU MUST HAVE ON THE VEHICLE. You must keep the vehicle insured against damage or loss ("Dual Interest Property Insurance") until you have paid all that you owe under this contract. You will provide coverage in the amount of the vehicle's actual cash value less a maximum deductible of $  500.** You may purchase, or provide through an existing policy, the Dual Interest Property Insurance through anyone you choose who is reasonably acceptable to us. Each policy you get must provide that the insurance company will give us at least 10 days' written notice before the policy is canceled. You must name us as the person to be paid under the policy in the event of damage or loss. If the vehicle is damaged or lost, at our option, we can use the insurance proceeds to replace or repair it or to repay any amounts you owe under this contract.

If you do not obtain and maintain the insurance required by this contract and do not continue to provide satisfactory proof of insurance, we will consider this contract in default. We may, at our option, repossess the vehicle, purchase insurance at your expense, or pursue any other remedy provided for in this contract. The insurance we purchase may either cover both our interest and your interest or our interest only. Any coverage we buy will pay claims to us for physical damage to the vehicle. Such coverage will not include insurance on liability for bodily injury or property damage, and will not meet the requirement for proof of financial responsibility under Florida law. The charges for insurance we obtain may be substantially higher than the charges you would pay if you bought the insurance you are required by this contract to have on the vehicle yourself. We will tell you which type of insurance we purchase and the charge to you. The charge for the insurance will be the premium of the insurance and a finance charge equal to the Annual Percentage Rate shown in this contract or, at our option, the highest rate the law permits.

You will deliver to us an insurance policy meeting the requirements listed above to be issued by

Insurance Company: _____

Agent: _____

## ACKNOWLEDGEMENT OF DUAL INTEREST PROPERTY INSURANCE TO BE FINANCED. If we finance the Dual Interest Property Insurance you are required by this contract to have, the following applies:

Name of Insurer: _____ N/A _____

Term of Insurance: _____ N/A _____

Premium: ___ N/A _____

You agree that the premium for the above-described insurance will be included in the Amount Financed under this contract.

X _____ N/A _____ (Buyer)

X _____ N/A _____ (Co-Buyer)

**FINANCE CHARGE AND PAYMENTS.** We will compute your Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed. We based the Finance Charge, Total of Payments and the Total Sale Price shown in this contract on the assumption that you will make each payment in the amount due and on the date due. These amounts will be more if you pay late and less if you pay early. These changes may take the form of a larger or smaller last payment or, if we choose, additional payments of the same amount as your scheduled payments with a smaller final payment. We will notify you about these changes before your final scheduled payment is due.

**PREPAYMENT.** You may prepay all or any part of the debt that you owe under this contract at any time without penalty. If you do, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the prepayment date.

**APPLYING PAYMENTS.** We may apply your payments to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe us in any order we choose, as permitted by applicable law.

**DEFERMENT.** You may ask us for a deferral of the scheduled due date of all or any part of a payment (extension). If we agree to your request, we may charge you a $15 extension fee. You must maintain the physical damage insurance required by this contract during any extension. If you do not have this insurance, we may buy it and charge you for it as this contract says. You may extend the term of any optional insurance you bought with this contract to cover the extension if the insurance company or your contract permits it, and you pay the charge for extending this insurance. If you get a payment extension, you will pay additional finance charges. You will also pay any additional insurance charges resulting from the extension, and the $15 extension fee if we charge you this fee.

**OWNERSHIP AND RISK OF LOSS.** You agree to pay us all amounts owed under this contract, regardless of whether the vehicle is damaged, destroyed or missing. You agree not to transfer any interest in the vehicle or this contract without our written permission. You agree to keep the vehicle in good order and repair, allowing for ordinary wear and tear. You will make sure our security interest on the vehicle is shown on the title. If we pay any repairs, storage, taxes, fines or other charges, you agree to repay us.

**CHANGE OF ADDRESS.** You agree to notify us immediately of a permanent change of address.

**SECURITY INTEREST.** You give us a security interest in the vehicle; any money or goods received (proceeds) for the vehicle; any accessories, equipment, modifications, or replacement parts installed in the vehicle; any insurance premiums and charges for service contracts returned to us; and any proceeds of service contracts or insurance policies on your life or health which are financed in this contract. This security interest secures all amounts you owe, and all of your other obligations, under this contract, as it may be amended from time to time.

**LATE CHARGE.** You will pay a late charge on each late payment as shown in the Federal Truth in Lending Disclosures on the first page.

**DEFAULT.** Any of the following events will be considered a default: your failure to pay any installment when due; your failure to perform or breach of any section of this contract; any failure to obtain and maintain the insurance required by this contract; any misstatement or misrepresentation by you relied on by us; you become insolvent; any judgment is entered against you; or the vehicle is transferred without our written consent, or seized under any legal process. If you default, or we believe in good faith that you are not going to keep any of your promises, we can demand that you immediately pay all that you owe. We do not have to give you notice that we are demanding or intend to demand immediate payment of all that you owe. We may repossess the vehicle; take any reasonable measures to correct the default, or save us from loss; or pursue any other remedy permitted by law in recovering the full remaining amount due.

**REPOSSESSION.** If you are in default, we may take the vehicle from you if we may do so without a breach of the peace. We may repossess the vehicle by any means including entering your property, or the property where it is stored. Notice to dispose of personal property found in the vehicle will be sent to you by a licensed repossession service. Personal property found in the vehicle may be returned to us provided you claim such property within 45 days of the notification of intent to dispose. However, we will keep any vehicle accessories, equipment, modifications, or replacement parts.

Initials ___ / ___ / ___  Page 3 of 5 (of document 680208)

# ADDITIONAL TERMS AND CONDITIONS

**RETURN OF THE VEHICLE TO YOU.** If we repossess the vehicle you have the right to get it back (redeem). In order to get the vehicle back, you must pay all amounts owed, not just past due amounts, including our expenses. We will tell you how much you have to pay to redeem the vehicle. Your right to the return of the vehicle will end if and when the vehicle is re-sold.

**RE-SALE OF VEHICLE.** Once your vehicle has been repossessed, we will send you notice of the re-sale at least 10 days in advance. Once your vehicle is sold, the proceeds will be credited to your account after reasonable expenses for retaking, holding, preparing for sale, processing and selling the vehicle, plus attorney's fees and court costs the law permits, are paid. Any surplus after applying the proceeds to your account will be returned to you unless we are required by law to pay the proceeds to another person. You must pay any deficiency in your account after the proceeds of sale are applied. Any deficiency that you do not satisfy upon our demand will bear interest at the maximum Annual Percentage Rate allowed by law.

**COLLECTION COSTS.** If you are in default and we demand full payment, you agree to pay us interest on the amount you owe at the Annual Percentage Rate shown in this contract. If we hire an attorney who is not our employee to enforce this contract, you will pay reasonable attorney's fees. You will also pay all collection costs that are permitted by law and all court costs associated with the collection.

**GOVERNING LAW.** Federal and Florida law apply to this contract.

**WHO IS BOUND.** This contract is binding upon the parties, their heirs, executors, personal representatives, and/or successors and assigns.

**JOINT LIABILITY.** All persons who sign this contract as Buyers are jointly and severally liable. We may enforce or release our rights entirely with respect to one Buyer without affecting our rights as to any other Buyer.

**NO WAIVER.** We can delay or refrain from enforcing any of our rights under this contract without losing them.

**INTERPRETATION.** If for any reason any section of this contract is deemed invalid, all other sections will remain enforceable.

**TRANSFER OF RIGHTS.** We may transfer this contract to another person. That person will then have all of our rights, privileges, and remedies.

**RETURNED CHECK CHARGE.** You agree to pay a charge for the return of unpaid or dishonored payment instruments. The charge will be the greater of 5% or $25 if the payment instrument is $50 or less, $30 if the payment instrument is over $50 but not more than $300, $40 if the payment instrument is over $300, or such amount as permitted by law. "Payment instrument" includes check, draft, order of payment, debit card order, electronic funds transfer or any other instrument that you use to make any payment under this contract, as permitted by applicable law.

**REJECTION OR REVOCATION OF VEHICLE.** If you reject or revoke acceptance of the vehicle and assert a security interest in the vehicle based on the ground of rightful rejection or justifiable revocation, you must take one of the following actions: (a) Post a bond in the amount of the disputed balance; or (b) Deposit all accrued, and thereafter accruing, installment payments into the registry of a court of competent jurisdiction.

**TELEPHONE MONITORING AND CALLING.** You agree that we may monitor and record telephone calls regarding your account to assure the quality of our service. In addition and subject to applicable law, in connection with servicing your account and/or collecting amounts you may owe, you expressly consent that we may call you and send text messages to you using prerecorded/artificial voice messages or an automatic dialing device. We may do so using any telephone number you provide to us, including a cellular phone, which may result in charges to you.

**OPTIONAL EXTENDED SERVICE CONTRACTS.** An Extended Service Contract is optional. An Extended Service Contract is not required to obtain credit and will not be provided unless you agree to pay the additional cost.

**WARRANTIES SELLER DISCLAIMS.** Unless we make a written warranty, or enter into a service contract within 90 days from the date of this contract, we make no warranties, express or implied, on the contract, and there will be no implied warranties of merchantability or of fitness for a particular purpose. This provision does not affect any warranties covering the vehicle that the manufacturer may offer.

**ACKNOWLEDGEMENT OF PURCHASE OF VEHICLE CONTAINING PAST DUE STARTER INTERRUPT AS CONDITION OF SALE.** You understand that there may be a payment guarantee device installed on the vehicle as a condition of sale. You understand that if you do not make all payments as required under this contract, **THIS DEVICE WILL PREVENT THE VEHICLE FROM BEING STARTED.** You agree to sign all disclosure forms describing the device, and further understand and agree that these forms are a part of this Contract and are incorporated herein as though fully set forth in this Contract.

**ACKNOWLEDGEMENT OF PURCHASE OF VEHICLE CONTAINING ELECTRONIC TRACKING DEVICE.** If your vehicle has an electronic tracking device, you agree that we may use this device to find the vehicle.

**USED CAR BUYERS GUIDE: The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.**
**Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

**Note:** The following notice applies only to the extent the vehicle is to be used primarily for personal, family or household use.
**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

---

**ASSIGNMENT:** By signing below, Seller hereby sells and assigns all right, title and interest in this contract to <u>RBI ALLIANCE</u>
<u>1920 HALLANDALE BEACH BLVD HALLANDALE, FL 33009</u> ("Assignee") in accordance with and under the terms and conditions of a separate agreement between Seller and Assignee.

☐ Assigned with recourse          ☐ Assigned without recourse          ☐ Assigned with limited recourse

Seller <u>IRENKO AUTO SALES, INC</u>          By _____          Title _____

Initials _____ / _____ / _____   Page 4 of 5 (of document 680208)
       Buyer  Co-Buyer  Seller

# ARBITRATION AGREEMENT

This Arbitration Agreement is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16. This Arbitration Agreement uses certain defined terms. A "Dispute" is any contract, tort, statutory or other claim or dispute between you and Seller arising out of or relating to your credit application, this contract, or any resulting transaction or relationship (including any such relationship with third parties who do not sign this Arbitration Agreement). "Seller" includes seller's assignee and also includes Seller's and such assignee's employees, agents, successors or assigns. "Dispute" includes any disagreement over the interpretation and scope of this clause, or the arbitrability of the Dispute.

Any Dispute shall, at your or Seller's request, be resolved by binding arbitration and not in court.  Arbitration will be by one arbitrator on an individual basis and not as a class action. You waive any right you may have to arbitrate a Dispute as a class action (this is referred to below as the "class action waiver"). Arbitration will be conducted by and under the rules of the American Arbitration Association, 1633 Broadway, 10th Floor, New York, NY 10019 (www.adr.org), or any other arbitration organization you select, subject to Seller's approval. You may get the rules of the organization by contacting it or visiting its website.

Arbitrators shall be attorneys or retired judges selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration hearing shall be conducted in the federal district in which you reside, or at some other location convenient to you, or as otherwise required by law. Seller will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $1,500, unless applicable law or the rules of the chosen arbitration organization require Seller to pay more. Each party shall be responsible for its own attorney, expert and other fees, unless otherwise awarded by the arbitrator under applicable law.

The arbitrator's award is final and binding on all parties. Any arbitration shall be governed by the Federal Arbitration Act and not by any state arbitration law.

You and Seller retain the right to sue in small claims court for a Dispute within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor Seller waive the right to arbitrate by filing suit. Any court with jurisdiction may enter judgment on the arbitrator's award. This Arbitration Agreement shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Agreement, other than the class action waiver, is deemed or found to be unenforceable for any reason, the remainder is enforceable. If the class action waiver is deemed or found to be unenforceable, then this entire Arbitration Agreement shall be unenforceable.

This Arbitration Agreement is incorporated into and becomes a part of this contract or any other credit obligation that you enter into with Seller on the contract date shown on Page 1.

**You may opt out of this Arbitration Agreement by doing so in writing to the Seller's address on Page 1 of this contract, or a different address the Holder may provide you, sent by registered mail, postmarked no later than 10 days from the contract date.**

It is important that you thoroughly read the above Arbitration Agreement before you sign this Contract. It affects your legal rights. By signing this Contract, you acknowledge that you have read and understand this Arbitration Agreement.

By signing this Contract on Page 1, you agree to the terms of this Arbitration Agreement.

Initials _FC_ / _FC_ / _____   Page 5 of 5 (of document 680208)
    Buyer   Co-Buyer   Seller

**BILL OF SALE**

DATE: 8/21/2020   STOCK #: 15535

| BUYER INFORMATION: | SELLER INFORMATION: |
|---|---|
| REAL HASTA LAMUERTE LLC | **IRENKO AUTO SALES, INC** |
| FRABIAN ELI CARRION | 7436 NW 55TH ST |
| 4751 DISTIBUTION CT | **MIAMI, FL 33166** |
| ORLANDO, FL 32822    COUNTY: ORANGE | **305-477-3306** |
| HOME:    CELL:    WORK: | |
| D.L./STATE ID #:    STATE: FL   EXP. DATE: | |
| D.O.B.: | SALESPERSON: JHON CARRERO |

**VEHICLE INFORMATION:**

| YEAR: 2012 | COLOR 1: | VIN: ZHWUC1ZD8CLA01270 | STOCK: 15535 |
|---|---|---|---|
| MAKE: LAMBORGHINI | COLOR 2: | STYLE: | CYL: 12 |
| MODEL: AVENTADOR | BODY: 2DR | MILEAGE: 9998 | TRANS: AUTO |

☐ If this box is checked, the vehicle that you are purchasing has been licensed, registered, or used as a taxicab, police vehicle, or short-term-lease vehicle, is a vehicle that is rebuilt or assembled from parts, is a kit car, glider kit, replica, street rod, custom vehicle, has been repurchased by a manufacturer under Florida's Lemon Law (Fla. Stat. ch. 681), or is a flood vehicle: _____ (indicate prior uses, brands or types)

| TRADE-IN INFORMATION: | | SETTLEMENT | |
|---|---|---|---|
| YEAR: 2018 | COLOR: BLUE | | |
| MAKE: NISSAN | MILEAGE: 6606 | VEHICLE PRICE | 268,973.58 |
| MODEL: GT-R | BODY: 2DR | Predelivery Service Fee [see NOTE 1] | 895.00 |
| VIN: JN1AR5EF9JM710371 | | SUBTOTAL | 269,868.58 |
| BALANCE OWED TO: | | Sales Tax: | 11,837.11 |
| | | Title Fee: | 0.00 |
| | | License Fee: | 0.00 |
| BALANCE OWED: $ 63,000.00   GOOD THROUGH: | | Registration Fee: | 0.00 |
| ALLOWANCE: $ 73,000.00   QUOTED BY: | | Transfer Fee: | 0.00 |
| | | Temp Tag Fee: | 0.00 |
| INSURANCE INFORMATION: | | Doc Stamps: | 638.40 |
| COMPANY: | | Payoff on Trade-in: | 63,000.00 |
| AGENT: | | | |
| PHONE:    POLICY #: | | | |
| LIEN HOLDER INFORMATION: | | | |
| COMPANY: RBI ALLIANCE | | | |
| STREET: 1920 HALLANDALE BEACH BLVD | | | |
| CITY, STATE, ZIP: HALLANDALE, FL 33009 | | | |
| | | | |
| REMARKS: | | | |
| | | TOTAL DUE | 345,344.09 |

**NOTE 1:** This charge represents costs and profit to the dealer for items such as inspecting, cleaning, and adjusting vehicles, and preparing documents related to the sale.

| | CREDIT | | |
|---|---|---|---|
| | TRADE-IN ALLOWANCE | 73,000.00 |
| | DEPOSIT | N/A |
| | DOWN PAYMENT | 90,000.00 |

**WARRANTY DISCLAIMER:**
**Unless Seller provides a written warranty, or enters into a service contract within 90 days from the date of this contract, this vehicle is being sold "AS IS – WITH ALL FAULTS" and Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.** This disclaimer does not affect any warranties the vehicle manufacturer. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle and the related products and services.

| TOTAL CREDIT | 163,000.00 |
|---|---|
| ☐ Cash ☒ Finance    BALANCE DUE | 182,344.09 |

If financed, please see your installment sales contract for information about finance charge, insurance, and terms of payment (other than cash).

**CONTRACTUAL DISCLOSURE STATEMENT (USED VEHICLES ONLY)** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale. Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

Buyer hereby declares that he/she is of legal age to transact business and that no unfair inducement has been made by Seller. This agreement and the related documents that Buyer signs contemporaneously with this agreement, including any retail installment contract, contain the entire agreement between Buyer and Seller and cancels and supersedes any prior agreement including oral agreements relating to the sale of the motor vehicle. Any change to this agreement must be in writing and Seller must sign it.

| X | 8/21/20 | X Frabian Carrion 8/21/20 | X | 8/21/20 |
|---|---|---|---|---|
| Accepted by Authorized Representative of Seller | Date | Buyer    Date | Co-Buyer | Date |

FZ-FL-BOS rev. 05/19                                    ©2019 Frazer Computing, Inc.

# ODOMETER DISCLOSURE STATEMENT

Federal law (and state law, if applicable) requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

I, IRENKO AUTO SALES, INC, state that the odometer now reads
**9998**       miles and to the best of my knowledge that it reflects the actual mileage of the vehicle described below, unless one of the following statements has been checked.

      [   ]   (1) I hereby certify that to the best of my knowledge the odometer reading reflects the amount of mileage in excess of its mechanical limits.

      [   ]   (2) I hereby certify that the odometer reading is NOT the actual mileage. WARNING: ODOMETER DISCREPANCY.

      Vehicle Description: 2012 LAMBORGHINI AVENTADOR,
              Body style: 2DR
                  VIN: ZHWUC1ZD8CLA01270
            Stock #: 15535

Transferors (Seller) Information: IRENKO AUTO SALES, INC
                               7436 NW 55TH ST
                               MIAMI, FL 33166

      Acknowledged by Transferor (Seller):

          Signature: _____   8/21/2020

      Hand Printed Name: _____

Transferees (Buyer) Information: REAL HASTA LAMUERTE LLC
                               4751 DISTIBUTION CT
                               ORLANDO, FL 32822

      Acknowledged by Transferee (Buyer):

          Signature: _Frabian Carrion._   8/21/2020
      Hand Printed Name: _Frabian Carrion_

      Co-Buyer Signature: _Frabian Carrion_   8/21/2020
      Hand Printed Name: _Frabian Carrion_

# ODOMETER DISCLOSURE STATEMENT

Federal law (and state law, if applicable) requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

I, REAL HASTA LAMUERTE LLC, state that the odometer now reads
**6606**      miles and to the best of my knowledge that it reflects the actual mileage of the vehicle described below, unless one of the following statements has been checked.

[  ]   (1) I hereby certify that to the best of my knowledge the odometer reading reflects the amount of mileage in excess of its mechanical limits.

[  ]   (2) I hereby certify that the odometer reading is NOT the actual mileage. WARNING: ODOMETER DISCREPANCY.

Vehicle Description: 2018 NISSAN GT-R, BLUE
Body style: 2DR
VIN: JN1AR5EF9JM710371
Stock #: 15536

Transferors (Seller) Information: REAL HASTA LAMUERTE LLC
4751 DISTIBUTION CT
ORLANDO, FL 32822

Acknowledged by Transferor (Seller):

Signature: _____   8/21/2020

Hand Printed Name: _____

Transferees (Buyer) Information: IRENKO AUTO SALES, INC
7436 NW 55TH ST
MIAMI, FL 33166

Acknowledged by Transferee (Buyer):

Signature: _____   8/21/2020

Hand Printed Name: _____

# AS-IS – SOLD WITHOUT WARRANTY

Date: 08/21/2020

Seller: IRENKO AUTO SALES, INC
7436 NW 55TH ST
MIAMI, FL 33166

Buyer: REAL HASTA LAMUERTE LLC
FRABIAN ELI CARRION
4751 DISTIBUTION CT
ORLANDO, FL 32822

The vehicle identified below is subject to the terms and conditions of this agreement.

**The seller, identified above, hereby expressly disclaims all warranties, either express or implied, including all implied warranties of merchantability or fitness for a particular purpose and the seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle.**

Vehicle Description: 2012 LAMBORGHIN AVENTADOR

VIN: ZHWUC1ZD8CLA01270

Mileage: 9998

## "NOTICE OF VEHICLE SOLD WITHOUT ANY WARRANTY"

This vehicle is sold **without any warranty**. The buyer will bear the entire expense of repairing or correcting any defects that presently exist and/or may occur in the vehicle unless the salesperson promises in writing to correct such defects.

BUYER HEREBY ACKNOWLEDGES HE HAS READ, UNDERSTANDS AND ACCEPTS THE PROVISIONS OF THIS WARRANTY STATEMENT FOR THE ABOVE-IDENTIFIED VEHICLE.

x _Frabian Carrion_     08/21/2020
REAL HASTA LAMUERTE LLC

x _Frabian Carrion_     08/21/2020
FRABIAN ELI CARRION

x _____     08/21/2020
IRENKO AUTO SALES, INC

## WARRANTY DISCLAIMER – **SOLD AS-IS**

FZ-ASIS rev. 06/16                                                     ©2016 Frazer Computing, Inc.

# BUYERS GUIDE

**IMPORTANT:** Spoken promises are difficult to enforce. Ask the dealer to put all promises in writing. Keep this form.

| LAMBORGHINI | AVENTADOR | 2012 | ZHWUC1ZD8CLA01270 |
|---|---|---|---|
| VEHICLE MAKE | MODEL | YEAR | VEHICLE IDENTIFICATION NUMBER (VIN) |

## WARRANTIES FOR THIS VEHICLE:

☒ # AS IS – NO DEALER WARRANTY

THE DEALER DOES NOT PROVIDE A WARRANTY FOR ANY REPAIRS AFTER SALE.

-------------------------------------------------------------

☐ # DEALER WARRANTY

☐ FULL WARRANTY.

☐ LIMITED WARRANTY. The dealer will pay ___% of the labor and ___% of the parts for the covered systems that fail during the warranty period. Ask the dealer for a copy of the warranty, and for any documents that explain warranty coverage, exclusions, and the dealer's repair obligations. *Implied warranties* under your state's laws may give you additional rights.

**SYSTEMS COVERED:**                    **DURATION:**

## NON-DEALER WARRANTIES FOR THIS VEHICLE:

☐ MANUFACTURER'S WARRANTY STILL APPLIES. The manufacturer's original warranty has not expired on some components of the vehicle.

☐ MANUFACTURER'S USED VEHICLE WARRANTY APPLIES.

☐ OTHER USED VEHICLE WARRANTY APPLIES.

Ask the dealer for a copy of the warranty document and an explanation of warranty coverage, exclusions, and repair obligations.

☐ SERVICE CONTRACT. A service contract on this vehicle is available for an extra charge. Ask for details about coverage, deductible, price, and exclusions. If you buy a service contract within 90 days of your purchase of this vehicle, *implied warranties* under your state's laws may give you additional rights.

**ASK THE DEALER IF YOUR MECHANIC CAN INSPECT THE VEHICLE ON OR OFF THE LOT.**

**OBTAIN A VEHICLE HISTORY REPORT AND CHECK FOR OPEN SAFETY RECALLS.** For information on how to obtain a vehicle history report, visit ftc.gov/usedcars. To check for open safety recalls, visit safercar.gov. You will need the vehicle identification number (VIN) shown above to make the best use of the resources on these sites.

**SEE OTHER SIDE for important additional information, including a list of major defects that may occur in used motor vehicles.**

**Si el concesionario gestiona la venta en español, pídale una copia de la Guía del Comprador en español.**

Here is a list of some major defects that may occur in used vehicles.

**Frame & Body**
Frame-cracks, corrective welds, or rusted through
Dog tracks----bent or twisted frame

**Engine**
Oil leakage, excluding normal seepage
Cracked block or head
Belts missing or inoperable
Knocks or misses related to camshaft lifters and push rods
Abnormal exhaust discharge

**Transmission & Drive Shaft**
Improper fluid level or leakage, excluding normal seepage
Cracked or damaged case which is visible
Abnormal noise or vibration caused by faulty transmission or drive shaft
Improper shifting or functioning in any gear
Manual clutch slips or chatters

**Differential**
Improper fluid level or leakage, excluding normal seepage
Cracked or damaged housing which is visible
Abnormal noise or vibration caused by faulty differential

**Cooling System**
Leakage including radiator
Improperly functioning water pump

**Electrical System**
Battery leakage
Improperly functioning alternator, generator, battery, or starter

**Fuel System**
Visible leakage

**Inoperable Accessories**
Gauges or warning devices
Air conditioner
Heater & Defroster

**Brake System**
Failure warning light broken
Pedal not firm under pressure (DOT spec.)
Not enough pedal reserve (DOT spec.)
Does not stop vehicle in straight line (DOT spec.)
Hoses damaged
Drum or rotor too thin (Mfgr Specs)
Lining or pad thickness less than 1/32 inch
Power unit not operating or leaking
Structural or mechanical parts damaged

**Air Bags**

**Steering System**
Too much free play at steering wheel (DOT specs.)
Free play in linkage more than ¼ inch
Steering gear binds or jams
Front wheels aligned improperly (DOT specs.)
Power unit belts cracked or slipping
Power unit fluid level improper

**Suspension System**
Ball joint seals damaged
Structural parts bent or damaged
Stabilizer bar disconnected
Spring broken
Shock absorber mounting loose
Rubber bushings damaged or missing
Radius rod damaged or missing
Shock absorber leaking or functioning improperly

**Tires**
Tread depth less than 2/32 inch
Sizes mismatched
Visible damage

**Wheels**
Visible cracks, damage or repairs
Mounting bolts loose or missing

**Exhaust System**
Leakage
Catalytic Converter

DEALER NAME
**IRENKO AUTO SALES, INC**
ADDRESS
**7436 NW 55TH ST; MIAMI, FL  33166**
TELEPHONE                         EMAIL
**305-477-3306**
FOR COMPLAINTS AFTER SALE, CONTACT:
**MANAGER ON SITE**

I hereby acknowledge receipt of the Buyers Guide at the closing of this sale.

_____                    _____
Signature                                                        Date

**IMPORTANT:** The information on this form is part of any contract to buy this vehicle.  Removing this label before consumer purchase (except for purpose of test-driving) violates federal law (16 C.F.R. 455).

**STATE OF FLORIDA**
DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES - DIVISION OF MOTORIST SERVICES
**SUBMIT THIS FORM TO YOUR LOCAL TAX COLLECTOR OFFICE**
www.flhsmv.gov/offices/

# Notice of Sale and/or Bill of Sale for a Motor Vehicle, Mobile Home, Off-Highway Vehicle or Vessel

☐ Notice of Sale (Seller must complete sections 1 & 3). The purchaser's signature in section 3 is optional.

☐ Bill of Sale (Seller and purchaser must complete sections 1, 2 (when applicable) & 3).

| 1. | Motor Vehicle, Mobile Home, Off- Highway or Vessel Description | | | | |
|---|---|---|---|---|---|
| **Year** | **Make/Manufacturer** | **Body Type** | | **Model** | **Color** |
| 2012 | LAMBORGHINI | 2DR | | AVENTADOR | |
| **Certificate of Title Number** | | **Vehicle/Vessel Identification Number** | | | |
| | | | ZHWUC1ZD8CLA01270 | | |

I/we do hereby sell or have sold and delivered the above described motor vehicle, mobile home, off-highway vehicle or vessel to:

**Print Name(s) of Purchaser(s)**

REAL HASTA LAMUERTE LLC AND FRABIAN ELI CARRION

| **Address** | **City** | **State** | **Zip Code** |
|---|---|---|---|
| 4751 DISTIBUTION CT | ORLANDO | FL | 32822 |

| **Date of Sale** | **Selling price** |
|---|---|
| 08/21/2020 | $ 249,973.58 |

| 2. | Odometer Disclosure Statement (Required For a Motor Vehicle) |
|---|---|

Federal and State law requires that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

WE STATE THAT THIS MOTOR VEHICLE'S ☐ 5 DIGIT OR ☒ 6 DIGIT ODOMETER NOW READS ☐☐☐ 9 , 9 9 8 .xx

(NO TENTHS) MILES, DATE READ  08 / 21 / 2020 , AND WE HEREBY CERTIFY THAT TO THE BEST OF OUR KNOWLEDGE THE ODOMETER READING:

☒ 1. REFLECTS THE ACTUAL MILEAGE.   ☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS.   ☐ 3. IS NOT THE ACTUAL MILEAGE.

**Affidavit (When applicable):**

| 3. | Certification |
|---|---|

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

| **Seller's Signature** | **Seller's Printed Name** | **Date** |
|---|---|---|
| | IRENKO AUTO SALES, INC | 08/21/2020 |
| **Seller's Address** | **City** **State** | **Zip Code** |
| 7436 NW 55TH ST | MIAMI            FL | 33166 |
| **Co-Seller's Signature (when applicable)** | **Co-Seller's Printed Name (when applicable)** | **Date** |
| | | |
| **Co-Seller's Address (when applicable)** | **City** **State** | **Zip Code** |
| | | |
| **Purchaser's Signature** *Frabian Carrion.* | **Purchaser's Printed Name** REAL HASTA LAMUERTE LLC | **Date** 08/21/2020 |
| **Co-Purchaser's Signature (when applicable)** *Frabian Carrion* | **Co-Purchaser's Printed name (when applicable)** FRABIAN ELI CARRION | **Date** 08/21/2020 |

✱ OWNERSHIP STATUS FOR THE ABOVE DESCRIBED MOTOR VEHICLE, MOBILE HOME, OFF-HIGHWAY VEHICLE OR VESSEL WILL NOT CHANGE UNTIL THE PURCHASER APPLIES FOR AND IS ISSUED A CERTIFICATE OF TITLE.

Check your local phone book government pages or visit the following website for current mailing addresses: http://www.flhsmv.gov/offices/

HSMV 82050 (Rev. 06/11) S

**STATE OF FLORIDA**
DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES – DIVISION OF MOTORIST SERVICES
SUBMIT THIS FORM TO YOUR LOCAL TAX COLLECTOR OFFICE
www.flhsmv.gov/offices/

## APPLICATION FOR NOTICE OF LIEN / REASSIGNMENT OF LIEN OR NOTICE TO FIRST LIENHOLDER OF SUBSEQUENT LIEN

SECTIONS 1 AND 2 SHOULD BE COMPLETED IF ADDING AN ORIGINAL LIEN.   ☐ MOTOR VEHICLE   ☐ MOBILE HOME
SECTIONS 1 AND 3 SHOULD BE COMPLETED IF REASSIGNING A LIEN.
SECTIONS 1, 2 AND 4 SHOULD BE COMPLETED IF ADDING A SUBSEQUENT LIEN.   ☐ OFF-HWY VEHICLE   ☐ VESSEL

### 1) DESCRIPTION OF MOTOR VEHICLE, MOBILE HOME, OFF-HIGHWAY VEHICLE OR VESSEL DESCRIPTION

| IDENTIFICATION NUMBER | | VESSEL REGISTRATION NUMBER | |
|---|---|---|---|
| ZHWUC1ZD8CLA01270 | | | |

| MAKE/MANUFACTURER | YEAR | MODEL | WT.-LGTH.-BHP |
|---|---|---|---|
| LAMBORGHIN | 2012 | AVENTADOR | |

| COLOR | TYPE | USE |
|---|---|---|
| | 2DR | |

| CERTIFICATE OF TITLE NUMBER | PREVIOUS ISSUE DATE | LICENSE PLATE NUMBER |
|---|---|---|
| | | |

### 2) NOTICE OF LIEN - LIENHOLDER INFORMATION

| ☐ FEID# | ☐ Driver License Number and Sex and Date of Birth | ☐ DMV Account# |
|---|---|---|

| DATE OF LIEN | LIENHOLDER NAME | LIENHOLDER'S E-MAIL ADDRESS | | |
|---|---|---|---|---|
| 8/21/2020 | RBI ALLIANCE | | | |

| LIENHOLDER ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 1920 HALLANDALE BEACH BLVD | HALLANDALE | FL | 33009 |

☐ Electronic title and lien participant (Electronic title only).

☐ If the lienholder authorizes the department to send title to the owner, _____
check box and countersign. **(DOES NOT APPLY TO VESSELS)**     Signature of Lienholder's Representative

**One of the following boxes must be checked.**

☐ A security agreement, retain title contract, conditional bill of sale, chattel mortgage or other similar instrument was executed **prior** to the filing of this notice of lien.

☐ This notice of lien is being filed **before** a security agreement, retain title contract, conditional bill of sale, chattel mortgage or other similar instrument is being executed.

**UNDER PENALTIES OF PERJURY, I (WE) DECLARE THAT I (WE) HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.**    Date _08/21/2020_

_Frabian Carrion_        _Frabian Carrion_
Signature of Registered Owner             Signature of Registered Co-Owner

**REAL HASTA LAMUERTE LLC**           **FRABIAN ELI CARRION**
Print Name of Registered Owner           Print Name of Registered Co-Owner

**4751 DISTIBUTION CT**           **9910 MW 74 TER**
Street Address (Owner)           Street Address (Co-Owner)

| ORLANDO | FL | 32822 | MIAMI | | FL | 33178 |
|---|---|---|---|---|---|---|
| City | State | Zip Code | City | | State | Zip Code |

### 3) APPLICATION FOR REASSIGNMENT OF LIEN

The undersigned hereby represents that they are the assignee of that certain ☐ first or ☐ second lien dated the _____ day of (Month/Year) _____, covering the motor vehicle, mobile home, off-highway vehicle or vessel described in section one of this form and request that the Florida Certificate of Title, which was issued on (Month/Day/Year) _____, be re-issued to show such lien as now being held by the undersigned applicant and represents that on this date there is a balance as principal still due and unpaid.

**UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.**

_____   By _____
Name of Assignee (New Lienholder)        Signature of Lienholder's Representative
       Title _____

Address _____ City _____ State _____ Zip Code _____

**UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.**

_____   By _____
Name of Assignor (Lienholder currently shown on Title)        Signature of Lienholder's Representative
       Title _____

HSMV 82139 (Rev. 06/11) S        www.flhsmv.gov

## 4) NOTICE TO FIRST LIENHOLDER OF SUBSEQUENT LIEN

Date _____

To: _____
First Lienholder

Address: _____

City and State: _____ Zip Code _____

You are the first lienholder on Title Number _____ covering the motor vehicle, mobile home, off-highway vehicle or vessel described on the reverse of this form, which is recorded in the office of the DIVISION OF MOTORIST SERVICES in Tallahassee, Florida. **FLORIDA STATUTES REQUIRE THE FIRST LIENHOLDER TO SUBMIT THE CERTIFICATE OF TITLE TO THE DIVISION OF MOTORIST SERVICES WITHIN TEN (10) DAYS AFTER RECEIPT OF THIS NOTICE, UNLESS THE DMV DATABASE REFLECTS AN ELECTRONIC TITLE.** This is to advise you that I have this date placed an additional lien on the above described motor vehicle, vessel, off-highway vehicle or mobile home with:

_____     _____
Name of Subsequent Lienholder            Lienholders E-mail Address

_____
Address

_____
City                                    State                          Zip Code
Please forward the above mentioned Certificate of Title with this request attached, if applicable, to the DIVISION OF MOTORIST SERVICES, at Tallahassee, Florida, for the purpose of recording the subsequent lien thereon. When the subsequent lien is recorded, the Division of Motorist Services will mail a Certificate of Title to you, if applicable, as first lienholder.

**UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.**

Signed: _____*Fabian Carrion*_____          _____*Fabian Carrion.*_____
<small>Signature of Owner</small>                        <small>Signature of Co-Owner</small>

Name: _____*Fabian Carrion*_____          _____*Fabian Carrion*_____
<small>Print or Type</small>                              <small>Print or Type</small>

### INSTRUCTIONS WHEN USING SECTION 4 OF THIS FORM:
Prepare in duplicate and send a copy of this form by registered or certified mail with the returned receipt requested to the first lienholder, as shown on the DMS database record. Submit the original copy of the form to a county tax collector's office with the return receipt signed by the first lienholder and the lien recording fee provided by section 328.14(6), Florida Statutes, for vessels, by section 319.32(1) and (2) (a), Florida Statutes, for motor vehicles and mobile homes and sections 317.0006(5) (a), & 317.0007(1), Florida Statutes, for off-highway vehicles.

**Notice to the First Lienholder:** If you fail, neglect, or refuse to forward the certificate of title to the department within 10 days from the date of the owner's request, the department, on the written request of the subsequent lienholder or an assignee thereof, shall make written demand to you for the return of such certificate of title for the notation of the second or subsequent lien or encumbrance.

THIS FORM IS A COMBINATION OF FORMS HSMV 82139, HSMV 82140, HSMV 82365 AND HSMV 87004.

Check your local phone book government pages or visit the following website for current mailing addresses: http://www.flhsmv.gov/offices/

HSMV 82139 (Rev. 06/11) S                    www.flhsmv.gov

## Vehicle Air Pollution Control Statement

Florida Law prohibits the operation, sale, lease, or transfer of title of any automobile or light-duty truck (1975 or newer, 10,000 pounds gross vehicle weight or less) that has been tampered with. "Tampering" means the dismantling, removal, or rendering ineffective of any air pollution control device or system which has been installed on the vehicle by the vehicle manufacturer except to replace such device or system with a device or system equivalent in design and function to the part that was originally installed on the motor vehicle (316.2935, Florida Statutes).

As a motor vehicle dealer licensed to conduct business in the State of Florida, I hereby certify that the following air pollution emission control devices and system of this vehicle, if installed by the vehicle manufacturer or importer, have not been tampered with by me or by my agents, employees, or other representatives. I also hereby certify that I or persons under my supervision have inspected this motor vehicle and, based on said inspection, have determined that the air pollution control devices and systems listed below, if installed by the vehicle manufacturer or importer, are in place and appear properly connected and undamaged as determined by visual observation.

This certification shall not be deemed or construed as a warranty that any air pollution control device or system of the vehicle is in functional condition, nor does the execution or delivery of this certification create by itself grounds for a cause of action between the parties to this transaction.

| MAKE: | MODEL: | BODY TYPE: |
|---|---|---|
| LAMBORGHINI | AVENTADOR | 2DR |

| VIN: | YEAR: |
|---|---|
| ZHWUC1ZD8CLA01270 | 2012 |

Transferor's (Seller's) Signature: _____

Transferor's (Seller's) Printed Name: **IRENKO AUTO SALES, INC**

Transferor's (Seller's) Street Address: **7436 NW 55TH ST**

City: **MIAMI**      State: **FL**      Zip Code: **33166**

Date of Statement: **08/21/2020**

Transferee's (Buyer's) Signature: *Arabian Carrion*

Transferee's (Buyer's) Printed Name: **REAL HASTA LAMUERTE LLC**

Transferee's (Buyer's) Street Address: **4751 DISTIBUTION CT**

City: **ORLANDO**      State: **FL**      Zip Code: **32822**

| 1975 – 1980 Model Year: | 1981 or Newer Model Year |
|---|---|
| Catalytic Converter | Catalytic Converter |
| Fuel Inlet Restrictor | Fuel Inlet Restrictor |
| Unvented Fuel Cap | Unvented Fuel Cap |
| | Exhaust Gas Recirculation System (EGR) |
| | Air Pump and/or Air Injection System (AIS) |
| | Fuel Evaporative Emissions System (EVP) |

15535
Stock No.

Form approved by the Department of Environmental Protection

HSMV 84058 (06/10)

# FLORIDA INSURANCE AFFIDAVIT

Under penalty of perjury, I  REAL HASTA LAMUERTE LLC                          certify that I have
                          (Name of Insured)

Personal Injury Protection, Property Damage Liability, and, when required, Bodily Injury Liability

Insurance currently in effect with _____ under
                                        (Name of Insurance Company)

_____ _____ covering the following motor vehicle:
        (Policy Number)              Company Code Number (5 digits)

2012      LAMBORGHINI                                    ZHWUC1ZD8CLA01270
Year          Make                                       Vehicle Identification Number

This insurance company is licensed to issue insurance policies in Florida.  I understand that my
driver license, license plate(s) and registration(s) will be suspended effective from the registration
date, if the insurer denies that this policy is in force.

_____
                                        Signature of Insured

**WARNING:    GIVING FALSE INFORMATION IN ORDER TO OBTAIN A VEHICLE REGISTRATION
             CERTIFICATE IS A CRIMINAL OFFENSE UNDER FLORIDA LAW.  ANYONE GIVING
             FALSE INFORMATION ON THIS AFFIDAVIT IS SUBJECT TO PROSECUTION.**

HSMV 83330 (Rev. 09/09)                    www.flhsmv.gov

DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES
DIVISION OF MOTORIST SERVICES

**SUBMIT THIS FORM TO YOUR LOCAL TAX COLLECTOR OFFICE**
www.flhsmv.gov/offices/

**VEHICLE IDENTIFICATION NUMBER AND ODOMETER VERIFICATION**

**PART A - OWNER'S VEHICLE IDENTIFICATION AFFIDAVIT AND ODOMETER DECLARATION**
(Completion of this part requires a physical inspection of the vehicle by the owner)

**AFFIDAVIT:**                                        **DATE:** ___08/21/2020___

This is to certify that I, the undersigned, am the lawful owner of the motor vehicle described on this form and that I have, on the date entered above, made a physical inspection of the motor vehicle and have recorded the vehicle identification number and other identification information and the odometer reading and certification in the spaces provided on this form.

**VEHICLE IDENTIFICATION**   (MOTOR NUMBER ALL MAKES THROUGH 1954 - IDENTIFICATION NUMBER 1955 AND LATER)

| Vehicle Identification Number | Year | Make | Color | Body | Previous State Vehicle Titled In |
|---|---|---|---|---|---|
| ZHWUC1ZD8CLA01270 | 2012 | LAMBORGHINI | | 2DR | |

**ODOMETER DECLARATION**
**WARNING:  Federal and State law require that you state the mileage in connection with an application for a Certificate of Title.  Failure to complete or providing a false statement may result in fines and/or imprisonment.**

I /WE STATE THAT THIS ☐ 5  OR  ☒ 6 DIGIT ODOMETER NOW READS ☐ ☐ 9 , 9 9 8 .XX (NO TENTHS)

MILES, DATE READ___08___/___21___/_2020___ AND I/WE HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THE ODOMETER READING:

☒ 1. reflects ACTUAL MILEAGE.      ☐ 2. is IN EXCESS OF ITS MECHANICAL LIMITS.      ☐ 3. is NOT THE ACTUAL MILEAGE.

UNDER PENALTY OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

_Nathan Carrion_                                    _Nathan Carrion_
(Owner's Signature)                                (Owner's Printed Name)

**PART B – VERIFICATION OF THE VEHICLE IDENTIFICATION NUMBER**
This section requires a physical inspection and a verification of the vehicle identification number (VIN) (or the motor number for motor vehicles manufactured prior to 1955) of the motor vehicle described on this form by a Florida Notary Public, Licensed Dealer, Police Officer, or Florida Division of Motorist Services Employee or Tax Collector Employee.  If an out-of-state motor vehicle dealer verifies the VIN, the verification must be submitted on their letterhead stationery.  Complete this section on all used motor vehicles, including trailers, (with abbreviation of "TL" with a weight of 2,000 pounds or more) not currently titled in Florida.

I, the undersigned, certify that I have physically inspected the above described vehicle and find that the vehicle identification number on the vehicle to be identical to the vehicle identification number recorded on this form.

**UNDER PENALTY OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.**

Date:_____                                                                    **(Seal)**

Commissioned Name of Florida Notary:_____  Notary's Signature: _____
                                              (Print, Type or Stamp)

**If other than a Notary, check the box below that applies, and sign and complete the corresponding fields**. Verified by:

☐ Florida Compliance Examiner/Inspector(DMS/TC Employee)   ☐ Law Enforcement Officer   ☐ Florida Licensed Dealer

Signature: _____   Printed Name: _____

Florida Compliance Examiner/Inspector Name: _____   Badge or ID #: _____

Law Enforcement Agency Name:_____   LEO Badge #: _____

Florida Dealer Name:_____   Florida Dealer #: _____

♦ NOTICE:  ANY ALTERATION OR ERASURE MAY VOID THIS DOCUMENT ♦

**HSMV 82042 (REV. 06/19)**                    www.flhsmv.gov

**STATE OF FLORIDA**
**DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES**
**DIVISION OF MOTOR VEHICLES**
Neil Kirkman Building - Tallahassee, FL 32399

# NOTIFICATION OF TRANSFER OF REGISTRATION LICENSE PLATE

**In compliance with section 320.0609(2), Florida Statutes, I hereby certify that the following motor vehicle has been sold, traded, transferred or otherwise disposed of:**

Year  2018      Make NISSAN          Type  2DR          Weight or Length _____

Identification Number  JN1AR5EF9JM710371                              Color   BLUE

**As the registered owner of Florida License Plate Number** _____ **Decal Number** _____

**which expires on** _____, **I authorize the following dealer:**

IRENKO AUTO SALES, INC
(Dealer)

7436 NW 55TH ST; MIAMI, FL 33166
(Dealer's Address)

**to properly transfer my license plate to the replacement vehicle described below:**

Year  2012      Make LAMBORGHIN      Type  2DR          Weight or Length_____

Identification Number   ZHWUC1ZD8CLA01270                              Color _____
REAL HASTA LAMUERTE LLC
FRABIAN ELI CARRION
_____  Print Name of Owner(s)          Signature of Owner(s)

4751 DISTIBUTION CT, ORLANDO, FL 32822
(Owner's Address)

## DEALER'S CERTIFICATION

As a motor vehicle dealer licensed in Florida, I hereby certify that the above Notification of

Transfer of Registration License Plate correctly describes the transaction involving the transfer

of the above described motor vehicle and license plate number: _____.

This license plate has been removed from the original vehicle, assigned and attached to the replacement

vehicle in compliance with section 320.0609(2), Florida Statutes. I also certify that

on behalf of my customer, I will process the necessary documents through a local county license plate agency

in order to obtain the transfer registration certificate, which will be delivered to my customer within 30 days as

stated in section 320.0605, Florida Statutes.

**Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.**

Dealer IRENKO AUTO SALES, INC _____  Authorized Agent _____

Dealer's License Number ___ VI/1022808/1 _____  Date of Sale  08/21/2020 _____

HSMV 83033 (Rev. 11/01)S

**STATE OF FLORIDA**

**DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES – DIVISION OF MOTORIST SERVICES**

**SUBMIT THIS FORM TO YOUR LOCAL TAX COLLECTOR OFFICE**
www.flhsmv.gov/offices/

# POWER OF ATTORNEY FOR A MOTOR VEHICLE, MOBILE HOME OR VESSEL

<u>08/21/2020</u>
(Date)

I/We hereby name and appoint, _____, to be my/our
(Full Legibly Printed Name is Required)

lawful attorney-in-fact, to act for me/us, in applying for an original or duplicate certificate of title, to register, transfer title, or record a lien to the motor vehicle, mobile home or vessel described below, and to print my/our name and sign their name, in my/our behalf.  My attorney-in-fact can also do all things necessary to the application or any other related instrument and to bind me/us in as sufficient a manner as I/we myself/ourselves could do, were I/we personally present and signing the same.

With full power of substitution and revocation, I/we hereby ratify and confirm whatever my/our said attorney-in-fact may lawfully do or cause to be done in the virtue hereof.

**CHECK ONE:**   [X] **Motor Vehicle**   [ ] **Mobile Home**   [ ] **Vessel**

| Year | Make/Manufacturer | Body Type | Title Number |
|------|-------------------|-----------|--------------|
| 2012 | LAMBORGHIN/AVENTADOR | 2DR | |

Vehicle/Vessel Identification Number

ZHWUC1ZD8CLA01270

### NOTICE TO OWNER(S):  COMPLETE THIS FORM IN ITS ENTIRETY PRIOR TO SIGNING.

**UNDER PENALTIES OF PERJURY, I/WE DECLARE THAT I/WE HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.**

| *Frabian Carrion* | REAL HASTA LAMUERTE LLC |
|-------------------|-------------------------|
| (Signature of Owner "Grantor") | (Legibly Printed Name of Owner "Grantor") |

| | |
|---|---|
| (Driver License, Identification Card or FEID Number for Owner) | (Date of Birth for Owner, if applicable) |

| 4751 DISTIBUTION CT | ORLANDO | FL | 32822 |
|---------------------|---------|-----|-------|
| (Owner's Address ) | (City) | (State) | (Zip) |

| | FRABIAN ELI CARRION |
|---|---|
| (Signature of Co-Owner "Grantor," if applicable) | (Legibly Printed Name of Co-Owner "Grantor," if applicable) |

| | 10/04/91 |
|---|---|
| (Driver License, Identification Card or FEID Number for Co-Owner) | (Date of Birth for Co-Owner, if applicable) |

| 9910 MW 74 TER | MIAMI | FL | 33178 |
|----------------|-------|-----|-------|
| (Co-Owner's Address) | (City) | (State) | (Zip) |

This non-secure power of attorney form may be used when an individual or entity appointed as the attorney-in-fact will be completing the odometer disclosure statement as the **buyer only** or the **seller only**.  However, this form cannot be used to allow an individual or entity (such as a dealership) to sign as both buyer **and** seller for the purpose of disclosing the odometer reading.  This may be accomplished only with the secure power of attorney (HSMV 82995) when:

(a)     the title is physically being held by the lienholder; **or**

(b)     the title is lost.

**NOTE:**  A licensed dealer and his/her employees are considered a single entity.

Check your local phone book government pages or visit the following website for current mailing addresses:
http://www.flhsmv.gov/offices/

HSMV 82053 (Rev. 12/11) S                    www.flhsmv.gov

Rev. 12/10

| FACTS | WHAT DOES IRENKO AUTO SALES, INC DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>■ Social Security number and income<br>■ account balances and payment history<br>■ credit history and credit scores |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons IRENKO AUTO SALES, INC chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does IRENKO AUTO SALES, INC share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes — such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes — to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes — information about your transactions and experiences | No | We don't share |
| For our affiliates' everyday business purposes — information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | Yes | Yes |

| To limit our sharing | ■ Call 305-477-3306 or Mail the form below<br><br>**Please note:**<br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|
| Questions? | Call 305-477-3306 |

✂ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**Mail-in Form**

| If you have a joint account, your choice(s) will apply to everyone on your account unless you mark below.<br><br>☐ Apply my choices only to me | Mark any/all you want to limit:<br>☐ Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br>☐ Do not allow your affiliates to use my personal information to market to me.<br>☐ Do not share my personal information with nonaffiliates to market their products and services to me. | |
|---|---|---|
| | **Name** | REAL HASTA LAMUERTE LLC | **Mail to:**<br>IRENKO AUTO SALES, INC<br>7436 NW 55TH ST<br>MIAMI, FL 33166 |
| | **Address** | 4751 DISTIBUTION CT | |
| | **City, State, Zip** | ORLANDO, FL 32822 | |
| | **Account #** | 15535 | |

**Page 2**

## What We Do

| | |
|---|---|
| **How does** IRENKO AUTO SALES, INC **protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does** IRENKO AUTO SALES, INC **collect my personal information?** | We collect your personal information, for example, when you<br>■ apply for financing or pay your bills<br>■ pay us by check or give us your wage statements<br>■ show your driver's license<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>■ sharing for affiliates' everyday business purposes—information about your creditworthiness<br>■ affiliates from using your information to market to you<br>■ sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |
| **What happens when I limit sharing for an account I hold jointly with someone else?** | Your choices will apply to everyone on your account—unless you tell us otherwise. |

## Definitions

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>■ *IRENKO AUTO SALES, INC has no affiliates.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>■ *Nonaffiliates we share with can include finance companies and insurance companies.* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>■ *IRENKO AUTO SALES, INC doesn't jointly market.* |

## Other important information

I/We acknowledge that I/we have received a copy of this notice.

| | | |
|---|---|---|
| REAL HASTA LAMUERTE LLC | *Frabian Carrion* | 8/21/2020 |
| Print Customer Name | Customer Signature | Date |
| FRABIAN ELI CARRION | *Frabian Carrion* | 8/21/2020 |
| Print Customer Name | Customer Signature | Date |

**Florida Department of Revenue**
**Hope Scholarship Program**
**Dealer Contribution Collection Report**

HD/PM Date:
08 / 24 / 2020

DR-HS2
R. 10/19
Rule 12A-1.097, F.A.C.
Effective 10/19
Page 1 of 2

Copy A - Organization Report

**Dealer Type**
[X] Motor Vehicle Dealer
[ ] Private Tag Agent
[ ] Tax Collector

[ ] Amended Report

Reporting Period: [M M / D D / Y Y] - [M M / D D / Y Y]
Beginning Date          Ending Date

FEIN [ ]-[ ]

or

Sales Tax Certificate # 2 3 - - 8 0 1 4 9 5 0 9 9 - 6

Print Information Below

IRENKO AUTO SALES, INC

7436 NW 55TH ST
MIAMI FL
33166

Eligible Nonprofit Scholarship-Funding Organization | Step Up For Students, Inc.

Total Contributions Paid Directly to Organization

US Dollars | Cents
[ ],[ ],[ 0].[0 0]

Under penalties of perjury, I declare that I have read this report and the facts stated in it are true.

Signature: _____   Date: 08/24/2020   Telephone Number: ( 3 0 5 ) 4 7 7 - 3 3 0 6

---

**Florida Department of Revenue**
**Hope Scholarship Program**
**Dealer Contribution Collection Report**

HD/PM Date:
08 / 24 / 2020

DR-HS2
R. 10/19
Rule 12A-1.097, F.A.C.
Effective 10/19
Page 1 of 2

Copy C - For your Records

**Dealer Type**
[X] Motor Vehicle Dealer
[ ] Private Tag Agent
[ ] Tax Collector

[ ] Amended Report

Reporting Period: [M M / D D / Y Y] - [M M / D D / Y Y]
Beginning Date          Ending Date

FEIN [ ]-[ ]

or

Sales Tax Certificate # 2 3 - - 8 0 1 4 9 5 0 9 9 - 6

Print Information Below

IRENKO AUTO SALES, INC

7436 NW 55TH ST
MIAMI FL
33166

Eligible Nonprofit Scholarship-Funding Organization | Step Up For Students, Inc.

Total Contributions Paid Directly to Organization

US Dollars | Cents
[ ],[ ],[ 0].[0 0]

Under penalties of perjury, I declare that I have read this report and the facts stated in it are true.

Signature: _____   Date: 08/24/2020   Telephone Number: ( 3 0 5 ) 4 7 7 - 3 3 0 6

---

**Florida Department of Revenue**
**Hope Scholarship Program**
**Dealer Contribution Collection Report**

HD/PM Date:
08 / 24 / 2020

DR-HS2
R. 10/19
Rule 12A-1.097, F.A.C.
Effective 10/19
Page 1 of 2

Copy B - File with Florida Department of Revenue

**Dealer Type**
[X] Motor Vehicle Dealer
[ ] Private Tag Agent
[ ] Tax Collector

[ ] Amended Report

Reporting Period: [M M / D D / Y Y] - [M M / D D / Y Y]
Beginning Date          Ending Date

FEIN [ ]-[ ]

or

Sales Tax Certificate # 2 3 - - 8 0 1 4 9 5 0 9 9 - 6

Print Information Below

IRENKO AUTO SALES, INC

7436 NW 55TH ST
MIAMI FL
33166

Eligible Nonprofit Scholarship-Funding Organization | Step Up For Students, Inc.

Total Contributions Paid Directly to Organization

US Dollars | Cents
[ ],[ ],[ 0].[0 0]

Under penalties of perjury, I declare that I have read this report and the facts stated in it are true.

Signature: _____   Date: 08/24/2020   Telephone Number: ( 3 0 5 ) 4 7 7 - 3 3 0 6

Motor vehicle dealers, private tag agencies, and county tax collectors receiving contributions under the Hope Scholarship Program must report contributions received to each eligible nonprofit scholarship-funding organization participating in the Hope Scholarship Program and to the Florida Department of Revenue (Department).

**Due Dates:**
Reports by **motor vehicle dealers and private tag agencies** are due on the 1st day of the month following the sales and use tax reporting period and are late after the 20th day of the month following each reporting period. If the 20th falls on a Saturday, Sunday, or a state or federal holiday, the report will be timely if received on the first business day following the 20th.

Reports by **county tax collectors** are due at the same time sales and use tax reports and payments are due to the Department, as prescribed in section 219.07, Florida Statutes.

When no contributions have been collected during a reporting period, motor vehicle dealers, private tag agencies, and county tax collectors are not required to file a report for the reporting period.

**Mail Copy A with your contribution payment to:**
Step Up For Students, Inc.
PO Box 645707
Cincinnati, OH 45264-5707

**Mail Copy B of the report only (no payments) to:**
Florida Department of Revenue
Revenue Processing
PO Box 5138
Tallahassee, FL 32314-5138

**Keep Copy C for your records.**



Motor vehicle dealers, private tag agencies, and county tax collectors receiving contributions under the Hope Scholarship Program must report contributions received to each eligible nonprofit scholarship-funding organization participating in the Hope Scholarship Program and to the Florida Department of Revenue (Department).

**Due Dates:**
Reports by **motor vehicle dealers and private tag agencies** are due on the 1st day of the month following the sales and use tax reporting period and are late after the 20th day of the month following each reporting period. If the 20th falls on a Saturday, Sunday, or a state or federal holiday, the report will be timely if received on the first business day following the 20th.

Reports by **county tax collectors** are due at the same time sales and use tax reports and payments are due to the Department, as prescribed in section 219.07, Florida Statutes.

When no contributions have been collected during a reporting period, motor vehicle dealers, private tag agencies, and county tax collectors are not required to file a report for the reporting period.

**Mail Copy A with your contribution payment to:**
Step Up For Students, Inc.
PO Box 645707
Cincinnati, OH 45264-5707

**Mail Copy B of the report only (no payments) to:**
Florida Department of Revenue
Revenue Processing
PO Box 5138
Tallahassee, FL 32314-5138

**Keep Copy C for your records.**

Motor vehicle dealers, private tag agencies, and county tax collectors receiving contributions under the Hope Scholarship Program must report contributions received to each eligible nonprofit scholarship-funding organization participating in the Hope Scholarship Program and to the Florida Department of Revenue (Department).

**Due Dates:**
Reports by **motor vehicle dealers and private tag agencies** are due on the 1st day of the month following the sales and use tax reporting period and are late after the 20th day of the month following each reporting period. If the 20th falls on a Saturday, Sunday, or a state or federal holiday, the report will be timely if received on the first business day following the 20th.

Reports by **county tax collectors** are due at the same time sales and use tax reports and payments are due to the Department, as prescribed in section 219.07, Florida Statutes.

When no contributions have been collected during a reporting period, motor vehicle dealers, private tag agencies, and county tax collectors are not required to file a report for the reporting period.

**Mail Copy A with your contribution payment to:**
Step Up For Students, Inc.
PO Box 645707
Cincinnati, OH 45264-5707

**Mail Copy B of the report only (no payments) to:**
Florida Department of Revenue
Revenue Processing
PO Box 5138
Tallahassee, FL 32314-5138

**Keep Copy C for your records.**



**FLORIDA**

## Hope Scholarship Program
## Contribution Election

DR-HS1
R. 10/19
Rule 12A-1.097, F.A.C.
Effective 10/19
Page 1 of 1

The Hope Scholarship Program (Program) provides a public-school student who was subjected to an incident of violence or bullying at school the opportunity to apply for a scholarship to attend an eligible private school rather than remain in an unsafe school environment.

When you purchase or register a motor vehicle qualifying for the Program in Florida, you may designate $105 per vehicle to an eligible nonprofit scholarship-funding organization participating in the Program. If the state sales tax due is less than $105, you may designate the amount of state sales tax due. Your motor vehicle dealer, county tax collector, or private tag agent will remit your contribution to the organization and remit the remaining state sales tax and surtax to the Florida Department of Revenue.

Eligible contributions are used to fund scholarships for the Hope Scholarship Program. Contributions may also be used to fund scholarships for the Florida Tax Credit Scholarship Program, which provides a low-income student the opportunity to apply for a scholarship to attend an eligible private school.

**To make your contribution to the Program, complete the following. Sign and date.**

| Eligible Nonprofit Scholarship-Funding Organization: | | Contribution Amount (Lesser of $105, or state sales tax due). | | |
|---|---|---|---|---|
| **Step Up for Students, Inc.** | | **N/A** | | |
| Vehicle Owner's Name: | | | | |
| **REAL HASTA LAMUERTE LLC** | | | | |
| Mailing Address: | | | | |
| **4751 DISTIBUTION CT** | | | | |
| City: | | State: | | ZIP. |
| **ORLANDO** | | **FL** | | **32822** |
| Vehicle Co-Owner's Name: | | | | |
| **FRABIAN ELI CARRION** | | | | |
| Mailing Address: | | | | |
| **9910 MW 74 TER** | | | | |
| City: | | State: | | ZIP: |
| **MIAMI** | | **FL** | | **33178** |
| Vehicle Year | Vehicle Manufacturer: | Vehicle Identification Number: | | |
| **2012** | **LAMBORGHINI** | **ZHWUC1ZD8CLA01270** | | |
| Signature of Owner: | | | Date: **08/21/2020** | |
| Signature of Co-Owner*: | | | Date: **08/21/2020** | |

* For vehicles purchased by more than one person, the signature of the owner and the co-owner is required when the owners' names are joined by "and" on the vehicle title or registration. When the owners' names are joined by "or" on the vehicle title or registration, the signature of one owner is required.

**Motor vehicle dealers, county tax collectors, and private tag agencies:** Retain this form in your records when a contribution to the Hope Scholarship Program is indicated on the form.

For use by motor vehicle dealer, county tax collector, or private tag agency.

## CUSTOMER DECLINED

**FLORIDA DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES**
## APPLICATION FOR CERTIFICATE OF TITLE WITH/WITHOUT REGISTRATION
SUBMIT THIS FORM TO YOUR LOCAL TAX COLLECTOR OFFICE
www.flhsmv.gov/offices/

CHECK APPLICATION TYPE: ☐ ORIGINAL ☒ TRANSFER VEHICLE TYPE: ☒ MOTOR VEHICLE ☐ MOBILE HOME ☐ VESSEL OFF-HIGHWAY VEHICLE: ☐ ATV ☐ ROV ☐ MC

### 1 — OWNER / APPLICANT INFORMATION

| Customer Number | Check this box if you are requesting the certificate of title to be printed. ☐ | Are you a Florida resident? ☐ yes ☐ no  Are you an alien? ☐ yes ☐ no | Owner: ☐ yes ☐ no | Co-Owner: ☐ yes ☐ no | Unit Number | Fleet Number |
|---|---|---|---|---|---|---|

☐ OR ☒ AND NOTE: When joint ownership, please indicate if "or" or "and" is to be shown on title when issued. If neither box is checked, the title will be issued with "and."
If applicable: ☐ Life Estate/Remainder Person ☐ Tenancy By the Entirety ☐ With Rights of Survivorship Owner's County of Residence: ORANGE

| | | Owner's Email Address | Date of Birth | Sex | FL Driver License or FEID/Suffix # |
|---|---|---|---|---|---|
| Owner's Name As It Appears on Driver License (First, Full Middle/Maiden, & Last Name) **REAL HASTA LAMUERTE LLC** | | | | | |
| Co-Owner's/Lessee's Name As It Appears on Driver License (First, Full Middle/Maiden, & Last Name) **FRABIAN ELI CARRION** | | Co-Owner's/Lessee's Email Address | Date of Birth **10/04/91** | Sex **M** | FL Driver License or FEID/Suffix # |

| Owner's Mailing Address (Mandatory unless a member of the Military) **4751 DISTIBUTION CT** | City **ORLANDO** | State **FL** | Zip **32822** |
|---|---|---|---|
| Co-Owner's/Lessee's Mailing Address (Mandatory unless a member of the Military) **9910 MW 74 TER** | City **MIAMI** | State **FL** | Zip **33178** |
| Owner's/Lessee's Physical Street Address in Florida (Mandatory unless a member of the Military) **4751 DISTIBUTION CT** | City **ORLANDO** | State **FL** | Zip **32822** |
| Mobile Home Physical Address (if applicable) Check if a mobile home rental park with 10 or more lots. | City | State | Zip |

| Mail To Customer Name (if different From Above Owner) | Mail To Customer's Email Address | Date of Birth | Sex | FL Driver License or FEID/Suffix # |
|---|---|---|---|---|
| Mail To Customer Address (if different From Above Mailing Address) | City | | State | Zip |

### 2 — MOTOR VEHICLE , MOBILE HOME OR VESSEL DESCRIPTION

| Vehicle/Vessel Identification Number **ZHWUC1ZD8CLA01270** | Make/Manufacturer **LAMBORGHIN** | Year **2012** | Body **2DR** | Color | Florida Title Number |
|---|---|---|---|---|---|

| Previous State of Issue | License Plate or Vessel Registration Number | Weight | Length Ft. ___ In. ___ | BHP/CC | GVW/LOC | VAN USE, IF APPLICABLE ☐ PASSENGER ☐ OTHER |
|---|---|---|---|---|---|---|

| TYPE | HULL MATERIAL | PROPULSION | FUEL | *DRAFT OF VESSEL (The depth of water a vessel draws) FT. ___ IN. ___ *For all vessels 26' or more in length and all sailboats |
|---|---|---|---|---|
| ☐ Open Motorboat ☐ Houseboat ☐ Personal Watercraft ☐ Cabin Motorboat ☐ Pontoon ☐ Canoe ☐ Auxiliary Sailboat ☐ Airboat ☐ Other ☐ Inflatable ☐ Sailboat ___ Specify | ☐ Wood ☐ Aluminum ☐ Fiberglass ☐ Steel ☐ Wood/Fiberglass ☐ Other ___ Specify | ☐ Outboard ☐ Sail ☐ Inboard ☐ Air Propelled ☐ Inboard/Outboard ☐ Other ___ Specify | ☐ Gas ☐ Diesel ☐ Electric ☐ Other ___ Specify | |

| USE OF VESSEL | | | PREVIOUS OUT-OF-STATE REGISTRATION NUMBER: |
|---|---|---|---|
| ☐ Recreational (Pleasure) ☐ Dealer/Manuf. ☐ Commercial Fish ☐ Exempt ☐ Hire (Livery) | ☐ Commercial Blue Crab ☐ Commercial Live Bait ☐ Commercial Mackerel | ☐ Commercial Stone Crab ☐ Commercial Shrimp Recip. ☐ Commercial Shrimp Non-Recip. ☐ Government ☐ Commercial Charter ☐ Commercial Oyster ☐ Commercial Sponge ☐ Commercial Other ☐ Commercial Spiney Lobster | |

Previously Federally Documented Vessel, Attach Copy of:
☐ U.S. Coast Guard Release From Documentation Form; or   ☐ Copy of Canceled Documentation Papers   State of Principal Use ___

### 3 — BRANDS, USAGE AND TYPE (Check Applicable Boxes)

| ☐ SHORT TERM LEASE ☐ ASSEMBLED FROM PARTS | ☐ LONG TERM LEASE ☐ BONDED TITLE | ☐ REBUILT ☐ KIT CAR | ☐ POLICE VEHICLE ☐ GLIDER KIT | ☐ PRIVATE USE ☐ MANUF. BUY BACK | ☐ TAXI CAB ☐ REPLICA | ☐ FLOOD ☐ AUTONOMOUS | ☐ ILEV ☐ ELECTRIC | ☐ CUSTOM ☐ STREET ROD |
|---|---|---|---|---|---|---|---|---|

### 4 — LIENHOLDER INFORMATION

| CHECK IF ELT CUSTOMER | ☐ FEID # ☐ DL # and Sex and Date of Birth ☐ DMV Account # | Date of Lien **8/21/2020** | Lienholder's Name **RBI ALLIANCE** | | |
|---|---|---|---|---|---|
| Lienholder's Email Address | Lienholder's Address **1920 HALLANDALE BEACH BLVD** | City **HALLANDALE** | State **FL** | Zip **33009** |

If Lienholder authorizes the Department to send the motor vehicle or mobile home title to the owner, check box and countersign: ___
(Does not apply to vessels). If box is not checked, title will be mailed to the first lienholder.   (Signature of Lienholder's Representative)

### 5 — TRANSFER TYPE

IF OWNERSHIP HAS TRANSFERRED, HOW AND WHEN WAS THE VEHICLE, MOBILE HOME, OR VESSEL ACQUIRED?
☒ SALE ☐ GIFT ☐ REPOSSESSION ☐ COURT ORDER ☐ OTHER (SPECIFY) ___   DATE ACQUIRED **8 / 21 / 2020**

### 6 — ODOMETER DECLARATION

WARNING: Federal and State law requires that you state the mileage in connection with an application for a Certificate of Title. Failure to complete or providing a false statement may result in fines or imprisonment.

I/WE STATE THAT THIS ☐ 5 OR ☒ 6 DIGIT ODOMETER NOW READS **9 , 9 9 8** .XX (NO TENTHS) MILES, DATE READ **8/ 21/ 2020** AND I/WE HEREBY CERTIFY THAT TO THE BEST OF MY/OUR KNOWLEDGE THE ODOMETER READING:

☒ 1. REFLECTS ACTUAL MILEAGE.    ☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS.    ☐ 3. IS NOT THE ACTUAL MILEAGE.

### 7 — DEALER SALES TAX REPORT AND VEHICLE TRADE IN INFORMATION (IF APPLICABLE)

| FLORIDA SALES TAX REGISTRATION NUMBER **23-8014950996-8** | DATE OF SALE **8/21/2020** | DEALER LICENSE NUMBER **VI/1022808/1** | AMOUNT OF TAX **11,837.11** | DEALER / AGENT SIGNATURE |
|---|---|---|---|---|
| YEAR OF TRADE IN **2018** | MAKE OF TRADE IN **NISSAN** | TITLE NUMBER OF TRADE IN (IF KNOWN) | VEHICLE IDENTIFICATION NUMBER OF TRADE IN **JN1AR5EF9JM710371** | |

HSMV 82040 – REV. 11/15    RULE 15C-21.001, FAC    www.flhsmv.gov

| 8 | MOTOR VEHICLE IDENTIFICATION NUMBER VERIFICATION |

THIS SECTION REQUIRES A PHYSICAL INSPECTION AND A VERIFICATION OF THE VEHICLE IDENTIFICATION NUMBER (VIN) (OR THE MOTOR NUMBER FOR MOTOR VEHICLES MANUFACTURED PRIOR TO 1955) OF THE MOTOR VEHICLE DESCRIBED ON THIS FORM BY A LICENSED DEALER, FLORIDA NOTARY PUBLIC, POLICE OFFICER, OR FLORIDA DIVISION OF MOTOR VEHICLES EMPLOYEE OR TAX COLLECTOR EMPLOYEE. IF THE VIN IS VERIFIED BY AN OUT OF STATE MOTOR VEHICLE DEALER, THE VERIFICATION MUST BE SUBMITTED ON THEIR LETTERHEAD STATIONERY. COMPLETE THIS SECTION ON ALL USED MOTOR VEHICLES, INCLUDING TRAILERS, (WITH ABBREVIATION OF "TL" WITH A WEIGHT OF 2,000 POUNDS OR MORE) NOT CURRENTLY TITLED IN FLORIDA.

I, the undersigned, certify that I have physically inspected the above described vehicle and find the vehicle identification number to be:  **ZHWUC1ZD8CLA01270**
(Vehicle Identification Number)

DATE _____   SIGNATURE _____   PRINTED NAME _____

Law Enforcement Officer or Florida Dealer/Agency Name **IRENKO AUTO SALES, INC**   Badge # or Florida Dealer # **VI/1022808/1**   Notary Stamp or Seal

FL DMV/Tax Collector Employee _____   Florida Compliance Examiner/Inspector Badge or ID Number _____

COMMISSIONED NAME OF FLORIDA NOTARY: _____   NOTARY'S SIGNATURE _____
(Print, Type or Stamp)

| 9 | SALES TAX EXEMPTION CERTIFICATION |

THE PURCHASE OF A RECREATIONAL VEHICLE TO BE OFFERED FOR RENT AS LIVING ACCOMMODATIONS DOES NOT QUALIFY FOR EXEMPTION. I CERTIFY THE RECREATIONAL VEHICLE, MOBILE HOME OR VESSEL DESCRIBED HAS BEEN PURCHASED AND IS EXEMPT FROM THE SALES TAX IMPOSED BY CHAPTER 212, FLORIDA STATUTES, BY:

☐ PURCHASER (STATE AGENCIES, COUNTIES, ETC.) HOLDS VALID EXEMPTION CERTIFICATE   CONSUMER'S CERTIFICATE OF EXEMPTION NUMBER _____

☐ MOTOR VEHICLE  ☐ MOBILE HOME  ☐ VESSEL WILL BE USED EXCLUSIVELY FOR RENTAL

SALES TAX REGISTRATION NUMBER _____

I hereby certify that ownership of the motor vehicle, mobile home or vessel described on this application, is not subject to Florida Sales and Use Tax for the following reason:  ☐ INHERITANCE  ☐ GIFT

☐ DIVORCE DECREE  ☐ TRANSFER BETWEEN A MARRIED COUPLE  ☐ EVEN TRADE OR TRADE DOWN (State the facts of the even trade or trade down and the transferor information, including the transferor's name and address, below under "Other: Explain.")

☐ OTHER: (EXPLAIN)

| 10 | REPOSSESSION DECLARATION |

IF CHECKED, THE FOLLOWING CERTIFICATIONS ARE MADE BY THE APPLICANT:

☐ I CERTIFY THAT THIS MOTOR VEHICLE, MOBILE HOME OR VESSEL WAS REPOSSESSED UPON DEFAULT IN THE TERMS OF THE LIEN INSTRUMENT AND IS NOW IN MY POSSESSION.
☐ (VESSEL) A PHOTOCOPY OF THE LIEN INSTRUMENT FOR THE VESSEL IS REQUIRED AND ATTACHED.
☐ I AM REQUESTING THAT AN ORIGINAL CERTIFICATE OF REPOSSESSION BE ISSUED FOR THE MOTOR VEHICLE OR MOBILE HOME IN LIEU OF A TITLE (REPOSSESSION).
☐ I AM REQUESTING THAT A DUPLICATE CERTIFICATE OF REPOSSESSION BE ISSUED FOR THE MOTOR VEHICLE OR MOBILE HOME, AS THE ORIGINAL HAS BEEN LOST OR DESTROYED.

| 11 | NON-USE AND OTHER CERTIFICATIONS |

IF CHECKED, THE FOLLOWING CERTIFICATIONS ARE MADE BY THE APPLICANT:

☐ I CERTIFY THAT THE CERTIFICATE OF TITLE IS LOST OR DESTROYED.
☐ THE VEHICLE IDENTIFIED WILL NOT BE OPERATED ON THE STREETS AND HIGHWAYS OF THIS STATE UNTIL PROPERLY REGISTERED.
☐ THE VESSEL IDENTIFIED WILL NOT BE OPERATED ON THE WATERS OF THIS STATE UNTIL PROPERLY REGISTERED.
☐ OTHER: (EXPLAIN)

| 12 | APPLICATION ATTESTMENT AND SIGNATURES |

I/WE PHYSICALLY INSPECTED THE ODOMETER/VIN AND FURTHER AGREE TO DEFEND THE TITLE AGAINST ALL CLAIMS. (More than one form HSMV 82040 may be used for additional signatures.)

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

_____   SIGNATURE OF APPLICANT (OWNER)   Date _____   SIGNATURE OF APPLICANT (CO-OWNER)   Date _____

| 13 | RELEASE OF SPOUSE OR HEIRS INTEREST |

The undersigned person(s) state(s) as follows: That _____ died on _____.
(Name of Deceased)   (Date)

☐ testate (with a will)  ☐ intestate (without a will) and left the surviving heir(s) named below.

☐ When applicable, the heir(s) (named below) certifies that the certificate of title is lost or destroyed.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.
(More than one form HSMV 82040 may be used for additional signatures.)

Print or Type Name of Spouse, Co-owner or Heir(s) _____   Signature of Spouse, Co-Owner or Heir(s) _____

That at the time of death the decedent was owner of the motor vehicle, mobile home or vessel described in section 2 of this form. The person(s) signing above hereby releases all of his/her/their right, title, interest and claim as heir(s) at law, legatee(s), devisee(s), or otherwise to the aforesaid motor vehicle, mobile home or vessel to:

_____

Name of Applicant(s) (Print or Type)

**RESIDENTS OF FLORIDA AND ALL VESSEL OWNERS, RESIDING IN FLORIDA OR OUT OF STATE, SHOULD SUBMIT THIS FORM AND ALL REQUIRED DOCUMENTATION TO A LOCAL FLORIDA TAX COLLECTOR'S OFFICE OR THE FLORIDA TAX COLLECTOR'S OFFICE LOCATED IN THE APPLICANT'S COUNTY OF RESIDENCE FOR PROCESSING.**
Check your local phone book government pages or visit the following website for current mailing addresses: http://www.flhsmv.gov/offices/
www.flhsmv.gov

HSMV 82040 – REV. 11/15   RULE 15C-21.001, FAC

```
            RECEIPT #:   5,002
            -----------------

        IRENKO AUTO SALES, INC
           7436 NW 55TH ST
           MIAMI, FL 33166
            305-477-3306


        Date/Time:  8/21/20   1:38 PM
         Taken by: YRM
         Account #: 15535
      Received from: REAL HASTA LAMUERTE LLC
              For: 12 LAMBORGHINI AVENTADOR;


   Amount Received:   $90,000.00  Down Payment

          Paid by Cash



       Receipt printing date:   8/24/20


    *  *  *   THANK YOU FOR YOUR BUSINESS!!  *  *  *


            THANK YOU!
```

# EXHIBIT K



23 East 4th Street
3rd Floor
New York, NY 10003

T: + 1 (212) 201-9280
F: + 1 (212) 201-9203
www.theorchard.com

### GLOBAL DISTRIBUTION AGREEMENT

### Executive Summary

| | |
|---|---|
| **Artist Company** | NibiruInternational,LLC<br><br>Real Hasta La Muerte, LLC |
| **Artist Company Address** | *NibiruInternational, LLC* – 2020 North Bayshore Drive, Apt 1402, Miami FL 33137<br><br>*Real Hasta La Muerte, LLC* – c/o Singh, Singh & Trauben, LLP, 400 S. Beverly Drive, Suite 240, Beverly Hills, CA 90212 |
| **Artist** | Jan Carlos Ozuna Rosado professionally known as *Ozuna* and Emmanuel Gazmey professionally known as *Anuel AA* |
| **Orchard Contact** | Erol Cichowski / Jason Pascal |
| **Term** | 10 years, with automatic rollovers unless terminated; *see Article 2* |
| **Territory** | Worldwide; *see Section 1* |
| **Advance** | $13M Delivery Advance, $2M Marketing Fund, potential Additional Profit Advance; *see Article 5A* |
| **Digital Distribution (Audio/Video)** | 50% in US and LATAM; 60% ROW, dropping to 50% after 5 years; *see Section 5.01*<br><br>*(Includes revenues from user-generated content, etc.)* |
| **Physical Distribution (Audio)** | 50% of Net Sales in US and LATAM; 60% ROW, dropping to 50% after 5 years; *see 5.02(a)* |
| **Collection Societies** | 50% of gross receipts; *see Section 5.02* |
| **Synchronization** | 50% of gross receipts; *see Section 5.03* |
| **Reporting and Payment** | Monthly + 30 days; *see Section 6.01* |

*Strictly for reference; binding provisions are in the Agreement below.*

## GLOBAL DISTRIBUTION AGREEMENT

This **AGREEMENT** (including all schedules, exhibits and amendments hereto, the "Agreement") is effective as of the date that you and Orchard have signed it as set out on the signature page below (the "Effective Date"), as between as between **NIBIRUINTERNATIONAL, LLC** f/s/o Jan Carlos Ozuna Rosado professionally known as *Ozuna*, with offices located at 2020 North Bayshore Drive, Apartment 1402, Miami FL 33137 ("Nibiru"), **REAL HASTA LA MUERTE, LLC** f/s/o Emmanuel Gazmey professionally known as *Anuel AA*, with offices located at Ritholz Levy, 235 Park Avenue South, Third Floor, NY, NY 10003 ("RHLM", and together with Nibiru, jointly and severally the "Artist Company"); and **ORCHARD ENTERPRISES NY, INC.**, with offices located at 23 East 4th Street, 3rd Floor, New York, NY 10003, USA ("Orchard").

1.      **Orchard as Your Distributor; Grant of Rights**.  Capitalized terms (as well as "you" and "your") are used as defined throughout this Agreement (as amended from time to time). Key definitions:

"you" (and "your," etc.), as used in this Agreement, means, jointly and severally, (i) the Artist Company, (ii) entities affiliated with, under common control with, or which are acquired by the Artist Company, and (iii) any entities with whom the Artist Company may merge during the Term.

"Artist" means, jointly and severally, Jan Carlos Ozuna Rosado professionally known as *Ozuna* ("Ozuna") and Emmanual Gazmey professionally known as *Anuel AA* ("Anuel AA").

"Anuel AA Agreement" means the global distribution agreement between Real Hasta La Muerta, LLC, Emmanuel Gazmey professionally known as *Anuel AA* and Orchard Enterprises NY, Inc., and Sony Music Entertainment US Latin LLC dated November 7, 2019.

"Channels" means any and all so-called channels, pages, profiles, or similar (as on YouTube or other platforms) that are owned or controlled by you, as well as all content included therein (the "Content")

"Collateral" is defined in Section 5A.

"Deliverables" is defined on Schedule C.

"Digital Distribution" means distribution (or other authorization of use) of the Recordings by any current or future means or media as selected by Orchard in good faith, excluding only distribution of physical records (e.g. vinyl, CD, cassette tape etc.).

"Outlets" is defined in Section 1.01(a).

"Ozuna Agreement" means the global distribution agreement between NibiruInternational, LLC f/s/o Jan Carlos Ozuna Rosado professionally known as *Ozuna* and Orchard Enterprises NY, Inc., and Sony Music Entertainment dated August 30, 2019.

"Physical Distribution" means the distribution of Records by Orchard, its affiliates and Sales Partners.

"Pipeline Income" means Orchard's good faith estimate of your share of amounts earned and actually received by Orchard deriving from the exploitation of the Properties in the United States following the most recent accounting statement rendered to you by Orchard, and which have not yet been credited to your royalty account hereunder.

"Properties" means all Recordings, Content and all material to be exploited under this Agreement, including anything delivered by you (or on your behalf) under Section 1.01(c) or 4.01.

 "Recordings" means (a) the newly recorded, previously unreleased, commercially satisfactory studio sound recording album featuring performances of the Artist, including all alternate versions and remixes of all tracks thereon ("Joint LP 1"), and (b) no less than three (3) associated professionally produced music videos for tracks contained on the Joint LP 1 (for the avoidance of doubt, Artist Company will determine which tracks from the Joint LP 1 they will shoot music videos for). Artist Company will have the right to determine which tracks are released as the so-called "singles" from Joint LP 1. Artist Company hereby represents and warrants that Joint LP 1 will consist of no less than twelve (12) tracks.

Records" means all physical records (including vinyl and CDs) and physical copies of videos (including DVDs) of the Recordings, in any form known or later developed. "Records" does not include downloads, server copies, or ephemeral or other copies made in connection with digital transmissions.

"Sales Partner" means a third party engaged by or on behalf of Orchard to distribute Records

"Talent" means all actors, directors, producers, writers, musical performing artists, engineers, athletes, songwriters, crew and any others who performed or participated in the making of Content.

"Territory" means the world.

1.01    Exclusive Distribution Rights.

(a) Orchard as Exclusive Distributor. You hereby appoint Orchard as the exclusive distributor of the Recordings during the Term and throughout the Territory, via Digital Distribution and Physical Distribution. This appointment includes the exclusive rights to sell, copy, distribute, perform, sublicense, monetize and otherwise exploit the Recordings via any and all forms of such distribution, including direct to retailers, digital service providers, direct to consumers, and to others of any description that exploit sound or audiovisual recordings by any and all means and media (whether now known or existing in the future) as selected by Orchard in its discretion ("Outlets"), including as embodied in so-called "user-generated content" and "art tracks" (such as via YouTube). Once a Recording is subject to distribution hereunder, your grant of rights to Orchard extends for the duration of the Term. As a result, any Recordings sold, licensed, or transferred to a third party, or to which you otherwise lose rights, remain subject to this Agreement for the full Term. For purposes of clarity, Orchard may not alter, remix, or otherwise change the Recordings without Artist Company's prior written consent (which may be withheld in its sole discretion); provided that Orchard may encode the Recordings as necessary for the purpose of automated delivery to Outlets (subject to the terms of Section 3.01). Additionally, Orchard will not release any Recordings as part of a commercial compilation without Artist Company's prior written approval (which may be withheld in its sole discretion).

(b) Artist Company and Artist will not create or engage any third party to create any Channels specifically for Artist as a group and/or Joint LP 1 during the Term hereof. Notwithstanding the foregoing, it is hereby acknowledged that there are pre-existing Channels for Ozuna and Anuel AA as solo artists pursuant to the Ozuna Agreement and Anuel AA Agreement respectively.

(c) Artwork; Name & Likeness. During the Term, you hereby grant Orchard and the Outlets the right, solely in order to exploit and promote the Recordings and the Content, to use: (i) Artist's' names, trademarks, logos, likenesses, photographs and biographical material, (ii) album and production artwork, video stills, thumbnail images, and the names, likenesses and biographical material of Talent, and (iii) Artist Company's names, trademarks, logos, biographical material and images. Notwithstanding the foregoing, Orchard will only use such materials to the extent delivered or otherwise approved by you.

1.02    Collection Society Income. Solely with respect to the Recordings, but subject to the last sentence of this Section 1.02, you hereby appoint Orchard as your exclusive copyright owner agent, licensee and representative during the Term for purposes of registering the Recordings with and collecting income from the Recordings from all applicable collective rights or licensing organizations and sound recording collection societies, such as SoundExchange, PPL and others throughout the Territory ("Societies"), including for performance, broadcasting, neighboring rights, and synchronization and dubbing rights, to the extent administered by Societies or as otherwise authorized by statute, industry agreement or otherwise. In addition, you grant Orchard the exclusive right to authorize Societies to license the Recordings for public performance, broadcasting, re-use, retransmission, synchronization, dubbing and making available to the public such Recordings. Notwithstanding the foregoing, nothing herein limits or otherwise restricts your right to collect the so-called "artist's share" from such Societies.

1.03    Synchronization. During the Term, you hereby grant to Orchard the exclusive worldwide right to license reproductions of the Recordings in synchronization with visual images. All such licenses for use in commercials, television or film productions are subject to your prior approval (which you will not withhold unreasonably, nor in order to renegotiate other terms of this Agreement). Once Orchard introduces a synchronization placement opportunity in writing to you, that opportunity (along with any options or ancillary uses such as film, trailers, TV shows and related commercials, and vice versa) becomes exclusive to Orchard.

1.04    Intentionally deleted.

2.    **Term**.

2.01    Initial Term.  The initial term of this Agreement runs from the Effective Date through the later of (a) the last day of the calendar month that is ten (10) years after the commercial release date of Joint LP 1, provided that if such day happens to fall on December 31, the initial term will continue for an additional month (through January 31), and (b) the end of the accounting period in which all advances paid by Orchard or its affiliates pursuant to this Agreement have been fully recouped. Notwithstanding the foregoing, with respect each Recording delivered hereunder, Orchard shall be entitled to a minimum exploitation period of not less than ten (10) years. Additionally, for six (6) months following the commercial release date of Joint LP 1, you will not release any other studio albums or EPs featuring

2

DocuSign Envelope ID: 9B567FD9-9AF6-40A2-88E0-E6D155E61E8D

performances of Ozuna and/or Anuel AA, and for three (3) months following the commercial release date of Joint LP 1, Ozuna and Anuel AA will not appear on or release any track as a main or featured performer unless otherwise mutually agreed in writing.

2.02    <u>Renewals and Extensions</u>. Following the initial term, the Agreement will automatically continue for additional, consecutive renewal terms of one (1) month each, unless you or Orchard gives the other Notice of termination at least thirty (30) days before the expiration of the initial term (or renewal term); otherwise, a renewal term will automatically apply. To the extent you have a negative balance in your account, the Term will automatically extend (even if you have sent a Notice of termination) on a month-to-month basis until the end of the month in which your account balance becomes positive or you repay to Orchard one hundred and twenty-five percent (125%) of such unrecouped balance (taking into account Pipeline Income and any applicable liquidation of reserves held). The "<u>Term</u>" of this Agreement means the initial term, the renewal terms, and any applicable extensions. If you exercise your right to make such repayment following the initial term then your royalty account hereunder shall be deemed recouped as of the date on which you make such payment (the "<u>Repayment Date</u>"), and the Term shall expire as of the Repayment Date.


3.      **Orchard's Distribution Activities**.

3.01    <u>Digital Distribution</u>. Orchard will (a) solicit and service Outlets for Digital Distribution, (b) encode Recordings in the required format(s), and (c) process delivery of Recordings to such Outlets. Orchard does not guarantee placement of Recordings with any Outlet. If you require non-standard encoding, formatting or subtitling, it may result in additional costs to you, which Orchard may require in advance. It is understood that if Orchard is requested to undertake non-standard encoding, formatting, subtitling or non-customary encoding, Orchard will notify you (email is sufficient) of any changes needed for conformance with Outlet requirements, whereby you shall either make such edits and/or changes within thirty (30) days (in which case, you must advise Orchard promptly in writing (email is sufficient) that you will be making such edits and/or changes), or you must pay the additional costs for Orchard to make such edits and/or changes, and Orchard may require such payments in advance.

3.02    <u>Physical Distribution</u>. Orchard will (a) solicit Record sales from Outlets, (b) fulfill Outlet orders, (c) warehouse Records, (c) provide inventory reporting, and (d) process returns from Outlets, all as further described in <u>Schedule B</u>.

3.03    <u>Affiliates and Contractors</u>. Orchard may elect to operate in part via its corporate affiliates, third-party contractors and Sales Partners. However, Orchard remains directly liable for all of its payment and other obligations to you. Solely to the extent needed for such operations, Orchard may sublicense its rights under this Agreement, subject to the requirements of Orchard to remain directly liable to you for all of its payment and other obligations to you.

3.04    <u>Workstation Access</u>. In connection with your Recordings, Orchard will provide you access to release and track-level sales and streaming reporting via Orchard's Workstation portal. Orchard may use information and data arising from or generated, obtained, or acquired by Orchard in connection with the exploitation of Properties, including demographic, statistical, usage and anonymized data relating to such activity, including for purposes of calculating Orchard's market share, with all such information subject to Orchard's policies on the protection of personal information and personal data.

3.05    <u>Release Dates</u>. The parties hereby agree that the commercial release date for Joint LP 1 is January 22, 2021 and that the parties will use good faith efforts to meet the release date, provided that Orchard will not be responsible for the inability of any Outlets to meet such release date as a result of any cause outside of the Orchard's reasonable control.

4.      **Your Obligations**.

4.01    <u>Delivery of Recordings</u>. Immediately following the Effective Date and throughout the Term you will deliver Recordings and other Deliverables at your expense in accordance with <u>Schedule B</u> to the address that Orchard specifies. With respect to each Recording, "<u>Delivery</u>" will be complete when Orchard provides written confirmation (email shall suffice), which will not be unreasonably withheld or delayed, that you have delivered the finished Recording to Orchard, and all publishing and other incorporated material has been fully cleared for the Orchard's use. Your "<u>Initial Delivery</u>" will be complete when you have fully Delivered the Deliverables that are in your possession or control as of the Effective Date. For the avoidance of doubt, once a Recording has been commercially released

pursuant to this Agreement it will automatically be deemed to have been Delivered hereunder. Orchard hereby acknowledges Delivery of the Recordings.

4.02     Intentionally Omitted

4.03     Third-Party Consents, Permissions, Obligations. In connection with exploitation of the Properties under this Agreement, you are solely responsible for your costs and expenses, and any obligations or liabilities to third parties related to the exploitations you authorize in this Agreement. For example, you are responsible for (a) any taxes that you owe; (b) any amounts due to artists, producers, performers, Talent, and any other persons who contributed to the Properties; (c) amounts due to any party for samples, or for footage in the Properties; (d) any payments you have agreed to under a collective bargaining agreement; (e) amounts owed by you for any necessary bar-code sequences, and other governmental or industry-accepted identifiers; (f) music publishing licenses, including synchronization and digital mechanical licenses, and any associated royalties or fees; (g) advertising, marketing and promotion you choose to do for the Properties; and (h) sound recording and artwork clearances. In the event that you fail to cover any of the foregoing, Orchard has the right (but not the obligation) to cover them for you, and to charge any applicable amounts to you, provided Orchard will not so cover any expenses without your consent (email is sufficient) and without first notifying you of the failure and affording you a reasonable opportunity to cure the same. In the event that Orchard pays or causes to be paid expenses on your behalf in accordance with the foregoing, Orchard will charge such amounts to you at the actual verifiable cost.

4.04     Deleted Recordings. Without limiting your indemnification obligations, if you no longer have the necessary rights to an individual Recording or other Property, or if the Property is the subject of a third-party claim that reasonably risks exposing you or Orchard to liability, you must promptly inform Orchard in writing (email shall suffice) so that Orchard may notify Outlets to remove the Property. For the avoidance of doubt, you are not permitted to delete any Recording from distribution by Orchard for convenience.

4.05     Orchard Content Guidelines. All Recordings and other Properties must abide by the terms of the Orchard Content Guidelines set forth on Schedule C (which Orchard may update from time to time). If any Properties appear not to abide by such guidelines (either individually or in the aggregate), Orchard may in its sole discretion reject, take down, or cease distribution or monetization of any or all such Properties, and (if such failure continues for thirty (30) days after Orchard's Notice to you about it), Orchard may elect to terminate this Agreement.

4.06     Fraudulent Practices. You will not, and will not authorize or encourage any third party to, directly or indirectly generate streams or queries, or generate impressions of or clicks on any ad(s), through any automated, deceptive, fraudulent or other invalid means, including by way of repeated manual clicks, the use of "bots" or otherwise. You acknowledge that doing so may result in the removal of some or all of your Properties from Outlets, as well as the withholding of royalties by such Outlets. In addition, in no event will you represent yourself as Orchard's or Sony Music's representative, or use any of their trademarks without express permission, or represent yourself as affiliated or connected with them in any way that is not strictly accurate, whether in connection with this Agreement or otherwise, but both you and Orchard may accurately state that your Recordings are "distributed by The Orchard." In the event that Orchard believes in good faith that you have violated this Section 4.06, then upon Notice to you the Orchard may withhold payments to you until such suspected fraud is resolved and remedied to Orchard's satisfaction [subject to the cure periods of Article A6], and if such fraud is not resolved then the Orchard may immediately terminate this Agreement.

4.07     Accuracy. It is your responsibility to ensure that all information you provide to Orchard is accurate, including any metadata or other information gathered by Orchard that you have then confirmed to be accurate. Upon first delivery of the Properties, you will advise Orchard of all contractual limitations to your rights (including Territory limitations and time-limited licenses).

4.08     Maintenance of Catalog. You understand that Orchard needs to retain sufficient Properties to recoup your advances. As a result, you will ensure that any Recordings sold, licensed or transferred to a third party remain subject to this Agreement for the full Term.

4.09     Artist Collaborations. From time to time, Orchard may suggest potential collaborations for artists featured on your Recordings with other artists; you agree to consider such suggestions in good faith provided your final decision will control.

4.10     Notice of Certain Transactions. If you would like to sell your content during the Term, Orchard may be interested. You agree that if at any time during the Term you seek to sell, transfer or otherwise

dispose of some or all of the Recordings, you will notify Orchard. Orchard will then have the right during the thirty (30) calendar day period immediately following the date upon which you notify Orchard of such contemplated transaction to make you an offer ("Offer Period") for such Recordings. If Orchard elects not to make an offer regarding the Recordings (or if an agreement between you and Orchard for the purchase of such Recordings cannot be consummated during the aforementioned Offer Period), you will have the right to negotiate an agreement with respect to such contemplated transaction with any third party(ies).

4.11   <u>Age and Authority</u>. You represent and warrant that Artist is at least eighteen (18) years of age, and is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to your right to execute this Agreement or your and Artist's rights to perform its terms and conditions.

4A.   **Mechanical Administration Services**

      (a) Provided that you (i) provide Orchard with all Publishing Information (as defined below) for each musical composition within the applicable (Recording(s) (collectively, the "Compositions"), and (ii) indicate within Orchard's b2b workstation at the time of Delivery of the applicable Recording(s) that you require such service for such Recording(s), Orchard will endeavor to secure digital phonorecord delivery ("DPD") licenses from the music publisher (collectively, the "Publishers") of the Compositions, necessary for exploitation of the Recording(s) in the United States (collectively, the "DPD Licenses") during the Term for the LPs at no cost to you (except, for the avoidance of doubt, third party costs on a "pass through" basis).  Via a spreadsheet to be provided to you by Orchard following the Effective Date, you will provide Orchard with complete and accurate songwriter names, publisher names, and splits (as well as publisher contact information, song title, translations, Work Number [or regional equivalent]) (the "Publishing Information") at the time of Delivery of the applicable Recording to Orchard.  For clarity, Orchard will only perform mechanical administration services as set forth within this Article 4A(a) if you have met the requirements set forth in this paragraph 4A(a) above in connection with the applicable Recording.

      (b) Orchard is authorized on behalf of you, and at your expense, to remit payments due to the Publishers under the DBD Licenses it secures.  Orchard has the right to deduct payments made to Publishers from monies otherwise payable to you.

      (c) Orchard may secure DPD Licenses for Compositions in connection with uses by companies affiliated with Orchard, and others on standard terms and conditions. The DPD Licenses secured by Orchard will be executed by Orchard as agent.  In such regard, you hereby grant to Orchard and itse employees the right and authority to execute DPD Licenses on your behalf, which limited power of attorney is coupled with an interest and irrevocable during the Term.  If for any reason it is not possible or practicable for Artist Company to be a party to a DPD License, Orchard may enter into the DPD License in Orchard's name as your designee and without limitation of the parties' respective rights and obligations hereunder.  Further, if for any reason it is not possible or practicable for Orchard to obtain a DPD License, Orchard may seek a compulsory license, but it will not be obligated to do so.

5.   **Distribution Fees**.

5.01   <u>Digital Distribution</u>. As to Digital Distribution in the United States, and in Mexico and Central and South America ("<u>LATAM</u>"), Orchard will pay you fifty percent (50%) of all gross receipts actually received by Orchard (less VAT or similar sales taxes received, and all taxes required to be applied or withheld) with respect to Digital Distribution of the Recordings to end users (i.e., equivalent to a distribution fee to Orchard of fifty percent (50%) of such gross receipts). As to Digital Distribution worldwide in all territories except the United States and LATAM, Orchard will pay you forty percent (40%) of gross receipts actually received by Orchard (less VAT or similar sales taxes received, and all taxes required to be applied or withheld) with respect to Digital Distribution of the Recordings to end users (i.e., equivalent to a distribution fee to Orchard of sixty percent (60%) of such gross receipts in those territories), until the last day of the month that contains the five (5) year anniversary of the commercial release date of Joint LP 1, after which Orchard will pay you fifty percent (50%) of all gross receipts worldwide. Orchard will account and credit to your account all such gross receipts, less such distribution fees and any other permitted deductions. Orchard will use best efforts to provide Artist Company with all necessary information so the Artist Company can claim foreign tax credits upon request.

5.02   <u>Physical Distribution Fees</u>.

(a) <u>Fees</u>. Orchard's Physical Distribution fee is equal to fifty percent (50%) of Net Sales in the United States and LATAM, and sixty percent (60%) in the rest of the world, until the last day of the month that contains the five (5) year anniversary of the commercial release date of Joint LP 1, after which Orchard will pay you fifty percent (50%) of all Net Sales worldwide (i.e., equivalent to a Physical Distribution fee to Orchard of fifty percent (50%) of Net Sales worldwide), provided that such fee on each unit will not be less than the minimum per unit distribution fee set forth in <u>Schedule B</u>. Additional charges, described in <u>Schedule B</u>, apply over and above the foregoing distribution fee. Otherwise, Orchard will account and credit to your account all Net Receipts derived from sales of Records, although the timing is subject to Section 6.02 below.

(b) Definitions for Physical Distribution Fees:

(i) "<u>Net Receipts</u>" means Net Sales, less Orchard's distribution fee, any applicable charges in <u>Schedule B</u>, any applicable import duties, all taxes required to be applied or withheld, bad debt, and any expenses paid or incurred by or on behalf of Orchard (if any) that are attributable solely to the manufacture, sale, approved marketing, approved advertising, approved promotion, distribution or exploitation of Records.

(ii) "<u>Net Sales</u>" means Gross Sales less returns, credits, and any VAT or similar sales taxes received.

(iii) "<u>Gross Sales</u>" means (A) the number of units of Records invoiced for payment, multiplied by (B) the price (after all rebates, adjustments, settlements, and allowances) charged by Orchard to its customers and Sales Partners for such Records (provided that such charges will not include any intracompany fees).

5.03   <u>Collections</u>. As to collections described in Section 1.02 above, Orchard will pay you fifty percent (50%) of all gross receipts actually received by Orchard (less VAT and other similar sales taxes) with respect to such collections (i.e., equivalent to a fee to Orchard of fifty percent (50%) of such gross receipts).

5.04   <u>Synch Placements</u>. As to synchronization licenses approved by you pursuant to Section 1.03 above, Orchard will pay you fifty percent (50%) of all gross receipts actually received by Orchard (less VAT and other similar sales taxes) for such synchronization licenses (i.e., equivalent to a fee to Orchard of fifty percent (50%) of such gross receipts).

5.05   <u>Orchard Reimbursements</u>. In the event that Orchard is permitted under this Agreement to charge any amounts to you (including any applicable warehouse charges hereunder), and with respect to any costs or expenses approved by you (such as for additional services that you request), Orchard may require payment in advance, or simply apply such charges against your account. If, however, you receive a bill from Orchard for any such charges (if for example your account balance becomes negative due to Record returns, or you are negative or unrecouped after the Term), you must pay it promptly.

5.06   <u>Tax Forms</u>. Orchard's payments to you are conditioned upon fulfillment of your delivery obligations and receipt of your completed U.S. Federal Tax form (e.g., W-9, W-8BEN, or W-8BEN-E), and any other tax documentation as may be required by law to carry out the intent of this Agreement.

5A. **<u>Advances</u>**. Orchard will pay to Artist Company advances as set forth below:

5A.01   <u>Delivery Advance</u>. Orchard will pay each of Nibiru and RHLM an advance in the amount of Six Million One Hundred and Seventy Five Thousand United States Dollars (USD$6,175,000) (i.e., equivalent to an aggregate advance to Artist Company in the amount of Thirteen Million United States Dollars (USD$13,000,000)(the "<u>Delivery Advance</u>") including the Legal Fee (as defined below)), no later than ten (10) business days after the later of: (a) full Delivery of Joint LP 1, and (b) Orchard's receipt of Artist Company's invoice.

5A.02   <u>Marketing Fund</u>. Orchard will make available up to Two Million United States Dollars (USD$2,000,000), to be administered by Orchard in connection with the payment to third parties for *bona fide* marketing expenses mutually approved by you and Orchard, to market Joint LP 1 (the "<u>Marketing Fund</u>"). Without limiting the foregoing, Orchard hereby agrees to reimburse Nibiru and RHLM, as applicable, from the Marketing Fund for marketing expenses incurred in connection with the Recordings, including but not limited to, radio, billboard and video costs (the "<u>Incurred Marketing Expenses</u>"), with any Incurred Marketing Expenses incurred to date subject to reimbursement at the same time at which the Delivery Advance is paid, provided that Artist Company furnishes Orchard with

an itemized invoice for any such Incurred Marketing Expenses. In the event that there is an unspent balance in the Marketing Fund as of the later of (a) twelve (12) months after the commercial release of the Joint LP 1, and (b) the completion of the Marketing Deliverables, then upon Artist Company's written request, such balance will be split equally and paid to each of Nibiru and RHLM as an additional advance hereunder no later than one (1) month after such written request.

5A.03   <u>Additional Profit Advance.</u>  In the event that aggregate gross receipts for the Recordings total the amount of Five Million Four Hundred Thousand Dollars (USD$5,400,000) (the "<u>Six Month Threshold Amount</u>") for the first six months from the commercial release date of Joint LP 1 (which, for the avoidance of doubt, is to be calculated on the actual amounts earned on all Outlets for such 6 month period), as reflected in the Orchard accounting statement representing revenue received and processed by Orchard, Orchard will pay an additional advance to Artist Company in an amount equal to three times (3x) the gross receipts received *above* the Six Month Threshold Amount (the "<u>Additional Profit Advance"),</u> with the maximum Additional Profit Advance capped at Five Million Dollars (USD$5,000,000). Conversely, in the event that gross receipts as reflected in the Orchard accounting statement representing revenue received and processed by Orchard for the first six months from the commercial release date of Joint LP 1 total *less* than the Six Month Threshold Amount (a "<u>Revenue Shortfall</u>"), Orchard will deduct an amount equal to three times (3x) the Revenue Shortfall Amount (the Six Month Threshold Amount less gross receipts is the ("<u>Revenue Shortfall Amount</u>")) from any future advances due to Artist pursuant to the Anuel AA Agreement and the Ozuna Agreement, respectively and equally, with a maximum aggregate deduction of Three Million Dollars ($3,000,000), unless Artist Company fails to perform the Marketing Deliverables pursuant to section 5B below to Orchard's reasonable satisfaction and does not cure the same in accordance with the time period set forth in Article A6, in which case the maximum aggregate deduction will be Five Million Dollars ($5,000,000). For the avoidance of doubt, any Additional Profit Advance payable to Artist Company will be split equally between Nibiru and RHLM, will be payable in equal portions directly to each of Nibiru and RHLM after payment of the Additional Legal Fee (as defined below), and is payable no later than ten (10) business days after the later of: (a) Orchard's written confirmation (email to suffice) of any Additional Profit Advance due, if any, and (b) Orchard's receipt of Artist Company's invoice, which Artist Company will provide to Orchard no later than one (1) month after Orchard's written confirmation of any Additional Profit Advance due.

All advances hereunder (including payments from the Marketing Fund) are pre-payments that recoupable from any monies payable by Orchard (or its affiliates) to or on behalf of Artist Company. As a material inducement to Orchard to enter into this Agreement, to secure your obligations under this Agreement you hereby irrevocably grant to Orchard, during the Term, a first priority security interest in and to (x) all of Artist Company's right, title, and interest in and to the sound recording copyrights and other copyrights in and to the Recordings, (y) the Records and related materials and physical master recordings and manufacturing parts, and (z) to the inventory, accounts and proceeds of the Artist Company with respect to the Recordings and Records (collectively, the "<u>Collateral</u>"). Upon full recoupment of any and all advances paid to Artist Company pursuant to this Agreement, all monies payable to Artist Company pursuant to this Agreement will be equally split and credited to the Orchard accounts governed by the Anuel AA Agreement and the Ozuna Agreement, respectively (for avoidance of doubt, any monies payable to Nibiru pursuant to this Agreement will not be used to offset any unrecouped amounts owed by RHLM pursuant to the Anuel AA Agreement, and vice versa), and upon full recoupment of any and all advances paid by Orchard pursuant to the Ozuna Agreement and/or the Anuel AA Agreement, all monies payable pursuant to the Ozuna Agreement and/or Anuel AA Agreement will be credited to any unrecouped balance hereunder, if any. Orchard's security interest hereunder shall be used solely for purposes of securing recoupment hereunder, and will be valid only to the extent that your account(s) under this Agreement are unrecouped (taking into consideration Pipeline Income and any applicable liquidation of reserves held), and Orchard shall, upon recoupment of all advances and negative balances within your account(s) corresponding to this Agreement and at your request, take all commercially reasonable steps, in cooperation with you, to lift any security interest obtained in the Collateral hereunder; and, further, this paragraph does not grant Orchard any right at any time to sell any of Artist Company's right, title, or interest in and to the sound recording copyrights and other copyrights in and to the Recordings. Without limiting the foregoing, such commercially reasonable efforts shall include, without limitation, promptly upon receipt of such notice from Artist Company (and in no case later than ten (10) business days thereafter) filing a UCC Financing Statement Amendment (Form UCC3) or the state-equivalent form to terminate the filed UCC-1 financing statement ("<u>Terminating Statement</u>") with the Secretary of State (or such other appropriate office) of the same state(s) in which Orchard filed any financing statement(s) in connection with this Agreement, requesting termination of the Form UCC1 and any financing statements filed as against Artist Company.

5A.04.  Letters of Direction. Notwithstanding anything contained herein to the contrary, you hereby irrevocably authorize Orchard to direct the following portions of the above advances in the following amounts on your behalf at such time as that amount would otherwise have been payable to you:

(a)  Amounts to Singh Singh & Trauben LLP. Orchard will direct to Singh Singh & Trauben LLP ("Singh"), via wire transfer to the account listed below, a portion of the Delivery Advance in the amount of Six Hundred and Fifty Thousand United States Dollars (USD$650,000) (the "Legal Fee") no later than ten (10) business days after the later of: (a) full Delivery of Joint LP 1, and (b) Orchard's receipt of Singh's invoice, and in the event that any Additional Profit Advance is payable, five percent (5%) of the Additional Profit Advance (the "Additional Legal Fee"), no later than ten (10) business days after the later of: (a) Orchard's written confirmation (email to suffice) that the Additional Profit Advance is payable (not to be unreasonably withheld), and (b) Orchard's receipt of Singh's invoice. All payments to Singh will constitute payment to Artist Company and Orchard will have no liability by reason of any erroneous payment or failure to comply with this authorization. Artist Company will indemnify and hold Orchard harmless against reason of any such claims asserted against Orchard and any damages, losses or expenses Orchard incurs by reason of any such payment or otherwise in connection herewith. Nothing herein shall: (a) grant Singh any right to a direct accounting from Orchard or to audit Orchard's books and records with any accounting hereunder or (b) otherwise create any contractual obligations from Orchard to Singh hereunder.

| ABA Routing Number: | 122243762 |
| Name: | 1st Century Bank |
| Address: | 1875 Century Park East, Suite 100 |
| | Los Angeles, CA 90067 |
| Beneficiary Account Number: | 2100057534 |
| Beneficiary Account Name: | Singh, Singh & Trauben LLP |

5B.  Marketing Commitment and Deliverables. Artist Company and Artist will fully meet all of the marketing commitments and provide all associated Marketing Deliverables as described in Schedule E to Orchard's reasonable satisfaction.

6.  **Accountings, Reserves, Audits and Tax.**

6.01  Accountings. Orchard will account to you by way of a permission-limited section of your workstation, which generally includes historical data back to the Effective Date. Accounting and payments will be made available to you on a monthly basis, thirty (30) days after the end of the month in which the applicable amounts were received by Orchard. Balances under five hundred dollars ($500) will be rolled into the following month and paid when your balance reaches five hundred dollars ($500). In the event that any Outlet issues any corrections to prior statements, or after six (6) months has failed to pay Orchard amounts that were previously paid or credited to you, or other errors are discovered, Orchard may adjust its accountings and payments to you and (if applicable) charge your account accordingly. To the extent that all or part of the accounting is not available via your workstation, Orchard will use its best efforts to deliver such accounting to you in a satisfactory and timely manner.

6.02  Examination of Orchard's Books and Records; Limitations on Claims. The Artist Company has the right to audit Orchard's books and records to verify the accuracy of payments, but only once with respect to any particular payment. Audits are permitted once per year during Orchard's normal business hours, on at least thirty (30) days' prior Notice, at the place where Orchard maintains such records. Audits are at the Artist Company's expense (unless such audit reveals an underpayment by Orchard of a sum equal to or greater than five percent (5%) of total payments due to Artist Company hereunder during the period being audited, in which event Orchard shall reimburse Artist Company for the reasonable costs and expenses actually incurred by you in connection with such audit), and may only be conducted by an independent certified public accounting firm. Any lawsuit by you regarding any statement or payment must be commenced within four (4) years after the date the applicable statement covers. Upon the expiration of such four (4) year period, you have no right to sue Orchard in connection with any such statement, in connection with the amounts received, or relating to the period such statement covers. You irrevocably waive any longer statute of limitations that would otherwise apply by law.

6.03  Required Withholdings; VAT. Notwithstanding anything to the contrary in this Agreement, Orchard is entitled to deduct from all payments due to you any sums (such as withholding taxes) which

Orchard or its licensees or related entities are obliged to pay or withhold in any country by reason of any law or regulation. All payments to or charges to be made by Orchard under this Agreement (including all distribution fees) are expressed as exclusive of VAT, which if applicable are payable by you in addition to the sums otherwise set out in this Agreement.

7.      **LIMITATION OF LIABILITY. EXCEPT AS SPECIFICALLY PROVIDED OTHERWISE, AND WITHOUT LIMITING ARTICLES A2 OR A4 OF SCHEDULE A, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR INCIDENTAL DAMAGES (INCLUDING LOST PROFITS OR GOODWILL, BUSINESS INTERRUPTION, REPUTATIONAL DAMAGE AND THE LIKE) ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE, NON-PERFORMANCE OR BREACH OF THIS AGREEMENT. WITH RESPECT TO TAKE-DOWN NOTICES REQUESTED BY YOU, PROVIDED THAT ORCHARD USES ITS BEST EFFORTS TO EFFECTUATE SUCH TAKEDOWNS AND CONTINUES TO WORK WITH YOU IN GOOD FAITH TO RE-SEND SUCH NOTICES TO OUTLETS WHENEVER APPROPRIATE, ORCHARD SHALL NOT BE LIABLE FOR ANY FAILURE TO EFFECT SUCH TAKE-DOWNS.**

8.      **Notices**. All formal notices with respect to this Agreement (each a "Notice") will be given in writing by registered or certified mail, return receipt requested, or by messenger or courier, or by nationally recognized overnight express mail service, to the respective addresses below. Orchard may alternatively give notice to your email address below. All other instructions, approvals and consents may be sent via email or elected on Orchard's b2b website.

To Artist Company:

NibiruInternational, LLC
2020 North Bayshore Drive
Apartment 1402
Miami, FL 33137

With copies to:

Contact: Simran Singh and Angela Martinez
Email:  ssingh@singhtraubenlaw.com
        angie@angielaw.com

Real Hasta La Muerte, LLC
c/o Singh, Singh & Trauben, LLP
400 S. Beverly Drive, Suite 240
Beverly Hills, CA 90212
Attn: Simran Singh, Esq.

With copies to:

Contact: Simran Singh
Email: ssingh@singhtraubenlaw.com

To Orchard:

Orchard Enterprises NY, Inc.
23 East 4th Street, 3rd Floor
New York, NY 10003
Attn: President & CEO

with a copy to:
contractadmin@theorchard.com

**ACCEPTED AND AGREED:**

**NIBIRUINTERNATIONAL, LLC**

_Jan Carlos Ozuna Rosado_

Jan Carlos Ozuna Rosado
_____
Name/Title of Signatory
1/15/2021
_____
Date

**ORCHARD ENTERPRISES NY, INC.**

Tucker McCrady, EVP & General Counsel (Jan 26, 2021 12:26 EST)

Tucker McCrady, EVP & General Counsel
_____
Name/Title of Signatory
Jan 26, 2021
_____
Date

**REAL HASTA LA MUERTE, LLC**

_Frabian E. Carrion_

Frabian Eli Carrion
_____
Name/Title of Signatory
President
_____

## INDUCEMENT

To induce Orchard to enter into the Agreement with Artist Company, the undersigned hereby:

(a)     acknowledges that the undersigned understands and is familiar with all the terms and conditions of the agreement;

(b)     assents to the execution of the Agreement and agrees to be bound by the terms and conditions thereof, including, without limitation, each and every provision of the Agreement that relates to the undersigned in any way, directly or indirectly, the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the Agreement, and hereby guarantees to Orchard the full and faithful performance of all the terms and conditions of the Agreement by the undersigned (including, without limitation, all representations, warranties and indemnification obligations set forth in the agreement); and

(c)     acknowledges and agrees that Orchard shall be under no obligation to make any payments to the undersigned or otherwise, for or in connection with this inducement and for or in connection with the services rendered by the undersigned or in connection with the rights granted to Orchard thereunder and the fulfillment of the undersigned's obligations pursuant to the Agreement.

(d)     acknowledges and agrees to the direction under Section 5A.04 above to pay Singh Singh & Trauben LLP an amount of Six Hundred and Fifty Thousand United States Dollars (USD$650,000) from the Delivery Advance and five percent (5%) of any Additional Profit Advance, if any, otherwise due to Artist Company hereunder.

Agreed and accepted:

**JAN CARLOS OZUNA ROSADO P/K/A OZUNA**

_____
Jan Carlos Ozuna Rosado
_____
Name/Title of Signatory
1/15/2021
_____
Date

Agreed and accepted:

**EMMANUEL GAZMEY P/K/A ANUEL AA**

_____
Emmanuel Gazmey Santiago
_____
Name/Title of Signatory
January 15, 2021
_____
Date

## SCHEDULE A

## ADDITIONAL TERMS AND CONDITIONS

A1.    Representations and Warranties. You warrant, represent, covenant, and agree the following: You have the right to grant to Orchard all rights you purport to grant hereunder, and have obtained all necessary licenses and clearances. You will comply with all applicable laws, rules (such as RIAA and IFPI guidelines), and regulations, including the application of parental advisory or other warnings or designations. No use of any Properties will violate any law or regulation of any country, or infringe upon or violate the rights of any person or entity. Other than as specifically provided in this Agreement, Orchard will not be required to make any payments of any nature for or in connection with the exercise or exploitation of rights by Orchard under this Agreement. All information you provide to Orchard is accurate, including (to the extent you confirm it as accurate) any metadata or other information gathered by Orchard. No prior security interest or lien of any kind exists in the Properties. Any future grant of rights with respect to Properties will be subject to Orchard's rights. At the time of first delivery to Orchard, you will advise Orchard of all contractual limitations to your rights (including Territory limitations, uncleared samples if any, and limited-duration licenses), so as to avoid any controversy thereafter. Orchard warrants, represents, covenants, and agrees that it has the right and authority to enter into this Agreement.

A2.    Indemnification. Each party will defend and indemnify the other party (including its parents, subsidiaries, and affiliates, and each of their respective stockholders, predecessors, successors, assigns, agents, directors, officers, attorneys, employees and representatives) against any expenses or losses (including reasonable attorneys' fees and litigation expenses) resulting from any third-party claim of breach, or a claim which if true would constitute a breach (any such claim, whether or not asserted in a formal legal action, a "Claim"), of any of the party's representations, warranties, covenants, agreements or obligations contained herein, or any violation of any applicable law or regulation. The indemnified party will give the indemnifying party prompt Notice of any such Claim and, if the indemnified party so requests, the indemnifying party will defend the indemnified party at the indemnifying party's expense with counsel approved by the indemnified party (which approval may not be unreasonably withheld or delayed); provided that the indemnifying party will not settle or resolve any Claim in a manner that imposes any liability or obligation on the indemnified party, or affects the indemnified party's rights, without first obtaining the indemnified party's prior written approval (which will not be unreasonably withheld or delayed). For purposes of clarity, Orchard may cease distribution and take down any Property that becomes subject to a Claim, and withhold payments to you in an amount reasonably related to the Claim and potential associated expenses, provided that if the third party asserting such claim does not litigate or otherwise pursue such Claim for a period of nine (9) months or more, Orchard will refund such amounts (without prejudice to its right to reasonably withhold such amounts in the future). In addition, Orchard will afford you the option, in your sole discretion, to post a bond in an amount reasonably related to the Claim, in lieu of withholding payments to you as otherwise permitted above.

A3.    Events of Default. In the event of a party's dissolution, or the liquidation of a party's assets, or the filing of a petition in bankruptcy or insolvency or for an arrangement or reorganization, by, for or against a party, or in the event of the appointment of a receiver, trustee, administrator or administrative receiver over all or a portion of a party's property, or in the event that a party makes an assignment for the benefit of creditors or commits any act for (or in) bankruptcy or becomes insolvent, or in the event a party shall fail to pay when due any amounts due to the other party under the Agreement (with such failure to pay subject to the cure provision set forth in Section A6 below), including, without limitation, amounts due to Orchard in respect of work or services it performed, or in the event a party fails to fulfill any of its material obligations [excluding those obligations of the Artist relating to the Marketing Deliverables] under this Agreement for any other reason (with such failure subject to the cure provision set forth in Article A6 below), then at any time after the occurrence of any such event, in addition to any other remedies which may be available, the other party shall have the option to terminate the Term upon giving Notice to the affected or failing party. Notwithstanding the foregoing: (a) if such affected or failing party is Orchard, Artist Company shall have no right to terminate this agreement pursuant to this paragraph unless and until any and all advances paid by Orchard (or its affiliates) to Artist Company or on Artist Company's behalf have been fully and completely recouped, and (b) if such affected or failing party is Artist Company, Orchard shall also have the option to recover any debt by exercising its rights against the Collateral under Section 5A.04 of the Agreement. For the avoidance of doubt, Ozuna's and/or Anuel AA's failure to perform the Marketing Deliverables will not be deemed a material obligation for which the Orchard may exercise their right to terminate the Term.

A4.    Confidentiality. Each party agrees that it shall, and it shall instruct in writing its attorneys, accountants and other professional advisors to, hold in confidence and not communicate, transmit, publish, disseminate or otherwise disclose any of the terms and conditions of this Agreement or any information regarding the other's business learned in the course of dealing or performance hereunder (including, without limitation, any data provided to you and any copies of documents you provide to Orchard) (collectively, "Confidential Information"). Without the other party's prior written consent, each party agrees that it may not disclose, or permit the disclosure any Confidential Information. Confidential Information does not include information which (a) is generally available to the public through no wrongful or negligent act or omission on your part; (b) you have received from a third party free to make such disclosure without breach of any legal obligation. In the event either party is required to disclose Confidential Information pursuant to any statute, regulation, order, subpoena or document discovery request, such party will give the other party prompt Notice in enough time to enable such party to seek a court order limiting or otherwise governing such disclosure. The fulfillment of both party's obligations under this Article A4 are integral to the success of each other's business dealings, and agree that either party is entitled to seek injunctive relief to enforce them.

A5.    Speculative Nature of Business; Orchard Discretion. You and Orchard each acknowledge that the sale and exploitation of Properties is a highly speculative business, that Orchard and you make no guarantee as to any degree of

sales or exploitations, and that Orchard retains absolute discretion over its sales and exploitation policies. Orchard may decline or cease distribution or monetization of any or all Properties under this Agreement without further liability to you, whether entirely or via a particular Outlet or country. To the extent that Orchard declines to distribute any Property in its entirety (or declines to distribute certain physical Records in a particular country), you may provide Notice of your intent to withdraw such Property from this Agreement (or to distribute such Records in such country), and Orchard will have ten (10) business days in which to reconsider its decision, whereupon if Orchard elects to not distribute any such Property (or not distribute such Records in such country), the right to do so will revert to you.

A6.    Interpretation and Enforcement. This Agreement contains the entire understanding between you and Orchard as to the matters herein, and supersedes all prior agreements as to such matters. This Agreement can only be amended by an instrument signed by both parties. A waiver of any term or condition of this Agreement in any instance is not a prospective waiver of such term or condition, nor of any subsequent breach. All remedies, rights and obligations in this Agreement are cumulative, and do not limit any other remedy, right or obligation. As used in this Agreement, "including" signifies one or more illustrative examples, not an exclusive list. Unless otherwise specified, "or" is used in its inclusive sense. To the extent of any conflict between the main body of this Agreement and any of the Schedules, the Schedules govern. The provisions of this Agreement are severable and distinct from one another; if any provision is or becomes invalid, illegal or unenforceable, the validity, legality or enforceability of the others will not be affected. If either party is in breach of this Agreement, (including any failure to perform the Marketing Deliverables), the other party will permit a reasonable time to cure such breach after receipt of Notice thereof (with it being agreed that a reasonable time will mean at least thirty (30) days [fifteen (15) days with respect to any failure to perform the Marketing Deliverables]. To the extent that a party is attempting in good faith to comply with this Agreement on a prompt basis, cures breaches within a reasonable time after Notice thereof, and does not commit persistent breaches of any particular sort, the other party will continue to work with such party in good faith to remedy any applicable concerns, in lieu of initiating litigation related thereto. The Agreement is governed by New York law. The parties grant the federal and state courts of New York, New York County, exclusive jurisdiction to hear any disputes arising out of or relating to this Agreement. Each party waives the right to request a trial by jury.

A7.    Relationship of the Parties. As to each other, you and Orchard are independent contractors. Nothing in this Agreement authorizes any party as agent of the other, nor establishes a partnership or fiduciary relationship. Without limiting Orchard's payment obligations to you, you have no right, title or interest in or to revenues received by Orchard. Accordingly, Orchard is not obligated to segregate any such revenues from other funds, and Orchard is not a trustee, pledgeholder or fiduciary of amounts owed to you. Orchard acts as principal in all transactions with its customers.

A8.    Assignment. Orchard may assign its rights under this Agreement in whole to a party who agrees to be obligated hereunder. You may not assign this Agreement or any rights or obligations, in whole or in part, without Orchard's prior written consent, except that (a) you may assign this Agreement in full to an affiliate for purposes of corporate housekeeping, to the extent you remain secondarily liable for your obligations hereunder, and (b) you may assign this Agreement in full to any third-party, arms-length purchaser of all applicable Recordings, provided (i) such purchaser is not a major label or direct competitor of Orchard, (ii) you remain secondarily liable for your delivery and indemnification obligations hereunder, and (iii) all rights granted hereunder to Orchard remain valid for the duration of each applicable Exploitation Period. Any purported assignment in violation of this paragraph is null and void ab initio.

A9.    Force Majeure. If a party is materially hampered in the fulfillment of its obligations due to an event not reasonably within its control (e.g., flood, water damage, power failure, catastrophe, terrorism, strike, war, failure of technical facilities, etc.) (the "Hindered Party"), the Hindered Party will not be in breach as a result of such event and may, on Notice to the other party, suspend the Term for the duration of such event (but if the Hindered Party is the Orchard, then the Orchard must continue to fulfill its payment obligations, to the extent not affected by such event).

A10.    Post-Term Provisions. Section 5.05 and Article 7 of this Agreement, as well as any applicable provisions of this Schedule A and of Schedules B and B-1, survive the end of the Term. After the Term, if Orchard receives any income from Outlets on Properties, Orchard's sole liability to you will be the obligation to pay through to you in full as though the Agreement were still in place, and to send renewed take-down notices whenever requested and appropriate. If for any reason the Agreement terminates prior to full recoupment, you must repay any unrecouped balance; provided however, that any Notice sent by Orchard in connection with any action (or inaction) by the Artist or the Artist Company that could result in Orchard terminating the Agreement (or the Term of the Agreement) prior to full recoupment and exercising their rights in this Article A10 must specifically reference this Article A10 and the Orchard's ability to terminate the Agreement and the Artist Company's obligation to repay the unrecouped balance in such an event. Notwithstanding the foregoing or anything in the Agreement to the contrary, the Orchard may not terminate this Agreement for convenience. For purposes of clarity, except as otherwise expressly set forth herein, nothing in the foregoing sentence or elsewhere in the Agreement limits your right to seek damages from Orchard with respect to any breach by Orchard hereunder, whether material or not, and whether or not you elect to terminate this Agreement.

A11.    Further Assurances. You will do such acts and execute such documents as Orchard may reasonably require to ensure Orchard the full benefit of this Agreement, including promptly and continuously registering all Recordings with the U.S. Copyright Office. In particular, you will promptly provide copies of all documents necessary to evidence your right and title in and to any particular Properties. In the event that you fail to provide or execute any such documents related to the Collateral within five (5) business days after Orchard's written request (email shall suffice), you hereby irrevocably authorize, empower, and appoint Orchard your true and lawful attorney-in-fact (with power of substitution and delegation), in your name, and in your place and stead, or in Orchard's name, to make, sign, execute, acknowledge, and deliver any and all such instruments or documents. In the event Orchard exercises the foregoing power of attorney, then the Orchard

DocuSign Envelope ID: 9B567FD9-9AF6-40A2-885D-E9D15DE61F8D

will provide you copies of any such instruments or documents within five (5) business after your written request (email shall suffice).

A12.    <u>Execution</u>. This Agreement may be executed in counterparts, including signatures sent electronically (e.g., .pdf), each of which is an original but which together constitute a single contract. The parties waive any rights they may have to object to such treatment.

## SCHEDULE B

### Terms and Conditions Relating to Physical Distribution

The following terms apply to Physical Distribution by Orchard and its affiliates:

B1     Release Schedules. You and Orchard will mutually determine the suitability of each of your releases for Physical Distribution, on a territory-by-territory basis. Subject to Orchard's standard release schedule, delivery requirements and deadlines, you may specify the release dates for your Records. You are responsible for any incremental costs resulting from missed deadlines on your part, including in connection with the cancellation of customer orders due to stock shortages. Note that sales in certain regions (e.g., Manaus in Brazil) may require Records to be manufactured locally.

B2     Delivery of Records to Orchard's Warehouse. Except to the extent otherwise agreed via Article B14 below, you are solely responsible for supplying Records to Orchard. In particular, you will ensure delivery to Orchard-specified warehouses sufficient stocks of Records for distribution in each applicable country, freight prepaid and packaged ready for shipment. To the extent you do not ensure such sufficient stock, you will be responsible for Orchard's stocking expenses and re-ordering costs. The initial delivery must arrive at least five (5) weeks prior to street date, and all deliveries must be made in standard box lot quantities, and in accordance with Orchard's standard shipping/receiving guidelines.

B3     Pricing. You determine the published wholesale (not retail) prices of your Records.

       (a)     Pricing Tiers. The simplest method of price selection is for you to select from the pricing tiers available within Orchard's system. Orchard has taken considerable care in matching United States wholesale prices to typical corresponding international prices, which are then automatically prompted upon selection of your US wholesale price tier. Orchard may update such pricing tiers from time to time. For any countries or territories not covered by the pricing tiers, Orchard will by default apply the prompted "SE-EU" category of pricing within the tier you select. In some instances Orchard may recommend lower published pricing categories for particular territories, but will not apply such categories to your Records without your consent.

       (b)     Custom Pricing. You may also set a published wholesale price for one or more countries that is not among Orchard's pricing tiers, though in some cases such custom pricing may incur additional costs, which Orchard may charge to you. In addition, you acknowledge that deviations from the Orchard tiers may result in pricing discrepancies that could disrupt sales of your Records in other countries.

       (c)     Special Dating; Discounts. Orchard must obtain your consent as to any "special dating" in the United States that will result in a delayed payment to you, as well as any special program free goods, and any discount on US sales greater than fifteen percent (15%). Otherwise, Orchard may grant discounts in its sole discretion. If you consent to a special sales discount on any units of Records for which you have already received payment, such discount will be charged to you in the next applicable accounting period.

B4     Inventory.

       (a)     Cutouts; Deletions. On no less than thirty (30) days' notice, you may (i) temporarily suspend Record sales of a particular title (a "Cutout"), or (ii) permanently cease Record sales of a particular title (a "Deleted Record"). Orchard will recall Deleted Records for nine (9) months from the following "Recall Notification Date" (i.e., either June 30th or January 31st). Orchard will only be required to recall Deleted Records two (2) times, i.e., on or about the applicable Recall Notification Dates.

       (b)     Excess Inventory. From time to time, Orchard may determine (in accordance with Orchard's standard business practices) the amount of any excess inventory (during the Term, excess inventory is generally considered more than a twelve (12) months' supply, or six months' supply in Canada) for each configuration in Orchard's possession. Within thirty (30) days after Orchard notifies you of its determination, you will remove such excess inventory in accordance with Section B4(c) below. Stock summaries will be updated monthly on Workstation.

       (c)     Removal from Warehouse. Within twenty-one (21) days of Orchard's request you must remove (or authorize Orchard to remove or destroy, at your expense) the stock of Cutouts, Deleted Records or excess inventory from Orchard's warehouses. If you do not, Orchard has the right to store or destroy such stock and charge you the applicable storage or scrapping charges below. Orchard may, in its reasonable discretion, mark any Records removed from Orchard's warehouses, at your expense, so as to distinguish those Records from Records distributed by Orchard.

       (d)     Shrinkage/Risk of Loss. Orchard will be responsible for shrinkage that exceeds three percent (3%) of all of your Records stored in Orchard's warehouse during the Term, up to two dollars ($2.00) per unit and in no event more than the actual unit cost of manufacture, including packaging. The foregoing assumption of risk does not apply to Records that you were obligated to remove from Orchard's warehouses prior to the date of loss.

B5     Shipments. You acknowledge that unit numbers of shipments may vary somewhat from customer order quantity, based, among other things, on available inventory.

B6     Title. Title to all units of Records remains with you, on consignment, until sold by Orchard. Orchard, as consignee, takes possession and control over the units at time of delivery to Orchard, but only takes title momentarily at the time of sale to customers. Upon receipt of units returned to Orchard, title reverts to Orchard momentarily, and then immediately back to you. In all events, Orchard acts as principal in making sales and accepting returns.

B7      Sales Partner Terms. Records distributed and sold by Sales Partners (as such term is defined in Article 1 of the main body of this Agreement) will be subject to the standard terms and conditions (as well as applicable warehouse charges) of such Sales Partners as may be varied from time to time.

B8      Returns. Orchard will charge you the price paid or credited by Orchard to the customer returning a Record, plus any applicable warehouse charge(s). Record(s) returned to Orchard may be scrapped or refurbished as Orchard elects, in accordance with Orchard's standard policy. Orchard may elect to accept returns of any Records distributed by Company's prior distributor, though generally not for more than the first six (6) months of the Term. In accounting for returns of such non-Orchard Records, any amounts credited or paid by Orchard for such returns will reduce Gross Sales, and Orchard will not be obligated to credit you back for any previously-retained distribution fee.

B9      Reserves. Orchard may establish monthly reserves against Record returns and credits, to be deducted from payments to you, not to exceed twenty-five percent (25%) of Net Sales for the month. Orchard may maintain each reserve for up to six (6) months, and thereafter liquidate the reserve as initially established, less any credits issued, except as otherwise set forth in Article B10 below. If, in Orchard's good faith business judgment (based on actual returns experience, or SoundScan), existing reserves are not sufficient to offset anticipated returns, Orchard may reasonably increase the amount of its reserves (and the duration of liquidation periods) in accordance with such assessment.

B10     Post-Term Returns. Upon any expiration or termination of the Term, Orchard may (but is not obligated to) accept returns of Records (solely during the Post-Term Returns Period, as defined below), after which you assume sole responsibility for such returns. Orchard will handle post-Term returns as in Article B9 above, except that Orchard retains the right to suspend the liquidation of outstanding reserves and apply such reserves against credits issued. After the end of the month following the Post-Term Returns Period, Orchard will render you a final statement. Within the United States, "Post-Term Returns Period" means 180 days; outside the United States, the term refers to the local customary post-returns period, if longer. (For example, the local customary post-returns period for Germany is one (1) year.)

B11     Disposition of Inventory. Within one hundred eighty (180) days after the Term, you will give Orchard instructions concerning the delivery to you or your designee of all Records and artwork then in Orchard's warehouses. Such delivery will be at your expense and subject to the payment of all outstanding debts to Orchard. Absent such instruction, Orchard may scrap such inventory, at your expense.

B12     Early Termination. If the Agreement is terminated prior to its natural expiration, Orchard may require you to remove all Records from its warehouses promptly (under the procedures set out in Article B9 above), to assume immediate responsibility for returns, and to repurchase from Orchard any Records not covered by reserves. All unshipped orders may be canceled without liability, except that you remain liable for the cost of any manufacturing then in process. Orchard may, if it so elects, immediately cease distributing the Records, remove from its advertising any reference to the Records or Orchard's distributorship, and send a recall notice for the Records.


### Optional Services

B13     Co-op Advertising. Upon your request, Orchard may agree to book co-op and other advertising on your behalf. Costs may be charged to you at the time the advertising is booked. Your approval of co-op advertisement charge-backs will constitute acceptance of Orchard's general policies for such services.

B14     Manufacturing. Upon your request and in Orchard's discretion (revocable on thirty (30) days' notice to you), Orchard may agree to provide manufacturing, packaging, inventory management and production control services:

        (a)     Orchard will charge you manufacturing costs (including costs relating to pre-production [e.g., pre-press, proofs, match prints], production [e.g., disc checks], and freight) on a "pass through" basis plus ten percent (10%). In the event that Orchard agrees to manufacture Records that Orchard will not be distributing, Orchard may require pre-payment.

        (b)     You and Orchard mutually determine, title-by-title and configuration-by-configuration, the quantities to be manufactured. However, your failure to respond to Orchard's order or re-order request within five (5) business days will be deemed your approval. Actual quantities manufactured may be subject to minor variations.

        (c)     For product manufactured or distributed in the United States, you will ensure that all relevant artwork and graphics for jacket covers, rear-tray cards, and disc graphics include the language: "Manufactured by Orchard Enterprises NY, Inc., 23 East 4th Street, New York, NY 10003" and "Distributed in the United States by Orchard Enterprises NY, Inc."

        (d)     To the extent that Orchard agrees to manufacture Records on your behalf, Orchard will be entitled (but unless otherwise agreed is not required) to withhold 100% of the applicable mechanical license fees, and to attempt to obtain and administer the applicable mechanical licenses. Unless otherwise agreed however, the primary liability for obtaining and administering such licenses remains with you. To the extent that Orchard does agree to attempt to obtain and administer such licenses in particular territories, such obligations will be contingent on you providing to Orchard all necessary and correct publishing information. Please note that such services are not available in all territories, and are currently not available in North America.

## SCHEDULE B-1

### WAREHOUSE CHARGES

#### U.S. AND CANADA

| Service | Price Per Unit |
|---|---|
| Minimum Distribution Fee | $.40 |
| Returns handling | Two percent (2%) of wholesale; minimum $.20 |
| Product stickering: | |
|     Label supplied on outside of shrinkwrap | $.10 |
|     Print/apply underneath shrinkwrap (i.e., UPC change/sticker) | $.35 |
| Deface cutouts | $.10 |
| Product received outside shipping/receiving guidelines (missing/incorrect PO, BOL, packslip, spa labels, incorrect carton count, mixed product, invalid/missing UPCs, etc…) | $25 per incident plus $.15 per unit if shipment requires respa, resort, rebox, repallet (product rework additional) |
| Product scrapping: | |
|     Finished goods inventory | $.10 |
|     Returned inventory | $.10 |
| Refurbish returns (shrinkwrap only) | $.30  ($.20 Deshrink and $.10 reshrink) |
| Return to Inventory | $.15 |
| Manual Refurbished Jewel Case | $.50 |
| Outbound Cost Recovery Charge | $.50 (Canada only) |
| Product shipment from inventory at Artist Company's direction to destination other than an Orchard account | $.20 handling plus .15 freight* (Domestic - $20 minimum per ship to address) $.25 handling plus .50 freight* (International - $75 min per ship to address) *in the event Label arranges for and incurs freight cost, only the handling charge applies |
| CD units purchased by Artist Company for sale at artist performance venue | $2 per single disc CD (if manufactured by Orchard) |
| Excess Inventory Charge | $.05 per month per excess unit |
| Amazon Multi-Vinyl Pizza Box | $.90 per unit |
| Additional Chargebacks | Price |
| Change to Street Date after publication (excludes vinyl) | $200 per selection |
| Product Shipment of backorders resulting from late delivery of new release (if product supplied by label) | $.50 per unit (standard shipping); $.75 per unit (2-day shipping); $1.00 per unit (overnight shipping) |
| U.S. Physical Release Solicitations | $150 for a fully interactive release page on releases.theorchard.com |

#### United Kingdom

| Service | Price Per Unit |
|---|---|
| Minimum Distribution Fee | £0.45 GBP (CD) £0.50 GBP (LP) |
| Stock Movement | £0.16 GBP (CD) £0.20 GBP (LP) |
| Excess Inventory Charge | £3.50 GBP per pallet* per week *Pallet = 2400 units across all formats. First 4 months free |
| Scrapping, Handling, or Freight of Excess Inventory | at cost + stock movement fee + freight |

17

| | |
|---|---|
| CD units purchased by Artist Company for sale at artist performance venue | 10% PPD + stock movement fee + freight |

Returns Handling
| | |
|---|---|
| Consignment Stock Return | £0.35 GBP (CD) £0.40 GBP (LP) |
| Non-consignment Stock Return | £0.40 GBP (CD) £0.50 GBP (LP) |

Refurbishment/ Rework Charges
| | |
|---|---|
| Inlay/Sleeve Changed (excluding materials) | £0.10 GBP per sleeve |
| Case Changed (including materials) | £0.25 GBP per unit |
| CD Tray Change (including materials) | £0.15 GBP tray |
| Replace Slip Case (CD) (using supplied slip case) | £0.10 GBP per slip case |
| Replace Sleeve (LP) (using supplied sleeve) | £0.15 GBP per sleeve |
| Replace Disc (using supplied disc) | £0.10 GBP per disc |
| Shrink Wrap Removed (CD) | £0.05 GBP per unit |
| Shrink Wrap Removed (LP) | £0.10 GBP per unit |
| Shrink Wrap Added (CD) | £0.15 GBP per unit |
| Shrink Wrap Added (LP) | £0.20 GBP per unit |
| Sticker Application (non-precision) (excl. materials) | £0.15 GBP per sticker |
| Barcode Sticker Creation | £0.05 GBP per unit |
| Insert Added (leaflet, download card, etc.) | £75.00 GBP per thousand or part thereof. * |
| | *Min. charge of £75.00 GBP* |

| | |
|---|---|
| Destruction Charge (FACT accredited destruction) | at cost |

### Continental Europe

| **Service** | **Price Per Unit** |
|---|---|
| Returns Handling | €0.50 per unit |

Stock Movement Inbound
| | |
|---|---|
| Inbound Handling (Guidelines met) | No Charge |
| Inbound Handling (Guidelines not met) | €25 per incident + €0.02 p/unit if resort/rebox required |

Stock Movement Outbound
| | |
|---|---|
| Standard Handling (ships within 2-3 business days)* | €0.30 per unit + Freight |
| Express Handling (ships next business day)* | €0.75 per unit + Freight |

*from time order is placed with warehouse and per warehouse territory, time zone, and operating hours.*
*Handling includes pick, pack, box, unbox, packaging, boxes, envelopes, wrapping, and other materials.*

Warehousing
| | |
|---|---|
| Excess Inventory Charge (During Term) | €0.02 per month per excess unit |
| Inventory Charge (After Termination) | €0.25 per month per unit |

*Excess Inventory will be deemed to be inventory of a given title in excess of that required for 6 months of sales. Excess Inventory will not be charged on new releases, released within the last 6 months.*

Refurbish & Other Logistics*
| | |
|---|---|
| CD Refurbishing | €0.30 per unit |
| Vinyl Refurbishing | €0.50 per unit |
| Stickering (Creation &/or Application) | €0.30 per unit |

*may include New box/case, new inlay/sleeve, tray replacement, shrink wrap remove/replace, and/or stickering.*

| | |
|---|---|
| Destruction of Stock | €0.50 per unit |

**NOTES:**

To the extent Orchard agrees to distribute physical product for you in countries other than those listed above, a list of applicable warehouse charges in such countries will be available on request.

Orchard will report from time to time the faulty, damaged or un-refurbished inventory. You will elect to have such items destroyed, returned, or refurbished when possible. Destruction, handling and freight will be charged at cost.

Orchard reserves the right to increase the above service charges in the event of an increase in actual costs of providing such services. Fees quoted above may vary due to currency fluctuations or fluctuations in exchange rates.

Any inventory-related costs incurred at the Warehouses as PO'd by your inventory manager at Orchard which are not covered above will be billed back to you at actual cost incurred.

DocuSign Envelope ID: 9B567FD9-9AF6-40A2-885D-E8DA55E61F8D

## SCHEDULE C
### Orchard Content Guidelines

**Orchard accepts only Recordings of first-class commercial quality, as determined in Orchard's sole discretion, as set forth below (the "Deliverables").**

**Submissions of the following should be made via Orchard's internet-based tool, for which you will receive log-in information:**

- digital uploads of the Recordings
- complete artwork
- complete and accurate metadata

**In addition, you will deliver:**

- a sufficient quantity of physical Records to fulfill anticipated orders, or (in the event that you elect manufacturing services under Article B14 of Schedule B), all physical "source" recordings, matrices, parts, artwork and all necessary booklets, jackets, graphics and inserts necessary to manufacture Records, in a form acceptable to Orchard, all in accordance with Section 4.01 of the main body of the Agreement
- the agreement of your previous physical distributor to change distribution with respect to all Records previously distributed by such distributor
-

**Orchard does not accept the following content for distribution:**

- Any content which is in any manner inconsistent with the style guides or content guidelines promulgated by Outlets (including the iTunes Style Guide and the Spotify Content Infringement Guidelines)
- Any content with misleading metadata or artwork
- Any content containing artists found in our Hidden Artist List (which will be updated from time-to-time)
- Duplicated albums: a duplicated album contains at least 50% of the same tracks as another album (however, deluxe, alternate-artwork and other "alternate version" variants of a particular release are allowed)
- Tracks that have been delivered more than 5 times
- Any non-exclusive or Public Domain sound recordings
- Soundalike or generic/misleading Tribute releases
- Karaoke (other than by the original artist)
- Low budget content with little editorial value
- Generic concepts
- Fake or keyworded artist names
- Generic artists, orchestras, or performers
- Generic holiday content
- Thematic style Classical compilations
- Titles packed with keywords
- Low-quality cover art
- Radio broadcasts
- Any content without clear chain of title

If you have any questions, please reach out to your Client Manager or contact us at clientservices@theorchard.com.

**Please note:**     These content guidelines are subject to change.

**SCHEDULE D**

**Intentionally Omitted**

**SCHEDULE E**

**Marketing Commitment and Deliverables (the "Marketing Deliverables")**

- Artist to record Key IDs (i.e. promotional audio/video recordings a/k/a "liners") for each single and Joint LP 1 for various territories and digital service providers ( "DSP(s)").

- Artist to record and deliver to Sony behind-the-scenes ("BTS") audio/video material of all corresponding music videos filmed for the Joint LP to use for promotional and DSP purposes.

- Artist to record a generic interview of no less than ten (10) questions to use for promotional purposes around the Joint LP 1 release. Artist Company will use best efforts to deliver the interview to Orchard no less than three (3) weeks after the Joint LP 1 release.

- Artist to record and deliver their video commentary for three (3) tracks as selected by Artist, and to be used by Orchard solely for promotional purposes.

- Artist to commit to  3 days for National and International media (Latin Iberia, Ex-Latin Iberia and US & Puerto Rico) ("Promotional Days"). It is essential to this Agreement that Orchard has the commitment of both Ozuna and Anuel AA to work also in the AM EST time, in order to include Ex- Latin Iberia media (Europe, Asia, etc.). The parties acknowledge and agree that as of Effective Date, the Artist has completed or are otherwise scheduled to complete, the Promotional Days as follows: (a) one (1) day for creation of the Leila Cobo/Billboard materials; (ii) one (1) day for recording promotional material with YouTube; and (iii) one (1) day to be used for a so-called "press junket" of no less than ten (10) one-on-one interviews with both Ozuna and Anuel AA at the same time. Day, time and location of this press junket to be mutually determined and agreed by the parties.

- Deliver to the Orchard a minimum of fifteen (15) promotional photos, to be used by the Orchard solely for DSP and promotional purposes. The Orchard hereby acknowledges receipt and delivery of such promotional photos.

- Artist to commit to a mutually agreed social media posting schedule subject to all mutually agreed DSP support plans around the Joint LP 1 and single releases.

- The above-referenced mutually agreed social media posting schedule will include no less than two (2) Instagram Live activations, each of which will be no less than fifteen (15) minutes in length.

- Artist agrees to "whitelist" any posts made in connection with the above-referenced mutually agreed social media posting schedule for a reasonable amount of time.

- At least one (1) personal appearance(s) in a US and/or Puerto Rico location by Artist for up to two (2) hours. Location, dates and times will be mutually agreed to by the parties, and in all instances subject to the Artist's prior professional commitments and any restrictions in place as a result of COVID. The Orchard and/or Sony Music will have the right to advertise, market, and promote the personal appearance(s). Artist Company will have the right to pre-approve all promotional pieces promoting these personal appearances, prior to distribution of materials for such personal appearances.

If any of the below activations are executed as part of a mutually agreed marketing campaign between Artist Company and Orchard, then Artist Company may be required to provide the following:

**Instagram Filter**:

- Fifteen (15) second clip of at least one member of Artist using the filter, to submit the filter for Facebook/Instagram approval

- Minimum of  one (1) clip of each of Ozuna and Anuel AA using the filter on Instagram Stories once the filter is live

**So-called "Playlist Generator" or other CRM campaign**:

- 1 feed and 1 story post day of launch from each of Ozuna and Anuel AA

- 1-2 story posts from each of Ozuna and Anuel AA for the remainder of the campaign flights (1-2 weeks)

**So-called "Influencer Campaign"**:

- Each of Ozuna and Anuel AA to upload a video performing a so-called "challenge" on TikTok and/or Instagram Reels

**So-called "Augmented Reality/Geolocalization campaign"**:

- 1 feed and 1 story post day of launch from each of Ozuna and Anuel AA

- 1-2 story posts from each of Ozuna and Anuel AA for the remainder of the campaign flights (1-2 weeks)

Any and all reasonable costs and/or expenses to be incurred by the Artist Company in connection with the performance of any Marketing Deliverables will be paid solely from the Marketing Advance, and the Artist Company will not be obligated to pay any such costs out of pocket (nor will Artist Company be deemed to be in breach of this Agreement in the event the Marketing Fund is insufficient to cover the cost of the Marketing Deliverables).

## EXECUTION INSTRUCTIONS

1.      **Review.** Please read the contract carefully, as it describes the terms on which Orchard will be distributing your content. We recommend that you consult an attorney to ensure that have understood all of your obligations, as well as Orchard's obligations to you.

2.      **Sign.** Once you have read and fully understood the contract, if everything is in order, sign the contract and fill in all requested information in the signature block.

3.      **Tax forms.**  Download and complete the applicable US tax form for your territory:

> If you are a U.S. company, please provide a W-9 (which can be downloaded here: https://www.irs.gov/pub/irs-pdf/fw9.pdf).

> If you are an individual outside the U.S., please provide a W-8BEN (which can be downloaded here: https://www.irs.gov/pub/irs-pdf/fw8ben.pdf).

> If you are a company outside the U.S., please provide a W-8BEN-E (which can be downloaded here: https://www.irs.gov/pub/irs-pdf/fw8bene.pdf).

*NOTE:  Individuals/companies based in certain countries may benefit from a lower withholding rate on US exploitations if a completed tax form is provided. If you are completing the W-8BEN-E form, Sony tax policy mandates that an entity type selection must be made under Section 14(b) for the form to be considered complete by Orchard. Information about each of the Section 14(b) designations can be found on page 10 of the directions from the IRS, located at https://www.irs.gov/pub/irs-pdf/iw8bene.pdf.*

4.      **Submit.** Email scanned **PDFs** of (a) the **complete**, **signed** contract, and (b) your completed tax form, to contractadmin@theorchard.com.

*NOTE:* Orchard does not accept photographs of documents. ***Please send us all pages of the contract (including all schedules and attachments) and tax forms (not just the pages you have signed); otherwise, we will NOT be able to activate your account.***

5.      **Start Delivery.** Once we receive your completed documents, an Orchard representative will contact you via email with login information for your Orchard Workstation account so that you can deliver your first batch of releases through Orchard's Release Builder program.

# EXHIBIT L



Kobalt®

Kobalt Music Services America, Inc.
2 Gansevoort Street, 6th Floor
New York, NY 10014
United States of America
Tel: +1 (212) 247-6204
www.kobaltmusic.com

Dated:  July 27, 2022

Real Hasta La Muerte LLC
f/s/o Emmanuel Gazmey-Santiago p/k/a "Anuel AA"
c/o Singh, Singh & Trauben, LLP
400 South Beverly Drive
Suite 240
Beverly Hills, CA 90212
ATTN: Simran Singh, Esq.

Dear all,

Reference is made to that certain administration agreement dated as of October 25, 2018 by and between Kobalt Music Services America, Inc. ("**Kobalt**") and Real Hasta La Muerte LLC f/s/o Emmanuel Gazmey-Santiago p/k/a "Anuel AA" d/b/a Gazmey Music Publishing (ASCAP) ("**you**"), as the same may have been amended or modified (the "**Agreement**"). All terms not specifically defined herein shall have the same meaning ascribed to them in the Agreement.

Notwithstanding anything to the contrary in the Agreement and for good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the parties hereby agree, with effect from the date hereof, to amend the Agreement as follows:

1.  The Term shall be extended for a period of three (3) years from September 30, 2022 (i.e., until September 30, 2025) (such extended period being the "**2022 Extension Period**"). For the avoidance of doubt, the remaining provisions of paragraph 2(i) of the Agreement shall apply to the 2022 Extension Period.

2.  The parties hereby agree that paragraph 2(iv) of the Agreement shall be deleted in its entirety and replaced with the following:

    *"The "**Rights Period**" shall mean the Term with an additional consecutive five (5) year period. Administrator shall be granted the exclusive rights under this Agreement for the Rights Period in respect of each Composition. For the avoidance of doubt, the Collection Period shall follow the expiration of the Rights Period."*

3.  In consideration of your grant of rights herein Kobalt shall, during the Term, pay to you an advance of up to Ten Million U.S. Dollars ($10,000,000) (the "**2022 Advance**") which amount is inclusive of a Twenty Nine Thousand Five Hundred U.S. Dollar ($29,500) contribution towards the legal fees of your attorney, Simran Singh, Esq., which amount shall be paid, solely as an accommodation to you, per your irrevocable instructions, directly to Singh, Singh & Trauben, LLP. For the avoidance of doubt, neither Simran Singh, Esq. nor Singh, Singh & Trauben, LLP will be deemed third party beneficiaries under the Agreement nor will they be deemed to have acquired any rights whatsoever as against Kobalt by virtue of the terms of this amendment. The 2022 Advance shall be fully recoupable against all royalties, fees and other monies payable to you pursuant to the Agreement. You give the following specific warranties with respect to the 2022 Advance:



DocuSign Envelope ID: 9942C1DS-A4C8-46DB-9A76-153DE3DA5676

(a)     no less than an average of thirty five percent (35%) of each of the fourteen (14) compositions which appear on the next forthcoming in-studio full length artist album recorded and released by Anuel AA (the "**Subject Album**") shall be Compositions under the Agreement;

(b)     the Subject Album shall be Fully Commercially Released (as defined below) by Orchard Enterprises NY, Inc. ("**The Orchard**") throughout the United States of America prior to August 31, 2022;

(c)     Kobalt shall be able to collect, from inception, all royalties, fees and other monies (excluding only the so-called "writer's share" of public performance income) arising in the Territory in connection with your share of the Compositions (including, without limitation, those Compositions embodied on the Subject Album); and

(d)     the gross mechanical royalty rate per unit in respect of the exploitation of your share of the Compositions in the United States of America and/or Canada shall be paid at not less than full statutory rate in each case.

For the purposes hereof, "**Fully Commercially Released**" means that the Subject Album: (i) has been made available by The Orchard to the general public via the digital service providers set out in Schedule A attached hereto ("**Key DSPs**"); and (ii) includes at least one single that is actively promoted by The Orchard to terrestrial "pop" radio and Key DSP playlists in the United States of America, with an accompanying professionally produced music video which is promoted to customary outlets (e.g. VEVO).

The 2022 Advance shall be reduced on a pro-rata basis to the extent that any of the warranties set out at paragraphs 3(a) and 3(d) are not accurate and by the amount that Kobalt does not receive to the extent that the either of the warranties set out at paragraphs 3(b) and 3(c) are not accurate. You shall indemnify Kobalt against any resulting loss and Kobalt shall have the right to reduce the 2022 Advance and, if necessary, to demand repayment of (and/or offset from monies otherwise payable or creditable to you) such sums as are appropriate in the circumstances (and upon such demand you shall make such payment to Kobalt within twenty (20) business days).

4.     The 2022 Advance shall be payable during the Term and as follows:

(a)     Five Million Four Hundred Seventy Thousand Five Hundred U.S. Dollars ($5,470,500) (the "**2022 Signing Advance**") shall be payable within fourteen (14) days of the date of full execution of this amendment (the "**Execution Date**").

(b)     Twenty Nine Thousand Five Hundred U.S. Dollar ($29,500) U.S. Dollars (the "**2022 Legal Advance**") solely as an accommodation to you shall be payable directly to the order of Singh, Singh & Trauben, LLP within fourteen (14) days of the later of:

(I)     the Execution Date; and



(II)    Kobalt's receipt of your attorney's applicable invoice and your attorney's W9 form.

(c)    One Million Five Hundred Thousand U.S. Dollars ($1,500,000) (the "**Subject Album Advance**") shall be payable within fourteen (14) days of the latest of:

(I)    the date that is one (1) year following the Execution Date;

(II)    Kobalt's receipt of written confirmation that the warranties made in paragraphs 3(a), 3(c) and 3(d) above with respect to the Subject Album are accurate; and

(III)    Kobalt's receipt of confirmation from The Orchard that the Subject Album has been Fully Commercially Released by The Orchard throughout the United States of America (for the avoidance of doubt, the Subject Album Advance shall not be paid in the event that this paragraph 4(b)(III) is not met).

Notwithstanding anything to the contrary contained in the foregoing, the Subject Album Advance will be reduced by the amount of any royalties, fees or other monies which relate to exploitation of those Compositions which appear on the Subject Album which have been paid out to you between the date of recoupment of the 2022 Signing Advance and the date on which the Subject Album Advance would otherwise become due in accordance with paragraph 4(b) above.

(d)    Three Million U.S. Dollars ($3,000,000) (the "**2022 Recoupment Advance**") shall be payable within fourteen (14) days of the provision by Kobalt to you (if at all) of the first accounting statement which shows that the Advance (including, without limitation, the 2022 Signing Advance, 2022 Legal Advance and Subject Album Advance) has been seventy five percent (75%) recouped (the "**Extension Qualifying Statement**"), provided that such Extension Qualifying Statement is provided by Kobalt to you within the first twenty four (24) months of the 2022 Extension Period. Notwithstanding the foregoing, Kobalt shall notify you of the qualification for the 2022 Recoupment Advance (if at all) and you shall have ten (10) days to provide Kobalt written notice to opt out of the payment of the 2022 Recoupment Advance; provided that if you provide such "opt out" notice, the 2022 Recoupment Advance shall be deemed waived and no longer payable.

5.    The 2022 Advance shall be treated as part of the Advance and shall be subject to all terms contained in the Agreement which relate to the Advance, including, without limitation, being fully recoupable from any and all royalties arising under the Agreement. For the avoidance of doubt, (i) no payment of royalties shall be made to you until one hundred percent (100%) of the Advance (including, without limitation, the 2022 Advance) has been recouped by Kobalt out of royalties and other monies accruing to your royalty account under the Agreement; and (ii) the "**Qualifying Recoupment Date**" shall mean the date of commencement of the Accounting Period in which the accounting statement provided to you in respect of the previous Accounting Period shows that the Advance (including, without limitation, the 2022 Advance) has been recouped by you from royalties and fees arising under the Agreement relating to the exploitation of the Compositions throughout the Territory and not further or otherwise.



DocuSign Envelope ID: 9942C1DS-A4C8-46DB-9A76-13DF2DA5676

6.   The rates in respect of royalties received by Kobalt after the Qualifying Recoupment Date pursuant to Agreement (i.e., the so-called "post-recoupment rates") shall be deleted from the Agreement and replaced with the following: (A) eighty percent (80%) under paragraphs 5(iii)(a), 5(iii)(b)(I), 5(iii)(c) and 5(iii)(d)(I) of the Agreement (i.e., print, mechanical, synchronization royalties and any other income); and (B) sixty percent (60%) under paragraph 5(iii)(f) of the Agreement (i.e., performance royalties). In addition, effective as of the Accounting Period commencing on July 1, 2022 (i.e., Q3 2022), the rates in respect of synchronization royalties pursuant to paragraph 5(iii)(c) of the Agreement received by Kobalt prior to the Qualifying Recoupment Date shall be seventy five percent (75%).

7.   The parties hereby agree that all references to "Cover Recordings" and "Co Written Compositions" shall be deleted from the Agreement.

8.   You hereby request and authorize that Kobalt, per your revocable instructions and solely as an accommodation to you, pay the Eli Override as directed and defined in Schedule B attached hereto. For the avoidance of doubt, the override letter of direction to Singh, Singh & Trauben, LLP set forth in Schedule Five of the Agreement shall apply to the 2022 Advance.

9.   Except as set forth herein, the Agreement is unmodified, and is hereby ratified and affirmed in all respects. This amendment may be executed by pdf and the same shall be fully binding. To the extent of any contradiction, ambiguity or conflict between the terms of this amendment and the terms of the Agreement, the terms set out in this amendment will prevail.

Please sign and return this letter to confirm your agreement to this amendment of the Agreement.

Yours sincerely,                                    Read and agreed,

**Kobalt Music Services America, Inc.**           **Real Hasta La Muerte LLC**
                                                  **f/s/o Emmanuel Gazmey-Santiago**
                                                  **p/k/a "Anuel AA" d/b/a Gazmey**
                                                  **Music Publishing (ASCAP)**

By: _James Array_                                 By: _Emmanuel Gazmey Santiago_
Name:  James Array                                Name:
Title:  Head of Business Affairs                  Title:

                                                  _Emmanuel Gazmey Santiago_
                                                  **Emmanuel Gazmey-Santiago**
                                                  **p/k/a "Anuel AA", individually**



**Schedule  A**

**Key DSPs**

iTunes
Apple Music
Deezer
Soundcloud
Spotify
YouTube
YouTube Music
YouTube Premium
Amazon Music
Amazon Prime
Amazon Music Unlimited
Pandora
Tencent Music



**Schedule B**

**Eli Override Letter Of Direction**

Real Hasta La Muerte LLC

f/s/o Emmanuel Gazmey-Santiago p/k/a "Anuel AA"

c/o Singh, Singh & Trauben, LLP

400 South Beverly Drive

Suite 240

Beverly Hills, CA 90212

ATTN: Simran Singh, Esq.

Kobalt Music Services America, Inc.

2 Gansevoort Street

6th Floor

New York, NY 10014

Attn: Royalty Department

Date:  July 27, 2022

1.    Reference is made to that certain administration agreement between Kobalt Music Services America, Inc. ("**you**") and Real Hasta La Muerte LLC f/s/o Emmanuel Gazmey-Santiago p/k/a "Anuel AA" d/b/a Gazmey Music Publishing (ASCAP) ("**me**") dated October 25, 2018, as modified by that certain amendment dated as of the date hereof (the "**2022 Amendment**") (collectively, the "**Kobalt Agreement**"). Subject to the terms hereof, I hereby request and authorize you to make payment of the Eli Override (as defined in clause 2 below) to Eli Entertainment LLC ("**Eli Entertainment**"). All terms not specifically defined herein shall have the same meaning ascribed to them in the Kobalt Agreement.

2.    The "**Eli Override**" shall, unless otherwise advised in writing, mean ten percent (10%) of all royalties, advances and other payments otherwise due and payable to me following the date hereof pursuant to the Kobalt Agreement (for the avoidance of doubt, after the deduction of your commission) from all sources (including, without limitation, ten percent (10%) of the 2022 Advance to the extent payable pursuant to the 2022 Amendment).

3.    Payments to Eli Entertainment pursuant to this authorization shall be made at the same time and on the same basis as payments are rendered to me (i.e., quarterly within sixty five (65) days). For the avoidance of doubt, all such payments will be subject to any recoupment provisions of the Kobalt Agreement and to your indemnity, withholding and related rights as set forth in the Kobalt Agreement.

4.    Your compliance with this authorization will constitute an accommodation to me alone. All payments to Eli Entertainment under this authorization will constitute payment to me and you will have no liability by reason of any erroneous payment or failure to comply with this authorization. For the avoidance of doubt: (i) Eli Entertainment will not be deemed a third party beneficiary of the Kobalt Agreement; (ii) Eli Entertainment will have no rights whatsoever as against you pursuant to the Kobalt Agreement or otherwise; and (iii) without limiting the foregoing, this authorization may be revoked by me upon written notice to you (and in such event, you will prospectively implement such revocation as promptly as reasonably practicable, as determined by you in your sole good faith business judgment). I will indemnify and hold you, and your affiliates, harmless



DocuSign Envelope ID: 9942C1D5-A4C8-46DB-8A76-143DE9DA5676

from and against any loss, damage and/or expense (including attorney's fees and costs) by reason of any third party claim (including from Eli Entertainment) related to the subject matter of this letter.

5.    All monies becoming payable under this authorization will be remitted to Eli Entertainment by electronic transfer into the account the details of which are set out below and will not, for the avoidance of doubt, be accompanied by statements with respect to those payments.

| | |
|---|---|
| Bank Name: | Chase Bank |
| Acct #: | 321513589 |
| Routing #: | 267084131 |
| Acct Name: | Eli Entertainment LLC |

6.    Eli Entertainment shall complete a "W9" tax form as set out in the attached Exhibit A hereto and return the same to you at the time of execution of the Kobalt Agreement.

Yours faithfully,

**Real Hasta La Muerte LLC**
**f/s/o Emmanuel Gazmey-Santiago p/k/a "Anuel AA"**
**d/b/a Gazmey Music Publishing (ASCAP)**

By: _Emmanuel Gazmey Santiago_
    DocuSigned by:
    EC022D22A5DD425...
Name:
Title:



DocuSign Envelope ID: 9942C1D5-A4C8-46DB-9A76-153DE9DA5676

**<u>Exhibit A</u>**

**W9 Form**



# EXHIBIT M



THE LEADER IN LIVE LATIN ENTERTAINMENT

## TERM SHEET

This binding Term Sheet is entered into as of January 11, 2022 ("**Effective Date**") between Cardenas Marketing Network, Inc., ("**CMN**") and Real Hasta La Muerte LLC ("**COMPANY**"). CMN and COMPANY shall each be referred to individually as a **"Party"** and collectively as the **"Parties"**.

| | |
|---|---|
| **Territory** | Worldwide territory.  The breakdown will be as follows (subject to opt-out):<br>(1) 105 concerts in USA, Canada and Puerto Rico ("USA Concerts");<br>(2) 50 concerts in Latin America; and<br>(3) 20 concerts in Europe<br><br>Totaling 175 concerts.  The concerts in Latin America and Europe shall be referred to as "Booking Concerts". |
| **Term** | The Term runs from the date of execution of the agreement through the last date of the 175 concerts, provided that after the Artist performs 50 USA Concerts either CMN or the Artist may opt-out.   In the event of an Opt-Out, then (except for performing any confirmed concerts and returning any unearned advances), neither party shall have any ongoing rights. |
| **Rights & Structure** | CMN shall be Artist's exclusive promoter, except as otherwise mutually agreed in a writing signed by both Parties, in connection with Artist's music performances in the Territory during the Term such that:<br>(1) USA Concerts: CMN shall produce USA Concerts;<br>(2) Booking Concerts: CMN and Relentless shall act as co-booking agents for Booking Concerts as follows: (a) CMN shall earn a booking commission of 15%; (b) Relentless shall lead negotiations with promoters; (c) Relentless shall secure Artist's approval for bookings; (d) CMN shall draft and send agreements to promoters using CMN's form agreements (Relentless shall review/approve terms in advance), such agreements to be signed by Artist's Co. and promoter; and (e) promoter shall make payments to CMN—CMN shall release 85% to Artist Co. |
| **USA Concerts** | In connection with each USA Concert, CMN shall pay Artist Co. the greater of:<br>(1) $400,000.00 all-in (inclusive of travel, production and any other expense); <u>OR</u><br>(2) 85% of the Tour Leg Net Revenue (i.e. tour leg gross revenue less expenses across all of the concerts as part of that tour leg), this percentage shall be cross-collateralized and paid out after the final concert of that USA Concert's tour leg |
| **LATAM & Europe Booking** | In connection with each concert in Latin America and Europe CMN shall pay Artist Co. a fee of: 85% of the Net Artist's Fee.<br><br>Net Artist Fee is as the term is customarily used: the Gross Fee paid by the promoter less mutually approved expenses (e.g. in a landed deal private jet, flights and per diems would be reduced from the Gross Fee to arrive at the Net Artist's Fee before the commission split<br><br>In connection with Booking Concerts: CMN shall receive all funds from the local promoter and shall release 85% to Artist Co. |
| **Advanced Payment Schedule** | In connection with the USA Concerts:<br><br>**$6,000,000.00**—Payable upon execution of the Artist Performance Agreement. |

1459 WEST HUBBARD ST.  |  CHICAGO, IL  |  60642  |  312.492.6424  |  CMNEVENTS.COM



THE LEADER IN LIVE LATIN ENTERTAINMENT

| | |
|---|---|
| | **$6,000,000.00**—Payable 15 days before the first show of the first leg of the USA Concerts, provided that Artist shall provide confirmation at least 60 days before this payment is due that Artist has contracted and paid for all production elements as part of the first leg of USA Concerts. |
| | After each First Leg Concert **$100,000.00** shall be deposited into an escrow account to be applied as an advance towards the second tour leg. *For example: $100,000 x 30 concerts = $3,000,000.00.* The triggers to release the escrow payments to Artist include that Artist is ready, willing and able to perform (i.e. not disabled or imprisoned); second leg is on sale; artist having life/disability in place and such other triggers as mutually agreed. |
| | **$2,500,000.00**—Payable upon the on sale of the Second Leg. <br> **$2,500,000.00**—Payable 15 days before the first show of the second leg of the USA Concerts, provided that Artist shall provide confirmation at least 60 days before this payment is due that Artist has contracted and paid for all production elements as part of the second leg of USA Concerts. |
| | All amounts due from CMN to Artist shall also be conditioned on Artist paying for an effective life and disability policy (as approved and directed by CMN) in the amount of greater of: $12,000,000 or to the extent of any unearned advance payment. CMN shall be the sole owner, sole beneficiary and sole loss payee of such insurance policies. |
| **Comp Tickets** | Each party shall receive 100 comp tickets in Primary Markets and 50 tickets in Secondary Markets with ticket allocation for each party being 50% of tickets in Section P1 and 50% of tickets in P2 |
| **Confidentiality** | The Parties shall keep confidential this Term Sheet and all information exchanged pursuant to this Term Sheet except to the extent: (i) disclosure is mutually agreed to in writing by the Parties; (ii) a Party shares such information with its accountants or attorneys; (iii) disclosure is ordered by a court of competent jurisdiction; (iv) the information is in the public domain prior to the Party's receipt of such information; or (v) the information is disclosed to the public by a source other than the receiving Party. |
| **Reps and Warranties** | COMPANY represents and warrants that: (a) it has entered into an exclusive agreement with the Artist, pursuant to which COMPANY is entitled to accept engagements on behalf of the Artist and confirms the right to furnish the Artist at any such engagement, including to right to enter into this Agreement; and (b) there are no conflicting agreements (whether written or verbal) which in any way limit, restrict, frustrate the purpose of the subject matter of this agreement, violate and/or constitute a default under this Agreement. |
| **Indemnity** | Standard mutual indemnity (i.e. for parties' acts, omissions, breach of contract, breach of representations and warranties, etc.). Additionally, COMPANY shall indemnify, defend and hold CMN harmless from any third party claims brought by Artist's prior concert promoter(s) (or any other third-party alleging to have any right (contractual or otherwise) to promote and/or produce Artist's Concerts (a "Prior Promoter Claim"), provided that CMN shall have the right to maintain control of the conduct of the defense of claims against CMN and COMPANY shall reimburse CMN for all its attorney's fees and costs incurred in connection with any such defense, provided that CMN's attorney's fees shall not exceed $495/hour and CMN shall provide COMPANY with visibility as to any billings on an as-requested basis and shall provide an invoice on a monthly basis. CMN shall have a right of offset for any Prior Promoter Claim(s). |





THE LEADER IN LIVE LATIN ENTERTAINMENT

Upon execution of this Term Sheet, the terms herein shall be binding on both Parties, provided that: (i) the Parties shall agree to negotiate, in good faith, the terms of a comprehensive Performance Agreement with additional terms; and ii) in all instances the terms contained in this Term Sheet shall continue to be binding on the Parties.


**CARDENAS MARKETING NETWORK, INC.**

Signed: _____          Date: ____1 - 13____, 2021

Print Name: Henry Cardenas

Title: President


**REAL HASTA LA MUERTE LLC.**

Signed: _____          Date: ____1-13____, 2021

Print Name: _Frabian Eli Carrion_

Title: _Presidet / Manager_

# EXHIBIT N

*UFC*

### SPONSORSHIP INSERTION ORDER

**Sponsor Name**: Buena Vibra Group ("**Sponsor**")
**Address**: B5 Calle Tabonuco Suite 216 PMB 261 Guaynabo Puerto Rico 00968
**E-mail**: mperez@buenavibrapr.com
**Phone**: 7877262600
**Attn:** Jose Max Perez

**Company Name**: Zuffa, LLC d/b/a Ultimate Fighting Championship ("**Zuffa**")
 6650 S. Torrey Pines Drive Las Vegas, Nevada 89118
 **Attn**: Ike Lawrence Epstein, SEVP & COO, lepstein@ufc.com
 Riché McKnight, General Counsel, rmcknight@ufc.com
 Frank Lamicella, Senior Counsel, flamicella@ufc.com

**Effective Date**: The latter date upon which both parties have executed this Agreement ("**Effective Date**")

**Territory**: Global ("**Territory**")

**Sponsorship Fee**: Sponsor shall pay Zuffa a Sponsorship Fee totalling Two Million Dollars (US$2,000,000).

- 25% of the Sponsorship Fee shall be paid no later than the Effective Date
- 25% of the Sponsorship Fee shall be paid no later than June 1, 2022
- 25% of the Sponsorship Fee shall be paid no later than August 1, 2022
- 25% of the Sponsorship Fee shall be paid no later than October 1, 2022

The Sponsorship Fee and any and all other fees payable hereunder by Sponsor to Zuffa represent net amounts after applicable withholding taxes and deductions.

Sponsor shall also provide Zuffa with the benefits set forth on Schedule B.

**Events**: The UFC Pay-Per-View and Fight Night events, or Dana White's Contender Series events, as applicable, as set forth on Schedule A (each an "**Event**" and collectively, the "**Events**").

**Marketing Rights & Designation**: Subject in all cases to this Agreement, and Section 3 in particular, Sponsor may use UFC Materials across local advertising and promotions (including on its social media channels) within the Territory in its capacity as a sponsor, which may include:



- Use of UFC Materials, including event marks and style guide
- Ability to run local promotions (at Sponsor's sole cost and expense) offering customers UFC prizes and experiences, number to be mutually agreed upon.
- A mutually agreed PR campaign during key milestones of the partnership, including announcement
- Access to approved UFC photos via Getty Images, with a 25% partner discount

Sponsor will be designated as an Official Partner of UFC.

**Term**: Unless terminated earlier as provided in this Agreement, the term shall commence on the Effective Date and terminate on December 31, 2022.

**Wiring Instructions**:  Sponsor shall pay the sponsorship fee via wire transfer per the wiring instructions below:

Name: Zuffa, LLC
Mailing Address: 6650 S. Torrey Pines Drive
Las Vegas, NV 89118

Bank name: Wells Fargo
Bank address: 3800 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89109

Bank wire contact: Leisha Pippin
(702) 791-6344 - Phone
(702) 791-6365 - Fax

SWIFT Code WFBIUS6WFFX
Bank account # 4121354807
ABA # 121000248

Zuffa Contact:
Nelva Fennell
Sr. Manager, Treasury
(702) 410-8577
nfennell@ufc.com

**Sponsorship Benefits**: Zuffa will provide Sponsor with the sponsorship benefits set forth on Schedule A with respect to the Ultimate Fighting Championship mixed martial arts promotion ("**UFC**") in the Territory during the Term. If any specific benefit to be provided by Zuffa to Sponsor under this Agreement is not made available for any reason (including, without limitation, due to Zuffa's inability to deliver certain benefits to Sponsor due to COVID-19 and related events (such as quarantines and shutdowns), athletic commission requirements and/or venue requirement), Zuffa shall provide Sponsor with a "make-good" benefit of similar economic value.  Zuffa will not incur any additional liability to Sponsor; and the total Sponsorship Fee shall remain the same and Sponsor shall still be obligated to pay the total Sponsorship Fee hereunder in full.

The parties have executed this Insertion Order, Schedule A, and Standard Terms and Conditions (collectively, this "**Agreement**") attached hereto effective as of the Effective Date hereof and shall be binding on the parties with full and legal force.

**ACCEPTED AND AGREED**:

**ZUFFA, LLC d/b/a Ultimate Fighting Championship**
By:

Name: Ike Lawrence Epstein

Title: SEVP & COO

Date: 4/27/2022

**BUENA VIBRA GROUP**
By:

Name: Jose Max Perez

Title: Partner

Date: 4 / 20 / 2022

## SCHEDULE A

Sponsorship Benefits

All Sponsor logo, voiceover and/or other Sponsor-provided content for purposes of inclusion in any of the below Sponsorship Benefits shall be subject to the approval of Zuffa not to be unreasonably withheld, delayed nor conditioned.

---

**LIVE EVENT MARKETING ASSETS**

**In-Octagon Branding:**

- **Peripheral Canvas:**
  - Sponsor logo and slogans will be featured on one (1) peripheral canvas position at:
    - All UFC Pay-Per-View Events during the Term

**PPV Broadcast Integration:**

- **Event Announcement (on-air):**
  - Sponsor will receive a :05 - :10 live read in advance of the main or co-main Event at all UFC Pay-Per-View Events during the Term
    - Feature will run one (1) time



- **Celebrity Shot:**
  - Sponsor will receive the "Celebrity Shot" feature, highlighting Anuel's presence in-arena
  - Feature includes a static or animated logo placement on broadcast and :05 voiceover
  - Feature will run One (1) time on the main card during the pay-per-view broadcast at:
    - Four (4) UFC Pay-Per-View Events· during the Term

---

**IN-VENUE**

- **In-Venue Commercial:**
  - Sponsor will receive one (1) :60 in-venue commercial, running a minimum of two (2) times at:
    - All UFC Pay-Per-View Events during the Term

---

**SOCIAL MEDIA**

- **Presenting Partner of UFC Social Media Posts:**
  - Sponsor will receive a logo integration into UFC social media posts and will feature paid partnership tag. Posts to be featured on @UFC Facebook, Twitter, and Instagram. Post type is subject to available inventory.

  - **Sponsor to receive:**
    - Ten (10) Social Post Sets

- **@UFC Instagram Stories Social Media Posts:**
    - Co-branded image or video (:15 max) to be posted on UFC IG Stories
    - Includes paid partnership tagging and sticker tag (to allow for Sponsor reposting
    - Sponsor to receive:
        - Ten (10) IG Stories Posts

---

## HOSPITALITY

### Event Tickets:

Sponsor to receive ten (10) P1 Floor & Center Riser Tickets to four (4) UFC Pay-Per-View Events during the Term.

---

## DANA WHITE'S CONTENDER SERIES

### Dana White's Contender Series:

- **Peripheral Canvas:**
    - Sponsor logo and slogans will be featured on two (2) peripheral canvas positions at:
        - All Dana White's Contender Series events during the Term

## SCHEDULE B

Marketing Benefits for Zuffa

- Sponsor hereby grants to Zuffa a royalty-free, perpetual, irrevocable license, free and clear of all encumbrances, to Sponsor's music (including sync rights, catalog rights, master rights and all other rights) from his three albums (Real Hasta la Muerte, Emmanuel, Las Leyendas Nunca Mueren) to be used for live UFC events, use in UFC Performance Institute, and other approved uses.
- Zuffa may develop custom co-branded merchandise using Anuel & RHLM brand rights and likeness and Zuffa shall be entitled to keep 100% of revenues.
- Anuel AA to use best efforts to be available for appearances at UFC events, such as e-sports tournament, etc.

**Anuel World Tour Sponsorship Package:**
- UFC logo integration on ad mat
- Zuffa in-venue video before World Tour event begins (at each event)
- All integrations and sponsorship elements must be approved by Zuffa in writing before any use by Sponsor
- Sponsor solely responsible for all expenses associated with the World Tour Sponsorship.

**Social Promotion:**
- Sponsor to post approved UFC Materials requested by Zuffa across Anuel AA's active social media channels

### Additional Opportunities:



- **EA Sports UFC Video Game:**
  - Sponsor hereby grants to Zuffa a royalty-free, perpetual, irrevocable license to use Anuel AA's music and likeness in the UFC EA Sports video game franchise.

- **Content:**
  - Sponsor to participate in good faith in other opportunities for additional content with Anuel AA, such as a podcast series similar to Dana White Looking for a Fight, etc.

- If requested by Zuffa, Sponsor to provide additional event support to Zuffa in Puerto Rico.

**STANDARD TERMS AND CONDITIONS**

1. **Sponsorship.** Zuffa agrees Sponsor shall be a non-exclusive sponsor of the UFC during the Term and in the Territory, and Sponsor understands and agrees that Zuffa retains all rights and abilities to grant other sponsorship rights to third parties. Sponsor further understands and agrees that UFC fighters, their affiliates and corner men are not covered by this Agreement and may wear or exhibit competitive brands or businesses. The parties acknowledge and agree that, notwithstanding anything to the contrary herein, to the extent that it is not expressly provided herein which party shall have the right to determine the specific details, timing or composition of the sponsorship benefits provided to Sponsor, such right shall be held exclusively by Zuffa.

2. **Sponsorship Fee.** Sponsor shall pay Zuffa the Sponsorship Fee according to the terms and conditions set forth in the Insertion Order.

3. **Advertising and Promotion.** Zuffa agrees to grant Sponsor the benefits as stated in Schedule A. Sponsor shall not use the UFC Brands or UFC Materials without the prior written approval of Zuffa (which may be withheld in its discretion). To the extent that Zuffa provides Sponsor with such written consent, all usage of the UFC Brands or UFC Materials must comply with UFC guidelines, requirements and directions (collectively, "**UFC Guidelines**"), and such use shall be limited solely to the purposes of publicity and promotion of the Events during the Term Sponsor acknowledges that all non-Event specific UFC imagery must be licensed directly from Getty Images, Inc.  No photo or footage may be altered by Sponsor.  All uses of the UFC logo and imagery (including without limitation, audiovisual clips, pictures and ads) (collectively, "**UFC Content**") require prior written approval from Zuffa (which may be withheld in its discretion).

    a. "**UFC Brands**" shall mean the UFC trade names, trademarks, services marks, logos and slogans.

    

    b. "**UFC Materials**" shall mean the UFC Brands, UFC Content, any audio-visual and/or data content connected to UFC owned or controlled by Zuffa, any fighters' images and/or any other materials provided by Zuffa to Sponsor under this Agreement.

4. **Sponsor's Obligations.** In consideration for the recognition stated in Section 1 above, Sponsor agrees to:

    a. promptly supply all necessary artwork of Sponsor's logo to Zuffa;

    b. promptly review and return any drafts of artwork or written copy to Zuffa;

    c. permit Zuffa to review and approve, in its sole discretion, all proposed advertising and/or promotional materials in which Sponsor proposes to include the UFC Materials;

    d. properly use (i.e., in strict compliance with UFC Guidelines) all of UFC Materials in any promotional material, publicity or advertising that Zuffa permits Sponsor to use (after UFC review and approval);

    e. use only UFC Materials provided and approved by UFC in compliance with UFC Guidelines and this Agreement.

5. **Termination.**

a. Zuffa may terminate this Agreement without notice and without any further obligation whatsoever to Sponsor if the Sponsorship Fee, and/or any part of the Sponsorship Fee, is not received by Zuffa as set forth in the Insertion Order or Sponsor breaches Section 6.b.vi. Such termination by Zuffa shall not prejudice any other legal or equitable rights that Zuffa may have against Sponsor for breach of this Agreement.

b. Either party may terminate this Agreement, effective upon the other party's receipt of termination notice, without prejudice to any legal or equitable rights to which such terminating party may be entitled, upon the occurrence of any one or more of the following:

 i. Material default by the other party in performance of any of the provisions of this Agreement, which default is not cured within three (3) business days following written notice of such default to the defaulting party.

 ii. If the other party (a) files a voluntary petition in bankruptcy; (b) is adjudged bankrupt; (c) has a court assume jurisdiction of its assets under a federal reorganization act; (d) has a trustee or receiver appointed by a court for all or a substantial portion of the assets of such party; (e) becomes insolvent or suspends its business; or (f) makes an assignment of its assets for the benefit of its creditors except as required in the ordinary course of business.



6. **Representations and Warranties.**

a. Zuffa represents, warrants, and covenants to Sponsor as follows:

 i. it is a limited liability company duly organized under the laws of the State of Nevada and will remain in good standing and qualified to do business;

 ii. it has the full right and legal authority to enter into and fully perform this Agreement in accordance with its terms;

 iii. this Agreement, when executed and delivered, will be a legal, valid and binding obligation in accordance with its terms; and

 iv. the execution and delivery of this agreement have been duly authorized by Zuffa, and such execution, delivery and the performance by Zuffa of its obligations hereunder do not and will not violate or cause a breach of any other agreements of obligations to which it is a party or by which it is bound, and no approval or other action by any third party is required in connection herewith.

b. Sponsor represents, warrants and covenants to Zuffa as follows:

 i. it is duly organized under the laws of its State of formation and will remain in good standing and qualified to do business throughout the Term;

 ii. it has the full right and legal authority to enter into and fully perform and grant the licenses in this Agreement in accordance with its terms;

    iii.    this Agreement, when executed and delivered, will be a legal, valid and binding obligation in accordance with its terms;

    iv.    the execution and delivery of this Agreement have been duly authorized by Sponsor, and such execution, delivery and the performance by Sponsor of its obligations hereunder do not and will not violate or cause a breach of any other agreements or obligations to which it is a party or by which it is bound, and no approval or other action by any third party is required in connection herewith; it is not necessary for Zuffa to obtain the consent or permission of, or to pay any amounts to, any person, corporation or other third party in order to fully enjoy the rights granted hereunder; and Zuffa's exercise of the rights granted hereunder will not violate or infringe upon the trademark, tradename, copyright or artistic and/or other rights of any third parties;

    v.    that it is in compliance with all applicable laws, legislation, codes of practice, standards, guidelines and regulations (the "**Applicable Law**") and shall remain in accordance with all Applicable Law to the extent applicable to this Agreement, its obligations hereunder, and its business generally.



  c.  Furthermore, if Sponsor holds any contests, sweepstakes or promotions during the Term with Zuffa's consent, Sponsor shall be responsible for the administration, operation, and promotion thereof, including all costs, and winner determination of any contest and shall be responsible for all dealings with the winner.  Upon prior approval, Zuffa may provide prizing for contests, but shall have no other responsibilities to Sponsor or the winner. If Zuffa provides a prize that involves interaction with Zuffa personnel or UFC athletes, such prize will only be provided if Sponsor has the winner submit to a background check and clear such background check to Zuffa's satisfaction.

**7.**  **Trademarks and License.**

  a.  Zuffa recognizes that Sponsor may have intellectual property rights with regard to its name, logos, service marks, collective and certification marks, trade and business marks, packaging, product configuration, functionality, trade dress, other product identification, and any verbal marks such as logos, tag lines and key identification phrases and any content provided by Sponsor to Zuffa for purposes of the sponsorship benefits hereunder (collectively, "**Sponsor's Trademarks**").

  b.  Sponsor hereby grants to Zuffa, and their respective successors, assigns, agents, directors, members, managers, officers, employees, and licensees, the non-exclusive right to use Sponsor's Trademarks in connection with publicity, advertising, exhibiting and exploiting the UFC Brand, the Event(s), at the weigh-ins, and at the pre-event and post-event press conferences, and all other commercial and non-commercial purposes, in whole or in part, in any manner whatsoever, by any and all means, media, devices, processes, and technology now or hereafter known or devised in perpetuity  throughout the universe.

  c.  Sponsor is responsible for clearing all Sponsor's Trademarks and content provided to Zuffa on a worldwide basis.  Sponsor acknowledges and agrees that the Events are distributed on a worldwide basis, notwithstanding the Territory.

d. Except as to the license granted in Section 3, Sponsor further agrees not to claim any right, title or interest of any kind or nature with respect to Zuffa's intellectual property (including, without limitation, UFC Brands) or intellectual property confusingly or substantially similar therefrom. Without limiting the foregoing restriction, Sponsor agrees not to:

   i. apply for registration, register, renew or otherwise claim ownership in Zuffa's intellectual property (including, without limitation, trademarks) or intellectual property confusingly or substantially similar therefrom with a governmental or administrative office such as the local or foreign trademark office or copyright office; or

   ii. harm, diminish, endanger, contest, oppose, hinder or otherwise adversely affect Zuffa's intellectual property (including, without limitation, UFC Brands), or assist others to do so. Should Sponsor breach the covenants set forth herein, in addition to any and all remedies available to Zuffa, Sponsor agrees to reimburse Zuffa for all fees and costs associated with resolving such breach.

8. **Expenses.** Unless otherwise specified herein, each party shall be responsible for any expenses incurred by such party in connection with this Agreement.

9. **Confidentiality.** In connection with this Agreement, each party may disclose (the "**Disclosing Party**") oral or written confidential or proprietary information ("**Confidential Information**") to the other party (the "**Recipient**"). The Recipient shall keep the Disclosing Party's Confidential Information confidential and shall not disclose such information to third parties or otherwise use such Confidential Information without Disclosing Party's prior written consent. To the extent necessary to implement the provisions of this Agreement, the Parties may disclose the confidential information to such of its employees, directors, officers, agents, representatives, affiliates, equityholders and professional advisors ("**Representatives**") as may be reasonably necessary or desirable, provided that such Representatives are under an obligation of confidentiality at least as restrictive as set forth herein and shall at all times procure compliance by such Representatives to whom such Confidential Information was disclosed to. These confidentiality obligations do not apply to Confidential Information that: (i) is legally obtained from other sources, to the knowledge of the party receiving the information, not in violation of an agreement of confidentiality; (ii) is or becomes part of the public domain through no fault (including through unauthorized disclosure) of the Recipient; (iii) was previously known to the party receiving the information without an obligation to keep such information confidential prior to its disclosure by the disclosing party or (iv) is independently developed by or on behalf of the party receiving the information without reliance on or reference to the confidential information. Each party acknowledges that compliance with this section is necessary to protect the business, goodwill, and Confidential Information of the other, and that a breach of the same will cause irreparable and continual damage for which money damages may not be adequate. If the Recipient breaches, or threatens to breach this section, the Disclosing Party may: (i) seek temporary, preliminary, or permanent injunctive relief, or other legal or equitable relief, in order to prevent such damage and (ii) money, or other damages allowed by law. The obligations of the parties under this section regarding confidential information shall survive termination, expiration or non-renewal of this Agreement. Notwithstanding anything herein to the contrary, in the event that either party is requested or required by applicable law, rule, or regulation, or order or other action of a competent judicial, regulatory, administrative, or governmental authority (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information of the other, the Recipient will provide the Disclosing Party with prompt written notice of such request or

requirement so that the Disclosing Party may seek an appropriate protective order or waive the Recipient's obligations hereunder. If, in the absence of such a waiver and failing the entry of a protective order, the Recipient, in the opinion of its legal counsel, is compelled to disclose Confidential Information, the Recipient may disclose that portion of the Confidential Information that such legal counsel advises the Recipient that the Recipient is compelled to disclose and will exercise reasonable efforts, at the Disclosing Party's cost and expense, to seek confidential treatment for that portion of the Confidential Information that is being disclosed. In any event, the Recipient will not oppose action by the Disclosing Party to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information. If requested by the Disclosing Party, the Recipient shall cooperate (at the expense of the Disclosing Party) in any action taken by the Disclosing Party to protect the confidentiality of the Confidential Information or any portion thereof.

**10. Indemnification.**



    a. Sponsor shall indemnify, protect, defend and hold harmless Zuffa, its parent, subsidiary and affiliated entities, and their respective directors, members, managers, officers, shareholders, employees and agents, and contractors (including UFC athletes who are express third party beneficiaries of this indemnity), from and against any and all third-party claims, liabilities, investigations (including any regulatory or governmental investigations), inquiries, losses, damages, injuries, demands, actions, causes of action, suits, proceedings, judgments and expenses, including without limitation attorneys' fees, court costs and other legal expenses, including without limitation, those costs incurred at the trial and appellate levels and in any bankruptcy, reorganization, insolvency or other similar proceeding (collectively, "**Claims**"), arising from or connected with any alleged or actual breach by Sponsor of any provision hereof, the inaccuracy of any warranty or representation made by Sponsor herein, libel, slander, invasion of privacy, or infringement of copyright or trademark resulting from the use and/or display of Sponsor's Trademarks or Sponsor's content in any manner, the manufacturing, advertising, promotion, marketing and sale of Sponsor's products and any other Claims arising from Sponsor's products or services, including any product liability claims, and from any and all Claims relating to sweepstakes, promotions, endorsements or ambassadorships (including Zuffa fighter endorsements or ambassadorships) or other activities operated by Sponsor and contemplated by this Agreement (including all activities relating from Schedule B), including any Claims related arising from any of Sponsor's contests, including without limitation, its administration, promotion to or and winner determination, and any Claims arising from Sponsor's negligence or willful misconduct. Zuffa shall give Sponsor prompt notice of any Claim coming within the purview of these indemnities, though failure to provide prompt notice shall not in any way extinguish or affect Sponsor's indemnity obligations to Zuffa. Upon the written request of Zuffa, Sponsor will assume the defense of any Claim against Zuffa, their parents, subsidiaries and affiliated entities, and their respective directors, members, managers, officers, shareholders, employees and agents with counsel reasonably satisfactory to Zuffa, and will upon the request of Zuffa, at Zuffa's expense, allow Zuffa to participate in the defense thereof. Sponsor shall not settle any Claim involving Zuffa without written consent from Zuffa's chief legal officer or equivalent. Settlement by the Sponsor with the prior written consent of Zuffa shall release the Sponsor from the indemnity as to the Claim so settled. Termination of this Agreement shall not affect the continuing obligations of the Sponsor to indemnify Zuffa hereunder.

    b. Zuffa shall indemnify, protect, defend and hold harmless Sponsor, its parent, subsidiary and affiliated entities, and their respective directors, member, managers, officers,

shareholders, employees and agents, from and against any and all third-party Claims, arising from or connected with any alleged or actual breach by Zuffa of any provision hereof. Sponsor shall give Zuffa prompt notice of any Claim coming within the purview of these indemnities. Termination of this Agreement shall not affect the continuing obligations of the Zuffa to indemnify Sponsor hereunder.

**11. Insurance.**

    a.  Sponsor shall obtain and maintain at its own cost and expense, the following insurance policies:

        i.  Commercial General Liability (including Products and Completed Operations, Blanket Contractual Liability and Personal and Advertising Injury) with limits not less than One Million Dollars ($1,000,000) each occurrence and Two Million Dollars ($2,000,000) in the aggregate;

        ii.  Commercial Umbrella or Follow Form Excess Liability coverage with limits not less than Five Million Dollars ($5,000,000) each occurrence and in the aggregate;

        iii.  shall name Zuffa (and upon request, any applicable Venue or other Venue-related entity) and its parent, subsidiary and affiliated entities, and its respective directors, members, managers, officers, shareholders, employees and agents as an additional insured. Coverage shall be primary and non-contributory with any coverage in place for Zuffa and shall include a waiver of subrogation in its favor.



    b.  If Sponsor and/or Sponsor's employees are present at an Event (including without limitation, due to the operation of a "marketing" booth, stand or table, or otherwise), Sponsor shall also obtain and maintain at its own cost and expense Workers Compensation including Employers Liability with a limit not less than One Million Dollars ($1,000,000) and shall include a waiver of subrogation. Sponsor shall furnish Zuffa with Certificates of Insurance for each required policy promptly and each policy shall include thirty (30) days' notice of cancellation or non-renewal.

**12. Intellectual Property.** All writings, ideas, graphics, photographs, and recordings (both audio and visual) created pursuant to this Agreement, including, without limitation, content, commercials, programming, compositions, titles, characters, plots, themes, stories, or any other creations originated, prepared, suggested or devised, and all elements thereof and any results and proceeds from those contributions, excluding Sponsor's Trademarks — shall be solely owned by Zuffa.

**13. Taxes.** Sponsor agrees to cooperate with Zuffa's tax department to determine the correct rate of withholding and to withhold taxes at the correct rate, if applicable. Sponsor is responsible for payment of penalties and interest resulting from failure to withhold the correct amount of tax.

**14. Failure to Object Not a Waiver.** The failure of either party to object to or to take affirmative action with respect to any conduct of the other party which is in violation of the terms hereon shall not be construed as a waiver thereof, or of any future breach or subsequent wrongful conduct.

**15. Entire Agreement; Amendment.** This Agreement together with all Schedules and Exhibits constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. This Agreement shall not be

modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement.  To the extent Sponsor and Zuffa execute a "Digital Insertion Order" reflecting the Sponsorship Benefits set forth in this Agreement, Sponsor and Zuffa acknowledge and agree that such Digital Insertion Order shall be for administrative purposes only and shall have no force and effect, and shall otherwise be governed by the terms and conditions of this Agreement. To the extent any provision in such Digital Insertion Order conflicts with a provision in this Agreement, this Agreement shall prevail.

16. **Independent Contractor.**  Nothing contained herein shall constitute this arrangement to be employment, a joint venture, or a partnership.  Each party acknowledges and agrees that it neither has given nor will give the appearance or impression of having any legal authority to bind or commit the other party in any way.



17. **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. The parties may execute this Agreement and exchange counterparts of the signature pages by means of email transmission, and the receipt of such executed counterparts by email transmission will be binding on the parties.

18. **Advice of Independent Counsel; No Construction Against Drafter.** Each Party acknowledges that it has independently sought and received the advice of competent independent counsel regarding this Agreement. No provision of this Agreement or any related document will be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or drafted such provision.

19. **Severability.**  If any term, clause, or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause, or provision and such invalid term, clause, or provision shall be deemed to be severed from this Agreement.

20. **No Third-Party Beneficiaries.**  Nothing in this Agreement is intended, or shall be construed, to give any party, entity or individual other than the parties hereto any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions contained herein.

21. **Successors and Assigns.**  Sponsor may not transfer or assign this Agreement or its rights or obligations under this Agreement without the prior written approval of Zuffa. Zuffa may assign or transfer this Agreement to any of its affiliates or in connection with an IPO, merger, sale, sale of all or substantially all assets, reorganization, restructuring, or other bona fide corporate transaction. This Agreement and all of the terms and provisions hereof will be binding upon, and will inure to the benefit of, the parties hereto, and their respective successors and approved assigns.

22. **[Intentionally Omitted]**

23. **[Intentionally Omitted]**

24. **Force Majeure.**  If the performance of any part of this Agreement by either party is prevented, hindered, delayed or otherwise made impracticable (other than Sponsor's payment obligations) as a result of an event or series of connected events outside of either party's reasonable control and/or the reasonable control of each party's affiliates, partners, sub-contractors and/or suppliers as applicable (including, without limitation, action, inaction, illness or death of any applicable UFC

fighter, lockout, strikes or other labor and industrial disputes, failure of a utility service or transport network, act of God, war (declared or undeclared), civil commotion, terrorism, embargo, epidemic, disease, widespread illness, substantial delay or failure of, technical facilities, accident, damage or destruction, compliance with any law or governmental order, rule, regulation or direction, accident, breakdown of plant or machinery, fire, flood, hurricane, earthquake or storm or any other cause beyond the reasonable control of either party (a "**Force Majeure Event**"), that party shall be excused from such performance to the extent that performance is prevented, hindered or delayed by such causes.  Notwithstanding the foregoing, if a Force Majeure Event exists for greater than thirty (30) days and prevents Sponsor from fulfilling its obligation hereunder, Zuffa shall have the right, but not the obligation, to terminate this Agreement.

25. **Anti-Bribery/Sanctions.**

   i.   Sponsor understands that a key aspect of Zuffa's business activities and corporate culture is conducting its business in a legal, honest and ethical manner. Sponsor agrees that Sponsor and its employees and representatives shall, in the performance of this Agreement and all related activities, comply in all respects with all applicable multilateral international conventions dealing with bribery and corrupt practices  and all applicable laws and regulations dealing with bribery and corruption of any governmental authority, including, without limitation, the United States Foreign Corrupt Practices Act ("**FCPA**"), as conventions, laws and regulations may be amended from time to time. Without limiting the generality of the foregoing, Sponsor agrees that Sponsor and all of its employees, agents, contractors or representatives will not, except as permitted under the FCPA, in order to obtain or retain an advantage in the course of business, directly or indirectly give, offer to give or offer a loan, reward, advantage or benefit of any kind to a public official:

      a.   as consideration for an act or omission by the official in connection with the performance of the official's duties or functions; or

      b.   to induce the official to use his or her position to influence any acts or decisions of the foreign state or public international organization for which the official performs duties or functions. For the purposes of this Section, "public official" includes an employee of a governmental or regulatory authority, a member of a political party, and or an officer or employee of a state-owned enterprise.

   ii.   Sponsor shall be in compliance with applicable laws, rules and regulations (including embargoes, sanctions and export control regulations of the United States, the United Kingdom and any applicable jurisdiction), including, without limitation, obtaining and maintaining all necessary authorizations, approvals and consents to enter into this Agreement and perform such obligations. Sponsor represents, warrants and agrees that neither Sponsor nor any of its subsidiaries, directors or officers is the subject of any sanctions administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the U.S. State Department, the United Nations Security Council, the United Kingdom, the European Union or any member thereof (collectively, "**Sanctions**"). Sponsor shall notify Zuffa in writing no later than one (1) business day following the date on which Sponsor or any of Sponsor's employees charged with responsibilities for performance under this Agreement or any of Sponsor's subsidiaries, owners, directors or officers becomes the subject of Sanctions.  Furthermore, Sponsor agrees that nothing in this Agreement requires Zuffa to take any action that the Zuffa determines in its sole discretion would be contrary to or prohibited by any embargo, sanction or export control regulation of the United States, the United Kingdom, the European Union or any similar

event either party engages counsel in connection with the enforcement or interpretation of this Agreement or the resolution of any dispute arising from or related to this Agreement, the prevailing party shall be entitled to recover from the other party its attorneys' fees and costs, including those incurred at the trial and appellate levels and in any bankruptcy, reorganization, insolvency or other similar proceedings, and regardless of whether an action is filed. Unless otherwise provided in this Agreement, if any specific benefit to be provided by Zuffa to Sponsor under this Agreement is not made available for any reason, Sponsor's sole remedy shall be a "make-good" benefit of similar economic value, Zuffa shall not incur any additional liability to Sponsor, and Sponsor shall remain obligated to pay to Zuffa the total Sponsorship Fee hereunder in full. Zuffa shall not be liable to Sponsor for any punitive, special, indirect or consequential losses or damages including any loss of profit, business, contracts, revenues or anticipated savings (whether or not such losses were within the contemplation of the parties at the date of this Agreement), suffered or incurred by Sponsor arising out of or in connection with the provisions of this Agreement.  Zuffa's maximum aggregate liability under this Agreement shall not exceed the Sponsorship Fee. Sponsor acknowledges that Zuffa would not have entered into this Agreement if not for such foregoing cap on liability. Those Sections of this Agreement that, by their nature, are intended to survive termination will survive in accordance with their terms, including without limitation, Sections 8, 9, 10, 11, 12, 14, 15, 18, 19, 20, 26, 27, 28 and 29.



# EXHIBIT O

**2019 Frabian Carrion Bank Withdrawals (No Reference)**

**Request Supporting Documentation / Reference for Accounting**

Check Details ✕

🖥 🖨

**$25,000.00**
Total

📅 Sep 24, 2019
Post date

💳 514911225
Check #

Front   Back



Check Details ✕

🖥 🖨

**$30,000.00**
Total

📅 Dec 6, 2019
Post date

💳 504752307
Check #

Front   Back